# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Nicole Rena McCrea

5205 East Capitol St., SE

Washington, DC 20019

202/491-9656

**Plaintiff**

vs.

Civil No.: **1:16-cv-00808** *TSC*

1. The District of Columbia

Attorney General Karl A. Racine for the District of Columbia

The Office of the Attorney General of the District of Columbia

441 4th St., NW Suite 630 South

Washington, DC   20001

2. The Council of the District of Columbia

c/o General Counsel Ellen Efros

John A. Wilson Bldg  1350 Pennsylvania Ave, NW Suite 4

Washington, DC   20004

3. Mayor Muriel A. Bowser, in Official Capacity and Personal/Individual Capacity

c/o The Office of the Attorney General of the District of Columbia

441 4th St., NW Suite 630 South

Washington, DC   20001

RECEIVED
Mail Room

JUN 2 5 2018

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

RECEIVED
Mail Room

JAN 1 0 2017

Clerk of Court
of Columbia

CLERK
US DISTRICT &
BANKRUPTCY COURTS

2017 JAN 17 P 11: 42

RECEIVED

2018 JUN 22 P 4: 08

CLERK
US DISTRICT &
BANKRUPTCY COURTS

RECEIVED

4. Former Mayor Vincent Gray, in Official Capacity and Personal/Individual Capacity

c/o The Office of the Attorney General of the District of Columbia

441 4th St., NW Suite 630 South_____

Washington, DC    20001


5. The District of Columbia Police and Firefighters' Retirement and Relief Board

c/o general Counsel of DC Human Resources Margaret Radabaugh

441 4th St., NW Suite 330 South_____

Washington, DC    20001


6. Assistant Attorney General Andrea G. Comantale, Esq., in Official Capacity and

Personal/Individual Capacity

The District of Columbia Police and Firefighters' Retirement and Relief Board

441 4th St., NW Suite 330 South_____

Washington, DC    20001 and;


Assistant Attorney General Andrea G. Comantale

2015 Ashliegh Woods Court

Rockville, Md 20850


7. Assistant Attorney General Lois Hochhauser, Esq., in Official Capacity and

Personal/Individual Capacity

The District of Columbia Police and Firefighters' Retirement and Relief Board

441 4th St., NW Suite 330 South_____

Washington, DC    20001

8. Fire and EMS Chief Gregory Dean in Official Capacity and

Personal/Individual Capacity

The DC Fire and EMS Department

The Frank D. Reeves Center

2000 14th St., NW Suite 500

Washington, DC 20009


Fire and EMS Chief Gregory Dean

750 3rd St., NW Apt 502

Washington, DC 20001


9. Former Fire and EMS Chief Kenneth B. Ellerbe in Official Capacity and

Personal/Individual Capacity

The DC Fire and EMS Department

The Frank D. Reeves Center

2000 14th St., NW Suite 500

Washington, DC 20009


Former Fire and EMS Chief Kenneth B. Ellerbe

4527 Alabama Avenue, SE

Washington, DC 20019

10. Former Assistant Fire Chief of Services Larry B. Jackson, in Official Capacity and

Personal/Individual Capacity

The DC Fire and EMS Department

The Frank D. Reeves Center

2000 14th St., NW Suite 500

Washington, DC 20009


Former Assistant Fire Chief of Services Larry B. Jackson

5269 Boniwood Turn

Clinton, MD 20735


11. Battalion Fire Chief Raymond Gretz  in Official Capacity and

Personal/Individual Capacity

The DC Fire and EMS Department

The Frank D. Reeves Center

2000 14th St., NW Suite 500

Washington, DC 20009


12. Battalion Fire Chief Micheal S. Donlon, in Official Capacity and

Personal/Individual Capacity

The DC Fire and EMS Department

The Frank D. Reeves Center

2000 14th St., NW Suite 500

Washington, DC 20009

13. Former EEOC and Diversity Manager Josh Henline, Esq. in Official Capacity and

Personal/Individual Capacity

The DC Fire and EMS Department

The Frank D. Reeves Center

2000 14th St., NW Suite 500

Washington, DC 20009

14. Former DC Fire and EMS EEOC and Diversity Manager Gitana Stewart-Ponder, Esq. in

Official Capacity and Personal/Individual Capacity ;EEOC and Diversity Manager Gitana

Stewart-Ponder

The DC Department of Corrections

The Frank D. Reeves Center

2000 14th St., NW , Seventh Floor

Washington, DC 20009

15. Captain Alan Noznesky. in Official Capacity and Personal/Individual Capacity

The DC Fire and EMS Department

The Frank D. Reeves Center

2000 14th St., NW Suite 500

Washington, DC 20009

Alan Noznesky

13517 Esworthy Road

Darnestown, MD 20695

16. Lieutenant John Thornton in Official Capacity and Personal/Individual Capacity

The DC Fire and EMS Department

The Frank D. Reeves Center

2000 14th St., NW Suite 500

Washington, DC 20009


John Thornton

10035 Pages Court

White Plains, MD 20695


17. Firefighter Travis Chase in Official Capacity and Personal/Individual Capacity

The DC Fire and EMS Department

The Frank D. Reeves Center

2000 14th St., NW Suite 500

Washington, DC 20009


Travis Chase

4710 C., St., SE Apt. B

Washington, DC 20019


18. Firefighter Michael Harrison in Official Capacity and Personal/Individual Capacity

The DC Fire and EMS Department

The Frank D. Reeves Center

2000 14th St., NW Suite 500

Washington, DC 20009

19. Police and Fire Clinic/ PFC Associates, LLC.

Chief Operating Officer Marian Booker

920 Varnum St., NE

Washington, DC 20017


20. Medical Director Dr. Olusola Maloma in Official Capacity and Personal/Individual Capacity

Police and Fire Clinic/ PFC Associates

920 Varnum St., NE

Washington, DC 20017


21. Dr. Marc Cottrell in Official Capacity and Personal/Individual Capacity

Police and Fire Clinic/ PFC Associates

920 Varnum St., NE

Washington, DC 20017


22. Dr. Raquel Gordon in Official Capacity and Personal/Individual Capacity

Police and Fire Clinic/ PFC Associates

920 Varnum St., NE

Washington, DC 20017


23 Dr. Gloria Morote in Official Capacity and Personal/Individual Capacity

Police and Fire Clinic/ PFC Associates

920 Varnum St., NE

Washington, DC 20017

Dr. Gloria Morote

424 S. Washington Suite 1A

Alexandria, VA 22314

24. Director of Privacy/ Medical Services William B. Sarvis in Official Capacity and

Personal/Individual Capacity

Police and Fire Clinic/ PFC Associates

920 Varnum St., NE

Washington, DC 20017

William B. Sarvis

6406 Grainger Terrace

Upper Marlboro, MD 20772

25. Assistant Privacy Officer Frieda L. Caldwell  in Official Capacity and

Personal/Individual Capacity

Police and Fire Clinic/ PFC Associates

920 Varnum St., NE

Washington, DC 20017

26. Human Resources Administrator Denise S. Gardner in Official Capacity and

Personal/Individual Capacity

The District of Columbia Police and Firefighters' Retirement and Relief Board

441 4th St., NW Suite 340 North

Washington, DC   20001

27. Human Resources Administrator Lela Jones in Official Capacity and

Personal/Individual Capacity

The District of Columbia Police and Firefighters' Retirement and Relief Board

441 4th St., NW Suite 340 North

Washington, DC   20001

**Defendant(s)**

# SECOND AMENDED COMPLAINT

**1. Jurisdiction in this case is based on:**

☐      Diversity (none of the defendants are residents of the state where plaintiff is a resident)

☒      Federal question (suit is based upon a federal statute or provision of the United States Constitution)

☒ Other (explain) ____42 U.S.C. § 1983 and state tort laws_____

This Court has Jurisdiction under 28 U.S.C. § 1343(a)(3), 28 U.S.C. § 1343(a)(4), and 28 U.S.C.

§1331, in addition to pendent and supplemental jurisdiction of state tort claims.  This is a civil

action authorized by 42 U.S.C. § 1983 to redress the deprivation, under color of state law, of

rights secured by the Constitution of the United States and federal statutes, specifically the

federal statutory rights secured by the Americans with Disabilities Act ("ADA") and the

Rehabilitation Act ("RA"); 42 U.S.C. § 1981; 42 U.S.C. § 1985 and 42 U.S.C. § 1983.

**2. Venue**

Venue is proper in this District Court pursuant to 28 U.S.C. § 1391(b)(2); 28 U.S.C. § 1391(c)(2)

and 28 U.S.C. § 1391(g).  The Plaintiff was employed in the District of Columbia and at all times

relevant to this Second Amended Complaint, was subjected by and to the Defendants, its agents and/or its municipal laws, under color of state law.  Defendants are "persons", entities and/or individuals, subject to be sued and are located and/or conducted business in the District of Columbia. A substantial part of the events and omissions giving rise to the Plaintiff's claims occurred in the District of Columbia during the course of Plaintiff's employment with the District of Columbia and/or interactions with the Defendants.

**3. The facts of this case are:**

1. I, Plaintiff, Nicole Rena McCrea a former Firefighter/EMT of the District of Columbia Fire and Emergency Medical Services Department ("DCFEMS").  While at work, around midnight, May 30/31, 2013, the Plaintiff was the victim of a sexual harassment incident involving three other members of the DCFEMS.

2. Plaintiff was awakened out of her sleep by aggressive movement and touching along her inner right thigh.  Startled out of her sleep, the Plaintiff jumped and rolled onto her back and the hand that was groping her inner thigh feel down, in between her legs.

3. As the Plaintiff stiffened with fright, frantically trying to determine what was happening. She noticed movement to the right of her bed.  She saw two individuals to the right of her bed.  Plaintiff was able to identify the person closest to her as Firefighter Michael Harrison.  Plaintiff was not able to identify the second person; they were positioned behind and to the right of Firefighter Michael Harrison.

4. Plaintiff then noticed Firefighter Travis Chase walking towards her.  He was holding his cell phone in his raised hand as a source of light.  Firefighter Travis Chase walked up to the left side of the Plaintiff's bed and began reaching for her covers.  As he was reaching

for the covers he glanced at the Plaintiff's face, he then jumped back when he realized

that the Plaintiff was staring back at him.  Firefighter Travis Chase paused and stayed by

the Plaintiff's bed for several moments assessing rather the Plaintiff was awake or asleep

before he backed away and left.

5. The Plaintiff immediately reported the incident to the DCFEMS officers on duty; twice

   that night to Lieutenant John Thornton and once in the morning to Captain Alan

   Noznesky. Nothing was done by the DCFEMS officers on duty and the Plaintiff was

   ordered not to do or say anything to anyone about it.

6. On June 01, 2013, due to Plaintiff's perseverance in continuing to report the incident to

   DCFEMS officers of higher rank and authority, Plaintiff was ordered to call 911. The

   investigating police officers, Detective Yvette Maupin of the Special Victims Unit of the

   Metropolitan Police Department ("MPD SVU") classified the sexual harassment incident

   as a misdemeanor sexual abuse; incident report case#13-074-198.  The MPD SVU

   initiated a full investigation, which included the convening of a Grand Jury.  Deputy Fire

   Chief Pearson, Deputy Fire Chief (DFC) Milton Douglass, and Chief Kenneth Ellerbe, on

   the scene at Engine 13 during the investigation. Detective Yvette Maupin briefed Deputy

   Fire Chief Pearson, Deputy Fire Chief Milton Douglass, and Chief Kenneth Ellerbe, on

   the scene, before and after documenting and recording my June 01, 2013 statement.  DFC

   Pearson and DFC Douglas ordered me to hold my special report of the assault in

   abeyance, until after the MPD investigation.

7. On June 2, 2013, Detective Yvette Maupin contacted me by phone to document of follow

   up statements pertaining to the two earlier incidents, the race and sex debate about the

assault of a black female entertainer and the racially charged argument with Firefighter Michael Harrison prior to my assault on May 30/31, 2013.

8.  On June 03, 2013, the Plaintiff was contacted by DCFEMS EEOC and Diversity Manager Joshua Henline, Esq. regarding the assault.  The Plaintiff was also assigned and contacted by a DC victim services advocate.

9.  On June 10, 2013, the Plaintiff was subpoenaed and she testified before a Grand Jury about the May 30-31, 2013 assault; Grand Jury Investigation, case #1-1916-13. Jeff T. Cook Esq was Attorney for the government during the Grand Jury inquiry; has access to all of the testimonies, evidence and statements from the accused refusing to answer questions or pleading the 5th.

10. On June 10, 2013, before my Grand Jury testimony, Detective Maupin and her MPD Supervisor recorded my statements regarding the three incidents that occurred at Engine 1 on May 30-31, 2013, On June 10, 2013, Detective Yvette Maupin submitted to Jeff T. Cook and the Grand Jury, recordings of my initial and follow up statements documenting the three incidents that occurred at Engine 1.  Detective Maupin interviewed and documented the testimonies and physical evidence of my case, Misdemeanor Sexual abuse #13-74-198.  Detective Maupin testified at the three DCFEMS Trial Boards against Lieutenant John Thornton, Captain Alan Noznesky, Firefighter Michael Harrison and Firefighter Travis Chase.

11. Within one month of the misdemeanor sexual abuse the Plaintiff began to experience a variance of stress related somatic dysfunctions, including difficulty concentrating, difficulty falling asleep and/or staying asleep, headaches, loss of appetite, nausea, upset stomach and diarrhea.

12. On June 23, 2013, while at work, Plaintiff woke up screaming, having had a nightmare about the events that occurred during the misdemeanor sexual abuse.

13. On June 24, 2013, Plaintiff reported her health concerns to the DCFEMS personnel involved in the MPD SUV investigation of the misdemeanor sexual abuse, DCFEMS Deputy Fire Chief (DFC) Milton Douglas and DCFEMS Equal Employment Opportunity Commission (EEOC) and Diversity Manager Joshua Henline, Esq.,.

14. On June 24, 2013 Plaintiff was advised by DCFEMS EEOC and Diversity Manager Joshua Henline, Esq., to report to the PFC on June 25, 2013.

15. On June 25, 2013 the Plaintiff reported to the PFC.  While at the PFC, Plaintiff completed and submitted a DCFEMS FD-44: Report of Illness or Injury to Uniform Member. In completing the DCFEMS FD-44, Plaintiff, described the nature and the circumstances leading to her illness and/or injury to be "chronic symptoms of mental [and] physical stress due to a hostile attack while on duty [on] 05/30/2013"; requesting that her injury/illness be classified as a P.O.D. injury. Plaintiff was assessed by medical and behavioral health physicians at the PFC and was immediately placed on medical Sick Leave with a diagnosis due to acute stress reaction and behavioral sick leave with a diagnosis of adjustment disorder with mixed anxiety and depressed mood.

16. Plaintiff sought private medical and psychological treatment, in addition to concurrent medical and psychological monitoring by physicians at the PFC.

17. On July 24, 2013 Plaintiff's written request for P.O.D. [Performance of Duty] injury was verbally denied; ruled Non-P.O.D. by DCFEMS Battalion Fire Chief ("BFC") Michael Donlon at the PFC.

18. On July 31, 2013 PFC Dr. Taunya Brownlee diagnosed the Plaintiff with Acute Stress Reaction.

19. In August. 2013, the Plaintiff was informed by US Attorney General Jeff Cook that he was suspending the Grand Jury Investigation because the identified accused were either pleading the 5th or failing to cooperate with the investigation. The Plaintiff then contacted DFC Douglas after she was informed by Jeff T. Cook that he was suspending the Grand Jury investigation due to the lack of cooperation and/or invocation of the 5th amendment by Firefighter Michael Harrison and Firefighter Travis Chase.  His response was dismissive with sentiments of "so, what are you going to do".

20. On August 06, 2013, Plaintiff, as outlined in DCFEMS Order Book Article XI Part II section 9, Plaintiff filed a written appeal of the Non-P.O.D. ruling to the DCFEMS Assistant Fire Chief of Services ("AFC-S") Kenneth Jackson.

21. On September 09, 2013 DCFEMS EEOC and Diversity Manager Josh Henline, Esq., sent Plaintiff a written notice regarding the DCFEMS' receipt of a documented update, from MPD, as pertaining to the status of the MPD SVU misdemeanor sexual abuse investigation.

22. On September 11, 2013 PFC Dr. Taunya Brownlee diagnosed the Plaintiff with acute stress reaction.

23. On September 12, 2013 Plaintiff submitted a detailed Sexual Harassment Report to DCFEMS and Diversity Manager Josh Henline Esq.,

24. On September 13, 2013 Plaintiff meet with the DCFEMS EEOC and Diversity Manager Josh Henline Esq.,.

25. In September 2013, Plaintiff contacted DCFEMS EEOC and Diversity Manager Josh Henline and was informed that four DCFEMS employees were formally charged, Charge

No: U-13-245, U-13-246, U-13-247 and U-13-248 by the DCFEMS Office of

Compliance, citing Plaintiff's Sexual Harassment report to DCFEMS EEOC and

Diversity Manager Josh Henline Esq., and evidence from the MPD SVU investigation.

26. On October 11, 2013 Dr. Taunya Brownlee certified the Plaintiff for light Duty,

diagnosing the Plaintiff with Acute Stress Reaction.

27. On October 31, 2013 PFC Dr. Taunya Brownlee diagnosed the Plaintiff with Post

Traumatic Stress Disorder ("PTSD").

28. In late October 2013 a family member with government contracts with the city offered to

use his connections to get me access to then mayoral candidate Muriel Bowser.

29. From late October – mid November 2013, a female that sounded like Muriel Bowser yet

identifying herself as "Karen Todd, an attorney on Muriel Bowsers team" contacted the

Plaintiff, by phone and voice-mail, several times over the course of approximately ten

days.  The initial conversation lasting over two hours.  Each subsequent conversation

being approximately 20-30 minutes in length.  "Karen Todd" interviewed the Plaintiff

extensively about the details of the May sexual harassment-assault; how many males and

females, were at the fire house on the day of the May sexual harassment-assault;  the

subsequent MPD investigation; the Grand Jury Investigation and Plaintiff's  ability to

hire an attorney.  By mid- November "Karen Todd" was trying to steer the Plaintiff to

"let it go … repeatedly stating that the Plaintiff did not have a case."

30. Beginning November 11, 2013 the Plaintiff began to make verbal requests, to return to

work, through DCFEMS officials at PFC, PFC psychologist Dr. Raquel Gordon and PFC

Medical Director Dr. Olusola Maloma.

31. On November 21, 2013 Plaintiff filed formal charges of sexual harassment, race discrimination, sex discrimination, disparate treatment and retaliation with the DC Equal Employment Office and Commission ("DCEEOC") **[Attachment F1]**.

32. On December 04 2013 PFC Medical Director Dr. Olusola Maloma diagnosed the Plaintiff with PTSD.

33. On January 08, 2014  PFC physician's assistance JiJi Ninan returned Plaintiff to full duty, medically; diagnosing the Plaintiff with PTSD.

34. In January 2014, though having fulfilled all of the necessary training to do so, the Plaintiff was administratively barred when she attempted to get recertified for her National Registry Emergency Medical Technician and CPR credentials at the Training Academy. On February 06, 2014, the Plaintiff submitted a special report to the Training Academy; "Verification of Completed NREMT Requirements for Recertification".

35. On February 24, 2014, Plaintiff reported to a forced monitoring session at PFC with PFC psychologist Dr. Raquel Gordon. Dr. Gordon documented Plaintiff's positive progress towards a return to full duty.

36. On February 2014, the Plaintiff's home was broken into, vandalized and flooded. Due to the nature of his business, the Plaintiff sought the assistance of the family member that had directed her to "Karen Todd".  The Plaintiff then learned that the family member had been harassed since assisting her in contacting "Karen Todd", most recently, at that time his computer system for his business had been hijacked.  As the family member was consulting with the Plaintiff about the vandalism and flooding of her home, the family member mused about the possible connection of assisting me and his misfortunes. A few

days later the family member backed out of assisting the Plaintiff with the mediation of the damage caused by the vandalism.

37. On March 06, 2014, after months of verbal inquiries and no notice or ruling on her written appeal of the Non- P.O.D. ruling, Plaintiff filed a written inquiry to the DCFEMS AFC-S Kenneth Jackson requesting written notice on the status of her Non-POD appeal.

38. On March 06, 2014, the Plaintiff submitted Special Report titled "Inquiry of Special Report for NREMT Recertification; After weeks of follow up attempts, at the DC Fire and EMS Training Academy and with her Officer, Lieutenant Hosea Sampson; at one point being told by Lieutenant Hosea Sampson, "they don't want to touch you because of your status".

39. On March 10, 2014, without written notice or explanation, Plaintiff was verbally informed that her Non-P.O.D. ruling had been upheld.  The Plaintiff was immediately placed in a SL status that required her to use her annual leave and sick leave to cover her compensation.

40. On March 10, 2014, Plaintiff made another verbal complaint, in a series of verbal complaints against PFC psychologist Dr. Raquel Gordon to DCFEMS Lieutenant ("Lt") Randell Stroman at the PFC, once again citing concerns about Dr. Raquel Gordon's demonstrated lack of integrity, lack of professionalism and lack of ethics.  Upon DCFEMS Lt. Randell Stroman's recommendation, Plaintiff made an appointment to meet with DCFEMS BFC Raymond Gretz, at the PFC prior to her next forced monitoring appointment at the PFC.

41. Around March 10, 2014, in response to her March 06, 2014 Special Report, the Plaintiff was ordered by Lieutenant Randall Stroman at the Police and Fire Clinic ("PFC") to

report to the Training Academy to take the training necessary to comply with the NREMT and CPR Recertification.  Plaintiff immediately protested asserting that she had already completed and entered the necessary course work and training needed to comply with the NREMT Recertification requirements.  Upon investigation the Plaintiff discovered that all of her submitted coursework materials had been deleted.

42. Around March 10, 2014, upon being able to gather proof of completion from another online source the Plaintiff reported to Battalion Fire Chief William Baltimore to rebut the appearance that she had not fulfilled the requirements for recertification.

43. On March 24, 2014, Dr. Raquel Gordon, having not seen the Plaintiff in one month, fabricated a written patient report to trigger an unwarranted psychological evaluation; expressing unsubstantiated concerns and making fraudulent misrepresentations about the Plaintiff t's lack of progress.

44. On March 26, 2014, Plaintiff petitioned the DCFEMS Fire Chief ("FC") Kenneth Ellerbe, in writing, requesting accommodation in the form of the Advancement of Sick Leave.

45. On March 31, 2014, Plaintiff meet with DCFEMS Lt Randell Stroman, at PFC, to vehemently protest the unwarranted order that she undergo a psychological assessment when PFC is fully aware of her case and psychological status due to her forced psychological monitoring twice a month. DCFEMS Lt Randell Stroman, at PFC, acknowledged Plaintiff's protests yet insisted that the psychological assessment was a Fitness for Duty Evaluation.  Plaintiff was ordered by DCFEMS Lt Randell Stroman to cooperate with the administration of the psychological assessments.

46. The Plaintiff was administered six extensive and comprehensive psychological exams: the Minnesota Multiphasic Personality Inventory- 2 ("MMPI-2") and/or the Minnesota

Multiphasic Personality Inventory- 2 Restructured Form ("MMPI-2 RF"); The

Personality Assessment Inventory ("PAI"); the Trauma Symptom Inventory- II ("TSI-

2");  the Beck Hopelessness Scale ("BHS");  the Beck Depression Inventory-II ("BDI-

II");  the Beck Anxiety Inventory ("BAI") and a detailed forensic psychological

interview, by PFC psychologist Dr. Gloria Morote.

47. Minnesota Multiphasic Personality Inventory-2("MMPI-2"). The MMPI-2 is designed

with 10 clinical scales which assess 10 major categories of abnormal human behavior,

and four validity scales, which assess the person's general test-taking attitude and

whether they answered the items on the test in a truthful and accurate manner.  MMPI-2

is made up 10 clinical subscales, which are a result of answering certain questions on the

test in a specific manner.  1. *Hypochondriasis* (Hs) – The Hypochondriasis scale tapes a

wide variety of vague and nonspecific complaints about bodily functioning. These

complaints tend to focus on the abdomen and back, and they persist in the face of

negative medical tests. There are two primary factors that this subscale measures — poor

physical health and gastrointestinal difficulties. 2. *Depression* (D) – The Depression scale

measures clinical depression, which is characterized by poor morale, lack of hope in the

future, and a general dissatisfaction with one's life. 3. *Hysteria* (Hy) – The Hysteria scale

primarily measures five components — poor physical health, shyness, cynicism,

headaches and neuroticism. 4. *Psychopathic Deviate* (Pd) – The Psychopathic Deviate

scale measures general social maladjustment and the absence of strongly pleasant

experiences. The items on this scale tap into complaints about family and authority

figures in general, self-alienation, social alienation and boredom. 5.

*Masculinity/Femininity* (Mf) – The Masculinity/Femininity scale measures interests in

vocations and hobbies, aesthetic preferences, activity-passivity and personal sensitivity. It measures in a general sense how rigidly a person conforms to very stereotypical masculine or feminine roles. 6. *Paranoia* (Pa) – The Paranoia scale primarily measures interpersonal sensitivity, moral self-righteousness and suspiciousness. Some of the items used to score this scale are clearly psychotic in that they acknowledge the existence of paranoid and delusional thoughts. 7. *Psychasthenia* (Pt) -The Psychasthenia scale is intended to measure a person's inability to resist specific actions or thoughts, regardless of their maladaptive nature. "Psychasthenia" is an old term used to describe what we now call obsessive-compulsive disorder (OCD), or having obsessive-compulsive thoughts and behaviors. This scale also taps into abnormal fears, self-criticisms, difficulties in concentration and guilt feelings. 8. *Schizophrenia* (Sc) – The Schizophrenia scale measures bizarre thoughts, peculiar perceptions, social alienation, poor familial relationships, difficulties in concentration and impulse control, lack of deep interests, disturbing question of self-worth and self-identity, and sexual difficulties. 9. *Hypomania* (Ma) – The Hypomania scale is intended to measure milder degrees of excitement, characterized by an elated but unstable mood, psychomotor excitement (e.g., shaky hands) and flight of ideas (e.g., an unstoppable string of ideas). The scale taps into overactivity — both behaviorally and cognitively — grandiosity, irritability and egocentricity. 10. *Social Introversion* (Si) – The Social Introversion scale measures the social introversion and extroversion of a person. A person who is a social introvert is uncomfortable in social interactions and typically withdraws from such interactions whenever possible. They may have limited social skills, or simply prefer to be alone or with a small group of friends.

48. The MMPI-2 is not a valid measure of a person's psychopathology or behavior if the person taking the test does so in a way that is not honest or frank. A person may decide, for whatever reasons, to over report (exaggerate) or underreport (deny) the behavior being assessed by the test. The Minnesota Multiphasic Personality Inventory-2 (MMPI-2) contains four validity scales designed to measure a person's test-taking attitude and approach to the test: 1. **Lie** (L) – The Lie scale is intended to identify individuals who are deliberately trying to avoid answering the MMPI honestly and in a frank manner. The scale measures attitudes and practices that are culturally laudable, but rarely found in most people. In other words, people who make these items are often trying to make themselves look like a better person than they really are (or that anybody is). 2. **F** – The F scale (the "F" does not stand for anything, although it is mistakenly sometimes referred to as the Infrequency or Frequency scale) is intended to detect unusual or atypical ways of answering the test items, like if a person were to randomly fill out the test. It taps a number of strange thoughts, peculiar experiences, feelings of isolation and alienation, and a number of unlikely or contradictory beliefs, expectations and self-descriptions. If a person answers too many of the F and Fb scale items incorrectly, it will invalidate the entire test. 3. **Back F** (Fb) – The Back F scale measures the same issues as the F scale, except only during the last half of the test. **K** – The K scale is designed to identify psychopathology in people who otherwise would have profiles within the normal range. It measures self-control, and family and interpersonal relationships, and people who score highly on this scale are often seen as being defensive.

49. The Personality Assessment Inventory ("PAI") is an objective inventory of adult personality, the PAI assesses psychopathological syndromes and provides information

relevant for clinical diagnosis, treatment planning, and screening for psychopathology. The 344 PAI items constitute 22 non-overlapping scales covering the constructs most relevant to a broad-based assessment of mental disorders: four validity scales; eleven clinical scales; five treatment scales and two interpersonal scales. ***Clinical scales provide critical diagnostic features of 11 important clinical constructs****.* These 11 scales may be divided into three broad classes of disorders: those within the neurotic spectrum, those within the psychotic spectrum, and those associated with behavior disorder or impulse control problems. ***Treatment scales indicate potential complications in treatment****.* These five scales include two indicators of potential for harm to self or others, two measures of the respondent's environmental circumstances, and one indicator of the respondent's motivation for treatment. ***Interpersonal scales provide valuable information regarding the client's relationships and interactions****.* Interpersonal style is assessed along two dimensions: a warmly affiliative versus a cold rejecting style, and a dominating/controlling versus a meekly submissive style. ***Two scales assess pathology****.* The Borderline Features scale is the only PAI scale that has four subscales, reflecting the factorial complexity of the construct. The Antisocial Features scale includes three subscales: one assessing antisocial behaviors and the other two assessing antisocial traits. ***Critical Items form alerts you to issues that require immediate attention****.* This form lists 27 items (distributed across nine content areas) that suggest behavior or psychopathology that may demand immediate attention.  They are identified as critical based on two criteria: indications of a potential crisis situation and a very low endorsement rate in normal individuals.

50. The Trauma Symptom Inventory- II ("TSI-2")   The TSI is recommended for measuring a variety of trauma-related symptoms in clinical or research settings.  A broadband measure, the TSI-2 is designed to evaluate posttraumatic stress and other psychological sequelae of traumatic events, including the effects of sexual and physical assault, intimate partner violence, combat, torture, motor vehicle accidents, mass casualty events, medical trauma, traumatic losses, and childhood abuse or neglect. The TSI-2 assesses a wide range of potentially complex symptomatology, ranging from PTSD, dissociation, and somatization to insecure attachment styles, impaired self-capacities, and dysfunctional behaviors.  The TSI has 10 clinical scales that assess a variety of symptom domains related to trauma: Anxious Arousal, Depression, Anger/Irritability, Intrusive Experiences, Defensive Avoidance, Dissociation, Sexual Concerns, , Dysfunctional Sexual Behavior, Impaired Self-reference, and Tension Reduction Behavior.  Three scales (Insecure Attachment, Somatic Preoccupations, and Suicidality) and several subscales, as well as four summary factors (Self-Disturbance, Posttraumatic Stress, Externalization, and Somatization), are new or have been significantly reconfigured. The TSI also includes three validity scales that may be useful in identifying response tendencies that would invalidate the test results. These scales assess Atypical Responses, Response Level (very low reporting), and Inconsistent Responses. Eight critical items help identify issues that potentially represent severe psychological disturbance or danger to the respondent or others.  The validation sample consisted of five non-overlapping clinical groups: combat veterans, individuals with borderline personality disorder, sexual abuse victims, victims of domestic violence, and incarcerated women. A sample of subjects simulating PTSD was used to test malingering.

51. The Beck Hopelessness Scale ("BHS") measures 3 major aspects of hopelessness: feelings about the future; loss of motivation; and expectations.  It is designed to measure an individual's attitudes about their long-term future and consists of 20 true/false items with patients either endorsing a pessimistic statement or denying an optimistic statement. The BHS acts as a powerful predictor of suicidal intent.

52. The Beck Depression Inventory-second edition ("BDI-II") is a widely used 21-item self-report inventory measuring the severity of depression in adolescents and adults.  The BDI-II was revised in 1996 to be more consistent with the DSM-IV criteria for diagnosing depressive disorders and includes items measuring cognitive, affective, somatic, and vegetative symptoms of depression. The BDI-II is widely used as an indicator of the severity of depression; measure depression symptoms and severity in persons ages $\geq 13$ years. It has also been used in numerous treatment outcome studies and in numerous studies with trauma-exposed individuals. The BDI-II is 1 of 3 instruments (BDI-II, Hospital Anxiety and Depression Scale, Patient Health Questionnaire-9) endorsed by the National Institute for Health and Clinical Excellence for use in primary care in measuring baseline depression severity and responsiveness to treatment.

53. The Beck Anxiety Inventory ("BAI") is a widely used 21-item self-report inventory, rated on a scale from 0 to 3.  Each item is descriptive of subjective, somatic, or panic-related symptoms of anxiety. The BAI enables clinicians to measure the anxiety levels in adults and adolescents. It has been used in multiple studies, including in treatment-outcome studies for individuals who have experienced traumas.  Items were selected based upon their consistency with DSM-III-R criteria for anxiety disorders, with an emphasis on panic disorder and generalized anxiety disorder.  The BAI is a brief measure

of anxiety with a focus on somatic symptoms of anxiety that was developed to be adept at discriminating between anxiety and depression. It measures the severity of anxiety in adults and adolescents, giving professionals a firm basis upon which to make confident diagnostic decisions.  The *BAI* evaluates both physiological and cognitive symptoms of anxiety.

54. The series of psychological assessments administered on March 31, 2014 in addition to the nature of PFC psychologist Dr. Gloria Morote's forensic psychological interview constitutes a Forensic Sexual Harassment Assessment designed to document and assess complete psychological history and beliefs, complete sexual harassment history, complete sexual history and complete history of trauma, sexual and non-sexual.

55.  On April 02, 2014, Plaintiff meet with DCFEMS BFC Raymond Gretz at the PFC to request that her ordered/forced monitoring, be accomplished with a different PFC psychologist, reiterating her complaints about being forced to interact with PFC psychologist Dr. Raquel Gordon.  Plaintiff expressed grave misgivings to DCFEMS BFC Raymond Gretz about PFC psychologist Dr. Raquel Gordon's demonstrated lack of integrity, lack of professionalism and lack of ethics when interacting with the Plaintiff. DCFEMS BFC Raymond Gretz dismissed the Plaintiff concerns and disregarded her complaints.

56. In April 02, 2014 DCFEMS EEOC and Diversity Manager Josh Henline sent the Plaintiff a certified letter containing FMLA information.  Josh Henline stated that the DCFEMS did not know that the Plaintiff was in need of leave. Further expressing veiled statements that she to accept its terms to protect her from impending disciplinary actions.

57. On April 02, 2014, PFC Medical Director Dr. Olusola Malomo authorized an Order from PFC directing the Plaintiff to attend rehabilitation counseling for employment, <u>outside</u> of the DCFEMS.

58. On April 19, 2014, the Plaintiff submitted a Special Report, "Inquiry to Certified Letter Received April 05, 2016 through the chain of command to DCFEMS EEOC and Diversity Manager Josh Henline, expressly requesting that her Supervisors from Lieutenant to Deputy Fire Chief inform her of the "impending actions" that the DCFEMS EEOC and Diversity Manager, Josh Henline was alluding to.

59. On May 01, 2014, DCFEMS BFC Michael Donlon, PFC privacy officer William B. Sarvis, and PFC psychologist Dr. Gloria Morote, signed and submitted to the DC Police and Firefighter Retirement and Relief Board ("DCPFRRB") a grossly skewed, subjective and unsubstantiated memorandum, titled "Report of Psychological Evaluation- Disability Retirement"; PFC Medical Director Dr. Olusola Maloma was noticed as a recipient of its submission. The memorandum: suppressed all of the objective and probative statistical data, profiles and charts generated from each of the six administered psychological assessments, repeatedly citing only two levels/sublevels: anxiety and paranoia, of the more than cumulative one hundred sublevels assessed by the six psychological tests; contained Dr. Gloria Morote's expressed forensic diagnosis of the Plaintiff; contained Temperament Codes submitted by Dr. Gloria Morote's that were highly subjective and unsubstantiated by citations and certified production of the objective and probative reports' statistical data, profiles and/or charts generated from each of the six psychological assessments administered to the Plaintiff; contained endorsements from DCFEMS BFC Michael Donlon and PFC Privacy Officer William B. Sarvis

recommending the Plaintiff for involuntary non-POD disability retirement and declaring

that the Complainant was permanently disable, citing several DC Municipal Policies

and/or Statutes, specifically DC Code § 5-633, DC Code § 5-634 and DC Code § 5-710.

**[Attachment D1- D20]**

60. On May 01, 2014, The PFC and DCFEMS in its recommendation of the Plaintiff for

Involuntary non-POD Disability retirement expressed the following:

> "This matter is submitted to the Board pursuant to DC Code Sections 5-633 and
>
> 5-634 which provide in pertinent part " and regardless of whether the prognosis is
>
> that the member will be able to perform the full range of duties after achieving
>
> maximum medical improvement, the Director shall process for retirement
>
> pursuant to §5-710, those Fire and Emergency Medical Services members who
>
> spent 64 cumulative work days in a less-than-full-duty status over any 2 year
>
> period as a result of any one performance-of-duty [or non-performance-of-duty]
>
> injury or illness, including any complications relating to the injury or illness"".

**[Attachment D7-D8]**

61. On May 08, 2014, as ordered by the PFC Medical Director Dr. Olusola Maloma in her

April 02, 2016 Order, Plaintiff reported to Rehabilitation Prospectives, Inc for

rehabilitative counseling to obtain rehabilitative occupation, <u>outside</u> of the DCFEMS.

62. On May 09, 2014, Plaintiff was able to obtain copies of DCFEMS' official endorsements

to her March 06, 2014 written inquiry on the status of her appeal of the Non-P.O.D.

ruling; in addition to a copy of a memorandum from PFC Medical Compensation

Specialist Frieda L. Caldwell, "dated January 16, 2014", addressed to the DCFEMS

AFC-S Kenneth Jackson, DCFEMS BFC Michael Donlon, PFC Privacy Officer William

B. Sarvis, with his endorsement of receipt. PFC Medical Compensation Specialist Frieda L. Caldwell fraudulently misrepresenting relevant case law; citing faulty and/or irrelevant case law; and detailing with explicit fabrication, a <u>lack</u> of PFC records and DCFEMS documentation and/or evidence regarding Plaintiff's Sexual Harassment/misdemeanor sexual abuse and subsequent PTSD, recommended denial of Plaintiff's Non-POD Appeal. **[Attachment C1- C5]**

63. On May 09, 2014, Plaintiff received copies of the DCFEMS' official endorsements of her written request for accommodations through the Advancement of Sick Leave. Among the endorsements was DCFEMS AFC-S Kenneth Jackson's, April 15, 2014, admitted utilization of PFC Medical Compensation Specialist Frieda L. Caldwell's fabricated memorandum, to defeat the Plaintiff's Non-POD Appeal and recommendation of its utilization to DCFEMS EEOC and Diversity Manager Josh Henline, Esq., by name, before further consideration of the Plaintiff's request for accommodations in the form of the Advancement of Sick Leave.

64. On May 09, 2014, Plaintiff also noticed DCFEMS FC Kenneth Ellerbe's signature with a date of May 05, 2014, denying Plaintiff's written request for accommodation through the Advancement of Sick Leave, without written determinations or explanations.

65. On May 09, 2014, Plaintiff petitioned the DCFEMS FC Kenneth Ellerbe, in writing, asking for a written explanation of the reasons and/or determinations utilized to deny her request for accommodation through the Advancement of Sick Leave.

66. On May 20, 2014, Plaintiff filed her first continuous violations complaint with DCOHR **[Attachment G1-G4].**

67. On May 31, 2014 Plaintiff, having exhausted all of her available leave, went into a
    Leave Without Pay Status, creating an adverse impact on Plaintiff's benefits that caused
    her to lose the ability to accrue annual leave, to lose the ability to accrue sick leave and
    triggered a countdown from DCFEMS human resources regarding imminent loss of her
    eligibility to qualify for health insurance through DCFEMS.

68. On June 04, 2014 –The Plaintiff reported to the DCFEMS Compliance Office for a Trial
    Board convening against Captain Alan Noznesky only to learn it had been cancelled.

69. On June 13, 2014, the Plaintiff having depleted all of her annual leave and sick leave
    received Check No: 000532903 from the District of Columbia in the amount of $0.00,
    with a pay stub outlining the concomitant non-payment of all payroll associated
    employee benefits, as well as non-accrual of annual leave and sick leave.

70. On June 14, 2014, the Plaintiff was informed by her supervisor, Lieutenant Hosea
    Sampson that that Erica Evans in DC Human Resources had informed him that the
    Plaintiff would now be carried in a Leave Without Pay (LWOP) status; in accordance
    with Article IX Section 1 of the DCFEMS Order Book, she would not accrue leave,
    annual or sick and she was beginning a timeline toward the suspension of her health
    benefits.

71. On June 16, 2016 the Plaintiff contacted the benefits and retirement division of DC
    Human Resources regarding the loss of her benefits due to her LWOP status.

72. Around June 17, 2014, Plaintiff received written notice of the involuntary disability
    retirement proceedings from the DCPFRRB.

73. On July 17, 2014, the Plaintiff reported to the DCFEMS Compliance Office and testified as the primary witness for the DCFEMS at a Trial Board convened against Captain Alan Noznesky. Assistant Attorney General, Kevin Turner, Esq was the prosecuting attorney for the District of Columbia.

74. On August 04, 2014 Plaintiff submitted a formal written complaint to DCFEMS officials at the PFC detailing her concerns about being forced to continue her enforced monitoring at PFC with PFC psychologist Dr. Raquel Gordon.

75. On August 05, 2014, after repeated verbal rebuffs form PFC psychologist Dr. Raquel Gordon, Plaintiff submitted her first written request to return to work, to DCFEMS officials at PFC and to PFC physicians, with recommendations for accommodations from her private physician(s).

76. On August 11, 2014, the Plaintiff reported to the DCFEMS Compliance Office and testified as the primary witness for the DCFEMS at a Trial Board convened against Lieutenant John Thornton. Assistant Attorney General, Kevin Turner, Esq was the prosecuting attorney for the District of Columbia.

77. On August 13, 2014, the Plaintiff meet with Alexis Taylor, the Interim Director of the Office of Disability Rights,  regarding her upcoming September 15, 2014 DC Office of Human Rights appointment and her difficulties in obtaining an exit letter from an DCFEMS EEOC despite having received EEOC counseling.

78. On August 19, 2014 the Interim Director of the Office of Disability Rights Alexis Taylor informed me that the DCFEMS EEOC and Diversity Manager Josh Henline, Esq., made

representations to her that the DCFEMS was aware of the Plaintiff's November 21, 2013
EEOC complaint and he had given her an exit letter then **[Attachment H1-H3].**

79. On August 21, 2014, the Plaintiff reported to the DCFEMS Compliance Office and
testified as the primary witness for the DCFEMS at a Trial Board convened against
Firefighter Travis Chase and Firefighter Michael Harrison. Assistant Attorney General,
Kevin Turner, Esq was the prosecuting attorney for the District of Columbia.

80. On September 08, 2014 Plaintiff's forced monitoring with Dr. Raquel Gordon was
terminated. On September 15, 2014 Plaintiff formalized Charge OHR Docket No: 15-
309-DC (N); Plaintiff also officially requested that her DCEEOC be transferred to
DCOHR **[Attachment H4-H10]**.

81. On September 16, 2014 Plaintiff submitted her second written request to return to work,
with recommendations for accommodations from her private physician(s); in response to
DCFEMS officials at PFC acting through PFC physiologist Marc Cottrell, insisting that
he needed to confer with Plaintiff's private physician(s) on the nature of her
accommodations, on October 07, 2014 Plaintiff signed an authorization for her private
physicians to discuss the accommodations needed for her to return to work.

82. On September 29, 2014, the Plaintiff was ordered to a follow up appointment with Dr.
Marc Cottrell and Dr. Raquel Gordon. In this transition session the Plaintiff confronted
Dr. Gordon about the wanton breach of my privacy that she had discovered in her written
treatment notes submitted to DC Police and Fire Clinic (DCPFC) and Dr. Raquel
Gordon's refusal to accept my first medical certification to return to work.  The Plaintiff
also insisted to Dr. Cottrell that she would like to receive a written informed consent
document that outlines his relationship with her, her rights within that relationship and

her written agreement to interacting with him in any capacity, as he is not treating she and she was unclear, as asserted to Dr. Gordon on several occasions, of my rights in being forced to report to DCPFC "to be monitored", as PFC and DCFEMS written policy that the Plaintiff signed on July 25, 2013 clearly states that "upon the rendering of a non-POD decision the PFC will NOT continue to support the patient…they must seek private care".

83. On October 07, 2014 the Plaintiff was ordered to a follow up appointment with Dr. Marc Cottrell.  Dr. Cottrell did not have a written informed consent document that outlines his relationship with the Plaintiff, the Plaintiff's rights within that relationship and the Plaintiff's written agreement to interacting with him in any capacity.  He stated that one would not be provided. He even went as far to say as he did not know who at the DCPFC the Plaintiff should talk to about her insistence on receiving one. When the Plaintiff inquired about the two written medical certifications that she had provided to him on September 29, 2014, he stated he needed her authorization to speak to her doctors so that he could clarify the accommodations they outlined for her return to work.

84. On October 09, 2014, Dr. Marc Cottrell contacted Plaintiff's private physicians rather than discussing Plaintiff's accommodations demanded  knowledge and/or access to Plaintiff's private medical records, specifically the private physicians diagnosis and treatment protocol.  Dr. Cottrell engaged in a heated exchange with the Plaintiff's doctor, "in an attempt to incite her to breach the stipulated constraints of the authorization"; to reveal her protocol for the Plaintiff's continued treatment; and detail the Plaintiff's medical symptoms and her medical notes, because he is the only person that can say when or if the Plaintiff will ever be allowed to come back to work.

85. On October 14, 2014, the Plaintiff was ordered to a follow-up appointment with Dr. Cottrell. When the Plaintiff began to address his exchange with Dr. Rhodes as related to her, Dr. Cottrell then attempted to give the Plaintiff a two page list of questions. He asserted to her that "he was acting with the guidance of his supervisors…that he was not going to accept the medical certifications that her doctors provided to the DCPFC … if she wanted to even be considered for return to work she needed to have her doctors answer his outlined questions in detail, immediately. The Plaintiff refused to take the list and asserted that he was not only violating the Americans with Disabilities Act concerning medical certifications, but he was also violating her HIPA Patient Privacy rights  by insisting that he would block her return to work until she authorized her doctors to give him access to her private medical files. The Plaintiff then inquired, again, about the written informed consent document that outlines his relationship with her, her rights within that relationship and her written agreement to interacting with him in any capacity, because he is not my doctor. He again refused to provide her with a written informed consent form.

86. On November 04, 2014, the Plaintiff pursuant to DC Code 12-309, gave the mayor, Vincent Gray and the District of Columbia her second notice of violations of civil rights, federal laws and state laws and her intent to sue. **[Attachment B1-B5]**

87. On November 06, 2014 the Plaintiff attended the first DCPFRRB hearing in the guise of involuntary NON-POD Disability retirement, under color of state law, to Constructively Discharge her for asserting federal rights against sexual harassment, despite her opposition and assertion of the violation of her federal rights. Lois Hochhauser esq was the chairperson of the DCPFRRB .

88. On November 06, 2014 Plaintiff attempted to give testimony and present evidence to the
fact that the Grand Jury Investigation was suspended due to the ACCUSSED pleading the
5th or the lack of cooperation of the ACCUSSED: that she had repeatedly asked the
DCFEMS for documentation about the Trial Boards; that her EEOC and DCOHR
complaints were still under investigation and were on going; repeatedly asserted privacy
and disability rights under the Americans with Disabilities Acts; presented and asserted
that PFC Medical Compensation Specialist' Frieda Caldwell's January 16, 20014 Memo
was fraudulent. Chairperson Lois Hochhauser dismissed the Plaintiff's doctors' medical
certifications and her need for accommodations, telling her explicitly that she would be
retired if she did not return to work in a Full Duty capacity; dismissed the Plaintiff's
assertions that the Memo from Frieda Cardwell was a fraudulent; dismissed the Plaintiff's
assertions that the PFC was suppressing her medical records that supported her claims of
sexual harassment over the years, that lead to physical and behavioral injuries, with a
general statement that the Board would look into it.

89. On November 06, 2014 , PFC Dr. Gloria Morote. though expressing in writing that her
report was based on assessment of Petitioner's PFC medical records, testified, repeatedly
that she was not aware of any evidence of a showing of the May 30/31,2016 sexual
harassment; disregarded PFC's documentation of the Petitioner's POD injury in 2002;
disregarded PFC's documentation of the Petitioner's Stress Reaction in 2005; disregarded
PFC's documentation of the Petitioner's 2013 through 2014 diagnosis of Acute Stress
Reaction and PTSD; expressly affirmed on direct examination that she did  NOT assess
the Plaintiff for fitness for duty/ percent of disability…her goal was to render a diagnosis.
Chairperson Lois Hochhauser repeatedly interjected or constricted the Plaintiff as she

was cross –examining Dr. Gloria Morote. At one point expressly telling the Plaintiff that she was not allowed to confront and/or challenge Dr. Gloria Morote in regards to her reported findings; that she could not challenge Dr. Gloria Morote about her insistence that there was nothing in her medical records to affirm PTSD or sexual harassment; contrary to the Plaintiff testifying about the MPD investigation, the Grand Jury Investigation,  the three DCFEMS Trial Boards, and the ongoing EEOC and DCOHR investigations Chairperson Lois Hochhauser coached Dr. Gloria Morote into making statements that the sexual harassment incident did not exist, therefore the Plaintiffcould not have PTSD.

90. On November 17, 2014, the District of Columbia, through the Office of Risk Management took notice of the Plaintiff's claims. **[Attachment B6]**

91. On November 25, 2014 Plaintiff meet with DCFEMS Lt Randell Stroman, DCFEMS BFC Raymond Gretz, PFC Phycologist Marc Cottrell and PFC Medical Director Dr. Olusola Maloma regarding DCFEMS and PFC's refusal to grant her repeated requests for accommodations.  In the meeting Dr. Cottrell demanded that the Plaintiff  have her doctors answer his questions.  The Plaintiff adamantly refused asserting her rights within the Americans with Disabilities Act, her HIPA Patient Privacy Rights, her rights within the International Association of Firefighters and NFPA 1582, and her rights to an outlined written informed consent document. PFC Medical Director Dr. Olusola Maloma informed Plaintiff that she was the Medical Director of DCPFC …"she was the policy maker… asserted that it is her policy that I have my doctors provide detailed answers to all of Dr. Cottrell's questions.   She even went as far as to say that they don't even have to accommodate me, as my private doctors have requested, "as it is a privilege they can

extend if they choose to... I would not be allowed to return to work in a modified capacity until I meet their demands.  Once again, my request for a written informed consent document that outlined my rights in being ordered to continue to report to DCPFC and "be monitored" were ignored.

92. On December 18, 2014, the DCPFRRB issued a written Order, ordering the Plaintiff to submit a third written request to return to work from Plaintiff's private physician(s), with recommendations for accommodations, outlining explicit orders that Plaintiff's private physician(s) detail the Plaintiff's diagnosis and treatment protocol; to be submitted to DCFEMS officials at the PFC, PFC psychologists and the DCPFRRB.

93. On January 12, 2015, the Plaintiff submitted her third written request to return to work, from her private physician, with recommendations for accommodations, with explicit details about the Plaintiff's diagnosis and treatment protocol to DCFEMS officials at the PFC, PFC psychologists Dr. Marc Cottrell and Dr. Gloria Morote and the DCPFRRB.

94. On January 19, 2015 PFC psychologist Dr. Gloria Morote disregarded the Plaintiff's third written request for accommodation and submitted a written affidavit to the DCPFRRB maintaining her diagnosis and her opinions as previously articulated in her Forensic Sexual Harassment Report, titled "Report of Psychological Evaluation- Disability Retirement", Temperament Codes and capricious testimony.

95. On January 20, 2015 PFC psychologist Dr. Marc Cottrell disregarded the Plaintiff's third written request for accommodation and submitted to DCPFRRB unsworn, subjective and unsubstantiated concerns of safety and prejudicial inferences. The PAI and the MMPI-2 RF assessments administered during PFC psychologist Dr. Gloria Morote's Forensic Sexual History Assessment, expressly assesses and generates a comprehensive report that

outlines objective and probative data, profiles and charts on beliefs/characterizations with regards to safety, professional and social interaction, and the ability to make and follow supervisory commands; data that was wantonly suppressed by PFC psychologist Dr. Gloria Morote in her memorandum to DCPFRRB.

96. On January 21, 2015, the Plaintiff attended the second DCPFRRB hearing in the guise of involuntary NON-POD Disability retirement; under color of state law, to Constructively Discharge her for asserting federal rights against sexual harassment, despite her opposition and assertion of the violation of her federal rights. Andrea Comentale was the Acting Chairperson during the hearing.

97. On January 21, 2015, Acting Chairperson Andrea Comentale began the hearing by interrogating the Plaintiff with veiled comments about how many times she had been disciplined/ put on charges/ investigated for insubordination.  After which the DCPFRRB disregarded its December 18, 2014 Order. Acting Chairperson Andrea Comentale then advised the Plaintiff that the PFC had submitted more questions to the DCPFRRB and she was ordering her to have her doctor submit a written report detailing PFC's questions if I wanted to go back to work. ..citing the unsworn, subjective and unsubstantiated questions and concerns of safety with prejudicial and defamatory references from PFC psychologist Marc Cottrell, the DCPFFRB issued a verbal Order for the Plaintiff to submit a fourth written report, "if Plaintiff wanted to return to work", with explicit orders that the Plaintiff's private physician must articulate explicit and detailed responses to each of PFC psychologist Dr. Marc Cottrell's unsworn, subjective and unsubstantiated questions and concerns, to be submitted to DCFEMS officials at the PFC, PFC and the DCPFRRB.  It was the last straw. Plaintiff adamantly refused, emphasizing the fact that

the third written request to return to work was a clear violation of her rights, yet they

want more. The written report from the Plaintiff's doctors' addressed her ability to

perform the essential duties of my job as well as any functional limitations and need for

reasonable accommodations.  The DCPFC did not submit any documentation amending

or maintaining its position in light of the report.  Instead the PFC aided and abetted by the

DCPFRRB choose to demand the Plaintiff answer far reaching disability question

inconsistent with any determination of the scope of her rights to compensation through

Performance of Duty (POD) injury, or the impact of her injury on her ability to perform

the essential functions of her job.  The questions have a very prejudicial tone that infers

that she am a threat or risk of harm/safety to myself and/or others, where there is no

objective evidence of such in my files with my private doctors or DCPFC.  Acting

Chairperson Andrea Comentale in turn became belligerent towards the Plaintiff, berating

her, as she vehemently asserted her federal rights.

98. On January 22, 2015, the DCPFRRB issued a written Order, expressly detailing PFC

psychologist Marc Cottrell's unsworn, subjective, and unsubstantiated questions and

concerns of safety with highly prejudicial and defamatory references to Plaintiff, ordering

Plaintiff to submit a fourth written report to DCFEMS officials at the PFC, PFC and the

DCPFRRB, by February 05, 2015.  Plaintiff did not comply.

99. On February 12, 2015, the Plaintiff attended the third and final DCPFFRB hearing in the

guise of involuntary NON-POD Disability retirement, under color of state law, to

Constructively Discharge her for asserting federal rights against sexual harassment,

despite her opposition and  assertion of the violation of her federal rights.  Acting

Chairperson Andrea Comentale began by asking the Plaintiff why she did not comply

with the DCPFRRB's orders from January 22/23, 2015.  Plaintiff once again asserted that they were a violation of her rights.  Acting Chairperson Andrea Comentale disregarded the Plaintiff's sentiments and began to interrogate her about my ability to immediately go back to work in a Full Duty capacity. Once again, to all of Acting Chairperson Andrea Comentale demands,  the Plaintiff cited and asserted her rights, specifically those outlined in the Americans with Disabilities Act, stating that the DCPFRRB's treatment and tone towards her joins them to the PFC, as they are aiding and abetting disability harassment and discrimination.

100.　　　On March 12, 2015, the Plaintiff submitted written requests, to both, Denise S. Gardner and Lela Jones administrators for the DCPFFRB at the DC Office of Human Resources, inquiring about the status and receipt of the Board's decision, in addition to the copies of the transcripts of the last two hearings and written directives for my appeal to the Board and the DC Court of Appeals.  The Plaintiff reiterated the written directives provided to her, through  Denise S. Gardner and Lela Jones prior to each hearing; a fraudulent misrepresentation of the provisions of 7 *DCMR* 2525.1 with regards to the Plaintiff's ability to seek reconsideration of the DCPFFRB's decision.  Neither Denise S. Gardner nor Lela Jones responded to the Plaintiff's requests.

101.　　　On March 26, 2015, the Plaintiff pursuant to DC Code 12-309, gave the mayor Muriel Bowser and the District of Columbia her third notice of violations of civil rights, federal laws and state laws and her intent to sue. **[Attachment B7-B11]**

102.　　　On March 26, 2015 Plaintiff filed her second continuing violation complaint with the DCOHR **[Attachment I1-I10]**.

103.     On March 26, 2015, the Plaintiff submitted a second written request to Denise S. Gardner and Lela Jones administrators for the DC Police and Firefighters' Relief and Retirement Board_at the DC Office of Human Resources, as well as the DC Police and Firefighters' Relief and Retirement Board inquiring about the status and receipt of the Board's final decision, in addition to the copies of the transcripts of the last two hearings and written directives for my appeal to the Board and the DC Court of Appeals. The Plaintiff once reiterated the written directives provided to her, through Denise S. Gardner and Lela Jones prior to each hearing; a fraudulent misrepresentation of the provisions of 7 DCMR 2525.1 with regards to the Plaintiff's ability to seek reconsideration of the DCPFFRB's decision. Neither Denise S. Gardner nor Lela Jones responded to the Plaintiff's requests.

104.     On April 02, 2015 DCFEMS, through Gitania Stewart Ponder filed a frivolous and vexatious Motion to Dismiss Charge OHR Docket No.: 15-309-DC (CN). DC Fire and EMS Chief Gregory Dean had assumed the role of Fire Chief by March 02, 2015. DCOHR served DCFEMS on March 24, 2015, As the person in charge, had knowledge of and acquiesced in his subordinates' violations with deliberate indifference to the consequences.

105.     On April 13, 2015, the Plaintiff submitted a third written request to Denise S. Gardner and Lela Jones administrators for the DC Police and Firefighters' Relief and Retirement Board at the DC Office of Human Resources, as well as the DC Police and Firefighters' Relief and Retirement Board inquiring about the status and receipt of the Board's final decision, in addition to the copies of the transcripts of the last two hearings and written directives for my appeal to the Board and the DC Court of Appeals. The

Plaintiff once reiterated the written directives provided to her, through Denise S. Gardner and Lela Jones prior to each hearing; a fraudulent misrepresentation of the provisions of 7 DCMR 2525.1 with regards to the Plaintiff's ability to seek reconsideration of the DCPFFRB's decision. Neither Denise S. Gardner nor Lela Jones responded to the Plaintiff's requests.

106.     On April 22, 2015, the District of Columbia, through the Office of Risk Management took notice of the Plaintiff's claims, however asserting they will not handle the claim **[Attachment B12-B13].**

107.     On April 24, 2015 Plaintiff submitted to DCOHR her opposition to DCFEMS' Motion to Dismiss Charge OHR Docket No.: 15-309-DC (CN).

108.     On April 30, 2015 the DCPFRRB issued a written Order and Decision forcing the Plaintiff into Non-POD involuntary disability retirement, in sole reliance of unsubstantiated evidence, arbitrary and capricious testimony or unsworn hearsay from the Respondent: PFC psychologists Dr. Gloria Morote's fraudulent and skewed memorandum with DCFEMS BFC Michael Donlon and PFC Privacy officer William B Sarvis endorsement of several DC Municipal Policies, in violation of Plaintiff's federal rights, with the expressed declaration that the Plaintiff is permanently disabled; Dr. Gloria Morote's sworn testimony, with unsubstantiated speculations, subjective, arbitrary and capricious opinions and prejudicial utterances upon cross examination; Casting false light on Plaintiff's evidence, deliberate perversion of Plaintiff's testimony in its summation, and debasing Plaintiff's ardent assertion of the DCPFRRB's violation of her rights in her declaration of their veiled, yet contemporaneous, aid in her victimization, in addition to autonomous harassment and discrimination; wantonly adulterating the

dispositive fact of PFC Medical Compensation Specialist Frieda L. Caldwell's

Memorandum, that was clearly fabricated for utilization by DCFEMS officers to address

Plaintiff's Non-POD Appeal and recommended to deny Plaintiff's request for

accommodations through the Advancement of Sick Leave; the DCPFRRB's fraudulent

misrepresentations uttered to justify their blatant inaction, operating short of their

statutory jurisdiction and power: *7 DCMR 2503.3, 7 DCMR 2510.1; 7 DCMR 2510.5; 7*

*DCMR 2510.7 and 7 DCMR 2510.8*;  the DCPFRRB's grave abuse of discretion,

operating in excess of its statutory jurisdiction, by stepping down from its impartial role

as trier of facts to make a subjective, unsubstantiated and defamatory character/demeanor

assessments of the Plaintiff with the malicious drive and intent of causing Plaintiff harm

in her profession and community.  **[Attachment E1- E24]**

109.       On April 30, 2015, the DCPFFRB in its written Decision cited the City Council of

the District of Columbia as conferring statutory authority to suppress the Plaintiff's ADA

and RA rights:

> "Following the events of September 11, 2001, the Council of the District of
>
> Columbia determined that the mandatory staffing levels at both the Metropolitan
>
> Police Department ("MPD") and D.C. Fire and Emergency Medical Services
>
> Department ("FEMSD") were negatively impacted by the large number of
>
> employees in each Department who were on extended medical leave or limited
>
> duty since those employees could not respond to this crisis.  On June 24, 2004, the
>
> Council passed the Omnibus Public Safety Agency Reform Amendment Act of
>
> 2004 ("Omnibus Act", which requires that uniformed members who have not
>
> worked in full duty status due to injury or illness for a specified time period to be

recommended for disability retirement. FEMSD recommends a firefighter who has spent at least 64 cumulative work days in a less-than-full-duty status in any two year period due to an injury or illness other than pregnancy, for disability retirement.  (Sept. 30, 2004, D.C. Law 15-194)." **[Attachment E17]**

110.      On May 01, 2015 Plaintiff formalized Charge OHR Docket No: 15-518 DC (CN). On May 26, 2015 DCFEMS filed a Motion to Dismiss Charge OHR Docket No: 15-518 DC (CN).  [Fire Chief Gregory Dean]

111.      On May 04, 2015 the Plaintiff pursuant to DC Code 12-309, the Plaintiff pursuant to DC Code 12-309, gave the mayor Muriel Bowser and the District of Columbia her fourth notice of violations of civil rights, federal laws and state laws and her intent to sue. **[Attachment B14-B17]**

112.      On May 08, 2015, the District of Columbia, through the Office of Risk Management took notice of the Plaintiff's claims however expressly stated that they will not handle the claim. **[Attachment B18-B19]**

113.      On May 28, 2105 the Plaintiff filed her action for Judicial review of the DCPFRRB's assertions that she had sustained a ***POD injury*** on May 30, 2013, due to ***aggravating factors*** triggered by ***Sexual Harassment*** in the form of a sexual assault; is not permanently disabled, due to ***Adjustment Disorder with Anxiety and Depression,*** it is a diagnosis made up by the DCPFRRB. The Petitioner has never been given that diagnosis, ***by any doctor*** private or at the PFC; having been ***returned to full duty, physically*** on January 08, 2014. is able to perform the ***essential functions*** of a full duty firefighter; possesses the vocational ability of a Job Zone rating of 5-8, as expressly noted in the Rehabilitative counselors ***primary*** assessment in its LMS, muted solely in reliance

on Dr. Gloria Morote's illegal, irrelevant, unreliable and unsubstantiated temperament codes and Report created by her own admission of incompetence, on direct examination, concerning PTSD; is capable of performing *useful and efficient service* within the DCFEMS, with accommodations up to her being deemed, through exposure therapy, psychologically able to return to full duty.

114.    Around May 28, 2015, DCFEMS, through Gitania Stewart-Ponder filed a second vexatious, frivolous and harassing Motion to Dismiss. DC Fire and EMS Chief Gregory Dean had assumed the role of Fire Chief by March 02, 2015. As the person in charge, had knowledge of and acquiesced in his subordinates' violations with deliberate indifference to the consequences.

115.    On June 01, 2015 Plaintiff filed her opposition to the DCFEMS' Motion to Dismiss Charge OHR Docket No: 15-518 DC (CN).

116.    On June 29, 2015 Plaintiff submitted her third continuing violations complaint to DCOHR. On July 07, 2015 DCOHR issued its written Order denying DCFEMS' Motion to Dismiss Charge OHR Docket No: 15-509 DC (CN) **[Attachment J1-J10]**.

117.    On July 09, 2015 DCOHR issued its written Order denying DCFEMS' Motion to Dismiss Charge OHR Docket No: 15-518 DC (CN) on the disability and retaliation aspects of the Charge and granting dismissal of the race and sex aspect of the charge with a remand that the Plaintiff go back to EEOC counseling regarding the race and sex aspects of her complaints against the Respondents.

118.    Around July 15, 2015 PFC submitted a Motion to Dismiss Charge OHR Docket No: 15-520-DC (CN).   On August 21, 2015, Plaintiff as remanded by the DCOHR, sought EEOC counseling with EEOC Counselor Mr. Hydan Demas at the DC Office of

Disability Rights ("DCODR"). Plaintiff presented documentation to Mr. Hydan Demas with regard to the race and sex aspects of her March 26, 2015 complaint against DCFEMS, PFC and the DCPFFRRB and the subsequent formalized Charges on remand from the DCOHR.

119.    On September 25, 2015, after fulfilling the July 09, 2015 remand, as ordered by DCOHR in its written Order for DCFEMS' Motion to Dismiss, Plaintiff submitted her fourth continuing violations complaint to DCOHR detailing the EEOC counseling with DCODR EEOC Counselor Mr. Hydan Demas on the race and sex aspects of her March 26, 2015 complaint;  her identification of one similarly situated DCFEMS white male and white female, currently and/or formally employed with the DCFEMS and subjective to medical/ psychological assessment at PFC and disability/retirement evaluation before the DCPFRRB;  explicit EEOC counseling regarding the disparity of treatment and the disparate impact of her interactions with DCFEMS, PFC and DCPFRRB and; the EEOC Counselor's reports to the Plaintiff of his interactions with the Respondents' as pertaining to his EEOC investigation of the disparate treatment and disparate impact of the race and sex aspects of the Plaintiff's Charge OHR Docket No: 15-518-DC (CN), 15-519-DC (CN), 15-520-DC(CN). On November 06, 2015 Plaintiff formalized Charge OHR Docket No: 16- 086- DC (CN), 16- 087-DC (CN), 16-088-DC (CN), as remanded by DCOHR in its July 09, 2015 written Order.

120.    On November 06, 2015 Plaintiff formalized her DCOHR Charge of Constructive Discharge against DCFEMS, PFC and the DCPFFRB.

121.    On November 09, 2015 DCOHR issued its written Order denying PFC's Motion to Dismiss Charge OHR Docket No: 15-520-DC (CN).  On January 11, 2016 PFC submitted a Motion to Dismiss Charge OHR Docket No: 16-088-DC (CN).

122.    Each Defendant is sued individually and in their official capacity.  At all times mentioned in this complaint each Defendant acted under the color of a District of Columbia, municipal law.

123.    Plaintiff is demanding a trial by Jury against the Defendants, jointly and severally

## 3. Cause of Action or Claim for Relief

 The Plaintiff, Nicole R. McCrea, in identifying her cause of action or claim for relief, also re-alleges and incorporates by reference paragraphs 1 through 121 of the Plaintiff's Complaint filed with this Court on this day  April 28, 2016:

1.    The Defendants' concerted actions to violate the Americans with Disabilities Act violated plaintiff, Nicole R. McCrea's rights and constituted **civil conspiracy** under 42 US Code 1983 through the enforcement of a municipal policy and state laws.

2.  The Defendants' concerted actions to violate the Americans with Disabilities Act violated plaintiff, Nicole R. McCrea's rights and constituted **Conspiracy to interfere with civil rights under 42 US Code 1985**.

3.    The Defendants' concerted actions to violate the Americans with Disabilities Act and enforce retirement without cause violated plaintiff, Nicole R. McCrea's rights and constituted **constructive discharge** under 42 US Code 1983 using the color of the law and a municipal policy.

a.      Plaintiff hereby incorporates and reinstates by reference paragraphs 1 through 121 as if stated herein;

b.      Plaintiff has a firmly established right to be free from reprisal and an established constitutional right to freedom of expression pursuant to the U.S Constitution and the Bill of Rights, specifically the freedom of speech clause of First Amendment in advocacy of my rights.

c.      The Defendants actions as alleged above deprived the Plaintiff of her First Amendment Right to freedom of speech, in retaliation for her opposition to further intrusion into her privacy and assertion of her rights under ADA. With the DCPFRRB expressly stating, in reference to the Plaintiff's refusal to comply with their January 2015 Order to submit a fourth written request … " the [Plaintiff] refused to relay additional questions to her [treating ] psychologist…if the [treating]psychologist [had]answered favorably, it may have resulted in the BHS [PFC] clearing her to return to full duty as she requested."

d.      This protected activity was one of many motivating factors in the DCPFFRB's Decision, acting in concert with the PFC and DCFEMS to force the Plaintiff into involuntary non-POD Disability Retirement. The Defendants acted with the malicious intent to suppress the Plaintiff's actions and deter due process of her Sexual Harassment complaint.

e.      The Defendants actions as allegedabove is an adverse impact through **First Amendment Retaliation.**

4.      The Defendants' concerted actions to violate the Americans with Disabilities Act and enforce unwarranted psychological assessments  without cause violated

plaintiff, Nicole R. McCrea's rights and constituted **medical malpractice** under 42 US Code 1983 and the enforcement of a municipal policy and state laws.

5.        The Defendants' concerted actions to violate the Americans with Disabilities Act and enforce unwarranted psychological assessments  without cause violated plaintiff, Nicole R. McCrea's rights and constituted **medical negligence –Informed Consent** under 42 US Code 1983 and state laws.

6.        The Defendants' concerted actions to violate the Americans with Disabilities Act and enforce unwarranted psychological assessments  without cause violated plaintiff, Nicole R. McCrea's rights and constituted violation of the **4th Amendment- invasion of privacy** under 42 US Code 1983 and state laws.

a.        Plaintiff hereby incorporates and reinstates by reference paragraphs 1 through 121 through as if stated herein;

b.        The Defendants actions as alleged above deprived the Plaintiff of her Fourth Amendment Right to privacy by ordering her to submit to psychological assessments beyond the business necessity of the essential functions of her job as a firefighter

c.        As testified by Dr. Gloria Morote, she was not assessing disability or percentage of disability but rendering a diagnosis; the series of  assessment administered by Dr. Gloria Morote was designed to reveal sexual history, sexuality, sexual trauma, gender identification, religious beliefs, personal perceptions and/or beliefs about societal constructs, personal perceptions about family, family history and/or family dynamics.

7.        The Defendants' deliberate indifference and disregard in publishing unsupported assessments and characterizations  violated plaintiff, Nicole R. McCrea's

rights and constituted **defamation of character** to cause harm in profession and community 42 US Code 1983 and state laws.

a.      Plaintiff hereby incorporates and reinstates by reference paragraphs 1 through 121 through as if stated herein;

b.      The Defendants actions as alleged above deprived the Plaintiff of her First Amendment Right to freedom of speech by retaliating against in her in the form of Constitutional Defamation of Character to cause harm in her profession and her community.

c.      The DCPFFRB operated outside of its statutory jurisdiction as an impartial trier of facts to create a "material fact"; an unsubstantiated and subjective demeanor assessments in its written Decision, outside of the record and without notice to the Plaintiff.  The DCPFRRB stated that the member was "visibly and extremely mistrustful and paranoid; The Member's conduct which the Board "observed"…strongly supports Dr. Morote's opinion …the Member's paranoia and distrust is so pervasive…prevent the Member from performing the full duties of a firefighter…she could no longer work effectively with a team; The "Board's interaction" with the Member strongly suggests that the Member's psychological condition impairs her ability to follow orders…she poses an unacceptable risk to herself and others"; The Board's observations of the Member's demeanor during the hearings …supports the conclusion that the Member is suffering from Adjustment Disorder with Anxiety and Depression; a diagnosis that was never rendered upon the Plaintiff by any doctor, private or at PFC.  However, it was concocted by Dr. Gloria Morote and incorporated into her psychological assessment of the Plaintiff's prior

mental health records/assessments; A firefighter who cannot work as part of a team poses an unacceptable danger to herself and to the public."

d.      The Defendants actions as alleged above created a Stigma against Plaintiff in her pursuit of further employment outside of the DCFEMS.  Prior to her forced vocational assessment Dr. Gloria Morote created oppressive and unsubstantiated constricts on the Plaintiff's vocational abilities and efforts to aquire further employment, due to unfounded temperament codes.

e.      After the vocational assessment, The DCPFFRB and Dr. Gloria Morote then acted, through unsubstantiated opinions, arbitrary and capricious scenarios and hypotheticals cloaked as evidence further constricted the Plaintiff's vocational assessments to zero, rendering her unemployable in her field of educational and vocational expertise, constitutes **5th Amendment Violation of Property Interest**.

f.      The Defendants actions were deliberate and willful, with disregard to truth or fact in an effort to enforce Discharge were it lacked a merit or cause; bad faith demonstrative of actual malice.

8.      The Defendants' fraudulent misrepresentations violated plaintiff, Nicole R. McCrea's rights and constituted **medical malpractice** under 42 US Code 1983 and state laws.

9.      The Defendants' fraudulent misrepresentations violated plaintiff, Nicole R. McCrea's rights and constituted **criminal, common law fraud and fraud on the court** under 42 US Code 1983 and state laws.

10.      The Defendants' fraudulent misrepresentations violated plaintiff, Nicole R. McCrea's rights and constituted **spoliation or fabrication of evidence** under 42 US Code 1983 and state laws.

11.      The Defendants' fraudulent misrepresentations violated plaintiff, Nicole R. McCrea's rights and constituted **forgery** under 42 US Code 1983 and state laws.

12.      The Defendants' fraudulent misrepresentations violated plaintiff, Nicole R. McCrea's rights and constituted **utterance of fraud** under 42 US Code 1983 and state laws.

13.      The defendants' continuous and pervasive pattern of administrative interference and or abuse violated plaintiff, Nicole R. McCrea's rights and constituted **Intentional Infliction of Emotional Distress** under 42 US Code 1983 and state laws.

14.      The defendants' continuous and pervasive pattern of administrative interference and or abuse violated plaintiff, Nicole R. McCrea's rights and constituted **Negligent Infliction of Emotional Distress** under 42 US Code 1983 and state laws.

15.      The defendants' continuous and pervasive pattern of administrative interference violated plaintiff, Nicole R. McCrea's rights and **constituted tortious interference** 42 US Code 1983 and state laws.

16.      The defendants' malicious intent to deter due process  violated plaintiff, Nicole R. McCrea's rights and constituted violation of the **5th Amendment –substantive due process clause**- of the Constitution under  42 US Code 1983 and state laws.

17.      The defendants' abuse of process violated plaintiff, Nicole R. McCrea's rights and constituted violation of the **5th Amendment- procedural due process clause** of the Constitution under 42 US Code 1983.

18. **Violation of the Supremacy Clause of the U.S. Constitution**

   a. Plaintiff hereby incorporates and reinstates each of the above and subsequent paragraphs 1 through 104 as if stated herein;

   b. The Supremacy Clause of the United States Constitution (Article VI, Clause 2) establishes that the Constitution, federal laws made pursuant to it, and treaties made under its authority, constitute the supreme law of the land.   It establishes that the federal constitution and federal law generally, take precedence over state laws, and even state constitutions.

   c. State laws are preempted where they stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

   d. DC Code § 5-633, DC Code § 5-634 DC Code § 5-701, DC Code § 5-709 and DC Code § 5-710 D.C. Law 15-194 are wholly are in relevant parts, preempted by the expressed Purpose and Objectives of the Americans with Disabilities Act and the Rehabilitation Act  **[Attachment A1-A21]**.

   e. The City Council of the District of Columbia's actions in implementing DC Code § 5-701 (2) to narrowly define disability and its flexible definition of disability depending on the circumstances, is preempted by the Americans with Disabilities Act and the Rehabilitation Act was unconstitutional and wantonly designed to constrict and suppress federal statutory rights conferred by the Americans with Disabilities Act and the Rehabilitation Act. **[Attachment A1-A21]**.

   f. The City Council of the District of Columbia's actions in implementing DC Code § 5-709 (c) to conduct non uniform and ambiguous disability assessments, is preempted by the Americans with Disabilities Act and the Rehabilitation Act was

unconstitutional and wantonly designed to constrict and suppress federal statutory rights conferred by the Americans with Disabilities Act and the Rehabilitation Act. **[Attachment A1-A21]**.

g. The City Council of the District of Columbia's actions in implementing DC Law 15-194, further constricting DC Code § 5-709 and DC Code § 5-710 to retire a police officer or firefighter on disability even though the individual is performing useful and Efficient services that are less than full duty, is preempted by the Americans with Disabilities Act and the Rehabilitation Act was unconstitutional and wantonly designed to constrict and suppress federal statutory rights conferred by the Americans with Disabilities Act and the Rehabilitation Act. **[Attachment A1-A21]**.

h. The City Council of the District of Columbia's actions in further constricting DC Code § 5-7091, DC Code § 5-709 and DC Code § 5-710 to determine which members are entitled to full or limited duty status, is preempted by the Americans with Disabilities Act and the Rehabilitation Act was unconstitutional and wantonly designed to constrict and suppress federal statutory rights conferred by the Americans with Disabilities Act and the Rehabilitation Act. **[Attachment A1-A21]**.

i. The City Council of the District of Columbia's increasing oppressive municipal enactments in response to challenges of involuntary retirement before the DCPFRRB demonstrates that the City Council intended to constrict and suppress federal statutory rights conferred by the Americans with Disabilities Act and the Rehabilitation Act.

j. The City Council of the District of Columbia's legislative and administrative history of  DC Code § 5-633, DC Code § 5-634 DC Code § 5-701, DC Code § 5-709,  DC Code § 5-710 and D.C. Law 15-194 shows extreme and deliberate indifference to the Constitutional and Federal rights of all members of the MPD and DCFEMS, most specifically targeting those members that are part of a protected class.  Having a disparate impact across racial lines.

k. The City Council of the District of Columbia's unconstitutional encroachments gave the members of the DCFEMS, PFC and DCPFRRB the "statutory authority" to infringe on the Plaintiff's Constitutional and Federal rights, under the color of state law.

l. The City Council of the District of Columbia is directly responsible for the Constitutional injuries that the Plaintiff sustained due to the color of state law, utilized to violate the Plaintiff's Fifth Amendment right to Substantive Due Process under the Americans with Disabilities Act. **[Attachment A1-A21]**.

m. The City Council of the District of Columbia is directly responsible for the Constitutional injuries that the Plaintiff sustained due to the color of state law, utilized to violate the Plaintiff's Fifth Amendment right to Substantive Due Process under the Rehabilitation Act. **[Attachment A1-A21]**.

n. The City Council of the District of Columbia is directly responsible for the Constitutional injuries that the Plaintiff sustained due to the color of state law, utilized to violate the Plaintiff's Fifth Amendment right to Procedural Due Process under the Americans with Disabilities Act. **[Attachment A1-A21]**.

o.  The City Council of the District of Columbia is directly responsible for the Constitutional injuries that the Plaintiff sustained due to the color of state law, utilized to violate the Plaintiff's Fifth Amendment right to Procedural Due Process under the Rehabilitation Act. **[Attachment A1-A21]**.

p.  The Plaintiff seeks Declaratory Judgment against the City Council of the District of Columbia for its unconstitutional enactment of laws to subvert the rights conferred by federal statutes; that the purposes and objectives of the Americans with Disabilities Act and the Rehabilitation Act preempts DC Code as established by the Supremacy Clause of the U.S. Constitution.

q.  The Plaintiff seeks Injunctive Relief ordering the City Council of the District of Columbia to cease its unconstitutional actions that "authorizes" the enforcement of involuntary disability retirement, under color of state laws, in violation of qualified members', under Americans with Disabilities Act and the Rehabilitation Act, Fifth Amendments substantive and procedural rights to due process.

r.  The Plaintiff seeks punitive damages against the City Council of the District of Columbia for the extraordinary act of implementing and then further constricting unconstitutional state laws wholly designed to suppress the federal rights of the members of the DCFEMS and MPD.

19. The Defendants' concerted actions to violate the Americans with Disabilities Act and enforce unwarranted psychological assessments without cause violated plaintiff, Nicole R. McCrea's rights and constituted violation of the **5ᵗʰ Amendment-Right to Equal Protection** under 42 US Code 1983 and state laws.

20. The Defendants' concerted actions to refuse to accommodate; enforce unwarranted psychological assessments without cause; and enforce Constructive Discharge violated plaintiff, Nicole R. McCrea's rights and constituted violation of the **Rehabilitation Act.**

21. The Defendants' concerted actions to violate the Americans with Disabilities Act , the Rehabilitation act and the Plaintiff's Constitutional rights constituted **Negligence under 42 US Code 1986** and state laws.

22. The  Defendants' concerted actions to violate the Americans with Disabilities Act , the Rehabilitation Act, 42 US Code 1983, 42 US Code 1985 and 42 US Code 1986 enforce unwarranted psychological assessments  without cause violated plaintiff, Nicole R. McCrea's **42 US Code 1981- Equal Rights under the Law**


**4. The relief I want the court to order is:**

☒ Monetary Damages for economic, non-economic, pecuniary, punitive and any other remedies of equity that the Court and/or jury finds just and proper.


☒ An injunction ordering: the City Council of the District of Columbia to cease its unconstitutional actions enforcing involuntary disability retirement of qualified members subject to such laws; restoration of the Plaintiff's leave annual and sick used or lost; the DC Police and Firefighters' Retirement and Relief Board to include copies of the rules and regulations pertaining to Disability Hearings with every notice to appear before the board.


☒ Other (explain) : Declaratory Judgment against the City Council of the District of Columbia for its unconstitutional enactment of laws to subvert the rights conferred by federal statutes; that

the purposes and objectives of the Americans with Disabilities Act and the Rehabilitation Act

preempts DC Code as established by the Supremacy Clause of the U.S. Constitution ;

Order the Defendants to pay the Plaintiff's fees and costs incurred in this action and the

antecedent administrative proceedings and Judicial reviews.

January 17, 2017
_____
(Date)

Nicole Rena McCrea
*Pro Se*
5205 East Capitol St., SE
Washington, DC 20019
E-mail: nic_mack@yahoo .com
202-491-9656

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NICOLE RENA MCCREA,

     Plaintiff,

v.

                               Civil Action No. 16-CV-0808-TSC

DISTRICT OF COLUMBIA, et al.,

     Defendants,

## CERTIFICATE of AUTHENTICITY

I, Nicole R. McCrea, certify under penalty of perjury that the following attachments in Support of the Second Amended Complaint, are true and authentic copies of:

1. The US Equal Employment Opportunity Commission's Enforcement Guidance Workers' Compensation and the ADA. **[Attachment A1-A21]**

2. The Plaintiff's November 04, 2014 Notice to the District of Columbia  **[Attachment B1-B5]**

3. The District of Columbia's  November 17, 2014 acknowledgement of receipt of the Plaintiff's Notice **[Attachment B6]**

4. The Plaintiff's March 26, 2015 Notice to the District of Columbia  **[Attachment B7-B11]**

5. The District of Columbia's  April 22, 2015 acknowledgement of receipt of the Plaintiff's Notice **[Attachment B12-B13]**

6. The Plaintiff's May 04, 2015 Notice to the District of Columbia  **[Attachment B14-B17]**

7. The District of Columbia's  May 08, 2015 acknowledgement of receipt of the Plaintiff's Notice **[Attachment B18-B19]**

8. Frieda L. Cardwell' s "January 16, 2014" Memorandum to the Assistant Fire Chief of Services Larry Jackson recommending denial of the Plaintiff's request for workman's compensation in the form of Performance of Duty Injury (POD). **[Attachment C1-C5]**

9. The PFC Associates, LLC and DC Fire and EMS' May 01, 2014 recommendation of the Plaintiff for Involuntary non-POD Disability retirement **[Attachment D1- D20]**

RECEIVED
Mail Room

JUN 2 5 2018

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

10. The DC Police and Firefighters' Retirement and Relief Board's  April 30, 2015 written Order and Decision **[Attachment E1-E24]**

11. Plaintiff 's November 21, 2013 Charges with the DC Equal Employment Office and Commission (EEOC) **[Attachment F1]**

12. Plaintiff 's May 20, 2014 Charges with the DC Office of Human Rights (DCOHR)**[Attachment G1-G4]**

13. Plaintiff's August 19, 2014 – August 24, 2014 e-mail correspondences with the Interim Director of the Office of Disability Rights Alexis Taylor. **[Attachment H1-H3]**

14. Plaintiff's September15, 2014 – March 26, 2015 correspondences with various EEOC offices requesting that her November 21, 2013 Charge and all supporting documents be transferred to the DCOHR **[Attachment H4-H10]**

15. Plaintiff 's March 26, 2015 Charges with the DCOHR **[Attachment I1-I10]**

16. Plaintiff 's June 29, 2015 Charges with the DCOHR **[Attachment J1-J10]**

Prepared January 17, 2017

Nicole Rena McCrea
*Pro Se*
5205 East Capitol St., SE
Washington, DC 20019
E-mail: nic_mack@yahoo .com
202-491-9656

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NICOLE RENA MCCREA,

      Plaintiff,

v.                                    Civil Action No. 16-CV-0808-TSC

DISTRICT OF COLUMBIA, et al.,

      Defendants,

## **CERTIFICATE of SERVICE**

I, Nicole Rena McCrea, hereby certify that on  January 17, 2017:

1. Service of the Second Amended Complaint was effected, via regular mail,  on the following Defendants, via their respective attorneys of record, pursuant to Federal Rule of Civil Procedure ("Fed R. Civ Proc.") 5(b)(1) and Fed R. Civ. Proc. 5(b)(2)(C):
   a. Ellen Efros, General Counsel for the Council of the District of Columbia, at 1350 Pennsylvania Avenue NW, Suite 4 Washington, DC 20004;
   b. Steven J. Anderson at 441 4th Street, NW Suite 630 South Washington, DC 20001, for The District of Columbia; D. C. Fire and Emergency Services,  Chief Dean Gregory, Travis Chase Lois Hochhauser and Gitania Stewrt-Ponder;
   c. Eric W. Gunderson Columbia Corporate Park 880 Stanford Boulevard Suite 3100 Columbia, MD 21045 PFC Associates, LLC ; Dr. Olusola Maloma; Dr. Raquel Gordon; and Dr. Marc Cottrell.

2. Service of the Second Amended Complaint, with the Amended Complaint,  will be attempted/effected, via personal service, on the following Defendants, at their last known address, upon which the original complaint was effected, pursuant to Fed R. Civ. Proc 5(b)(2)(B)(ii):
   a. Lieutenant John Thornton 10035 Pages Court White Plains, MD 20695

3. Pursuant to Fed R. Civ Proc. 15(c)(1)(A),  Fed R. Civ. Proc. 15(c)(1)(B) and Fed. R. Civ. Proc. 15(c)(1)(C), personal service of the original Complaint, with the Amended Complaint  and the Second Amended Complaint  will be made on the DC Police and Firefighter Retirement and Relief Board/DC Human Resources, via their attorney of record Margaret Radabaugh, General Counsel  for DC Human Resources at 441 4th St., NW Suite 330 South Washington, DC 20001.

RECEIVED
Mail Room

JUN 2 5 2018

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

4.  Personal Service of the original Complaint, with the Amended Complaint and the Second
    Amended Complaint, will continue to be attempted on all of the Defendants, except, Lieutenant
    John Thornton and Travis Chase, as to their individual capacities, pursuant to the Court's Order,
    denying as moot the Plaintiff's August 31, 2016 Motion, "Plaintiff's Motion for an Extension of
    Time to Effect Service".

Nicole Rena McCrea
*Pro Se*
5205 East Capitol St., SE
Washington, DC 20019
E-mail: nic_mack@yahoo .com
202-491-9656

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NICOLE RENA MCCREA,

    Plaintiff,

v.                                 Civil Action No. 16-CV-0808-TSC

DISTRICT OF COLUMBIA, et al.,

    Defendants,


## CERTIFICATE of AUTHENTICITY

I, Nicole R. McCrea, certify under penalty of perjury that the following attachments in Support
of the Second Amended Complaint, are true and authentic copies of:

1. The US Equal Employment Opportunity Commission's Enforcement Guidance for
   Workers' Compensation and the Americans with Disabilities Act **[Attachment A1-A21].**

2. The Plaintiff's November 04, 2015 Notice to the District of Columbia. **[Attachment B1-
   B5].**

3. The District of Columbia's November 17, 2015 acknowledgment of receipt of the
   Plaintiff's Notice. **[Attachment B6].**

4. The Plaintiff's March 26, 2015 Notice to the District of Columbia. **[Attachment B7-
   B11].**

5. The District of Columbia's April 22, 2015 acknowledgment of receipt of the Plaintiff's
   Notice. **[Attachment B12-B13].**

6. The Plaintiff's May 04, 2015 Notice to the District of Columbia. **[Attachment B14-B17].**

7. The District of Columbia's May 08, 2015 acknowledgment of receipt of the Plaintiff's
   Notice. **[Attachment B18-B19].**

8. Frieda L. Cardwell's "January 16, 2014" Memorandum to the Assistant Fire Chief of
   Services Larry Jackson; recommending denial of the Plaintiff's request for workman's
   compensation in the form of Performance of Duty (POD) Injury. **[Attachment C1-C5].**



RECEIVED
Mail Room

JUN 2 5 2018

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

9.  The PFC Associates, LLC and DC Fire and EMS' May 01, 2014 recommendation of the Plaintiff for Involuntary non-POD Disability Retirement. **[Attachment D1-D20].**

10. The DC Police and Firefighters' Retirement and Relief Board's April 30, 2015 written Order and Decision. **[Attachment E1-E24].**

11. Plaintiff's November 21, 2013 Charge with the DC Equal Employment Opportunity and Commission (EEOC). **[Attachment F1].**

12. Plaintiff's May 20, 2015 Charges with the DC Office of Human Rights (DCOHR) **[Attachment G1-G4].**

13. Plaintiff's August 19, 2014 – August 24, 2015 correspondences with the Interim Director of the Office of Disability Rights Alexis Taylor **[Attachment H1-H3].**

14. Plaintiff's September 15, 2014 – March 26, 2015 correspondences with various EEOC offices requesting that her November 21, 2013 Charge and all supporting documents be transferred to the DCOHR **[Attachment H4-H10].**

15. Plaintiff's March 26, 2015 Charges with the DCOHR. **[Attachment I1-I10].**

16. Plaintiff's June 29, 2015 Charges with the DCOHR. **[Attachment J1-J10].**


Prepared June 22, 2018

Nicole Rena McCrea
*Pro Se*
5205 East Capitol St., SE
Washington, DC 20019
E-mail: nic_mack@yahoo .com
202-491-9656


## CERTIFICATE of SERVICE

I, Nicole Rena McCrea, hereby certify that on June 22, 2018, service of the Second Amended Complaint was effected, on the Defendants, via regular mail, via their perspective attorneys of record:

1.  Ellen Efros,; John Hoellen and Zach M. Walter at 1350 Pennsylvania Avenue NW, Suite 4 Washington, DC 20004
2.  Taylor Morosco at 441 4th Street, NW Suite 630 South Washington, DC 20001

3. Abby A. Franke and Justin M. Flint at 1629 K Street NW Suite 260 Washington, DC 20006
4. Eric W. Gunderson Columbia Corporate Park 8840 Stanford Boulevard Suite 3100 Columbia, MD 21045

via United States Postal Service, regular Mail via United States Postal Service.

Nicole Rena McCrea
*Pro Se*
5205 East Capitol St., SE
Washington, DC 20019
E-mail: nic_mack@yahoo .com
202-491-9656

*The U.S. Equal Employment Opportunity Commission*

**Notice Concerning The Americans With Disabilities Act Amendments Act Of 2008**

The Americans with Disabilities Act (ADA) Amendments Act of 2008 was signed into law on September 25, 2008 and becomes effective January 1, 2009. Because this law makes several significant changes, including changes to the definition of the term "disability," the EEOC will be evaluating the impact of these changes on this document and other publications. See the list of specific changes to the ADA made by the ADA Amendments Act.

EEOC NOTICE
Number 915.002
Date

1.   SUBJECT: EEOC Enforcement Guidance: Workers' Compensation and the ADA

2.   PURPOSE: This enforcement guidance sets forth the  Commission's position on the interaction between Title I of the  Americans with Disabilities Act of 1990 and state workers' compensation laws.

3.   EFFECTIVE DATE: Upon receipt.

4.   EXPIRATION DATE: As an exception to EEOC Order 205.001, Appendix B, Attachment 4, § a(5), this Notice will remain in effect until rescinded or superseded.

5.   ORIGINATOR: ADA Division, Office of Legal Counsel.

6.   INSTRUCTIONS: File after Section 902 of Volume II of the  Compliance Manual.

_____          _____
Date                     Gilbert F. Casellas
                         Chairman

*Attachment A 1*

*Exhibit 55*

EEOC Enforcement Guidance: Workers' Compensation and the ADA

## TABLE OF CONTENTS

INTRODUCTION

DISABILITY

QUESTIONS AND EXAMINATIONS

CONFIDENTIALITY OF MEDICAL INFORMATION

HIRING DECISIONS

RETURN TO WORK DECISIONS

REASONABLE ACCOMMODATION

LIGHT DUTY

EXCLUSIVE REMEDY PROVISIONS

INDEX (removed in ASCII version)

Attachment A 2

EEOC Enforcement Guidance: Workers' Compensation and the ADA

### INTRODUCTION

This enforcement guidance concerns the interaction between Title I of the Americans with Disabilities Act of 1990 (ADA)[1] and state workers' compensation laws.[2]  The purpose of Title I of the ADA is to prohibit employers from discriminating against qualified individuals because of disability in all aspects of employment.[3]  On the other hand, the purpose of a workers' compensation law is to provide a system for securing  prompt and fair settlement of employees' claims against employers for occupational injury and illness.[4]  While the purposes of the two laws are not in conflict, the simultaneous application of the laws has raised questions for EEOC investigators, for employers, and for individuals with disabilities in a number of areas.[5]  In this document, the Commission provides guidance concerning the following issues:

* whether a person with an occupational injury has a disability as defined by the ADA;

* disability-related questions and medical examinations relating to occupational injury and workers' compensation claims;

* hiring of persons with a history of occupational injury, return to work of persons with occupational injury, and application of the direct threat standard;

* reasonable accommodation for persons with disability-related occupational injuries;

* light duty issues; and

* exclusive remedy provisions in workers' compensation laws.

### DISABILITY

The Commission has provided general guidance on the definition of the term "disability" under the ADA in EEOC: Definition of the Term "Disability," 8 FEP Manual (BNA) 405:7251 (1995). This section applies that guidance in the context of occupational injury and workers' compensation.  The definition of "disability" under the ADA is no different in the workers' compensation context than in any other context.

1. Does everyone with an occupational injury have a disability within the meaning of the ADA?

No.  Even if an employee with an occupational injury has a "disability" as defined by a workers' compensation statute, s/he may not have a "disability" for ADA purposes.

Attachment A 3

The ADA defines "disability" as: (1) a physical or mental impairment that substantially limits a major life activity, (2) a record of such an impairment, or (3) being regarded as having such an impairment.  Impairments resulting from occupational injury may not be severe enough to substantially limit a major life activity, or they may be only temporary, non-chronic, and have little or no long term impact.

2. Does every person who has filed a workers' compensation claim have a disability under the "record of" portion of the ADA definition?

No.  A person has a disability under the "record of" portion of the ADA definition only if s/he has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities.

3. When does a person with an occupational injury have a disability under the "regarded as" portion of the ADA definition?

A person with an occupational injury has a disability under the "regarded as" portion of the ADA definition if s/he: (1) has an impairment that does not substantially limit a major life activity but is treated by an employer as if it were substantially limiting, (2) has an impairment that substantially limits a major life activity because of the attitude of others towards the impairment, or (3) has no impairment but is treated as having a substantially limiting impairment.[6]

Example A:  An employee has an occupational injury that has resulted in a temporary back impairment that does not substantially limit a major life activity.  However, the employer views her as not being able to lift more than a few pounds and refuses to return her to her position.  The employer regards her as having an impairment that substantially limits the major life activity of lifting.  The employee has a disability as defined by the ADA.

Example B:  An employer refuses to allow an employee whose occupational injury results in a facial disfigurement to return to his position because the employer fears negative reactions by co-workers or customers.  The employer regards him as having an impairment that substantially limits the major life activities of interacting with others and working.  The employee has a disability as defined by the ADA.

Example C:  An employee is fully recovered from an occupational injury that resulted in a temporary back impairment.  The employer fires the employee because it believes that, if he returns to his heavy labor job, he will severely injure his back and be totally incapacitated.  The employer regards the employee as having an impairment that disqualifies him from a class of jobs (heavy labor) and therefore as substantially limited in the major life activity of working.  The employee has a disability as defined by the ADA.

Attachment A4

QUESTIONS AND EXAMINATIONS

The Commission has provided general guidance on disability-related questions and medical examinations in ADA Enforcement Guidance: Preemployment Disability-Related Questions and Medical Examinations, 8 FEP Manual (BNA) 405:7191 (1995).  The guidance provided here pertains particularly to disability-related questions and medical examinations related to workers' compensation and occupational injuries.

4. When may an employer ask questions about an applicant's prior workers' compensation claims or occupational injuries?

An employer may ask questions about an applicant's prior workers' compensation claims or occupational injuries after it has made a conditional offer of employment, but before employment has begun, as long as it asks the same questions of all entering employees in the same job category.

5. When may an employer require a medical examination of an applicant to obtain information about the existence or nature of prior occupational injuries?

An employer may require a medical examination to obtain information about the existence or nature of an applicant's prior occupational injuries, after it has made a conditional offer of employment, but before employment has begun, as long as it requires all entering employees in the same job category to have a medical examination.  Where an employer has already obtained basic medical information from all entering employees in a job category, it may require specific individuals to have follow-up medical examinations only if they are medically related to the previously obtained medical information.

6. Before making a conditional offer of employment, may an employer obtain information about an applicant's prior workers' compensation claims or occupational injuries from third parties, such as former employers, state workers' compensation offices, or a service that provides workers' compensation information?

No.  At the pre-offer stage, as at any other time, an employer may not obtain from third parties any information that it could not lawfully obtain directly from the applicant.

7. May an employer ask disability-related questions or require a medical examination of an employee either at the time s/he experiences an occupational injury or when s/he seeks to return to the job following such an injury?

Yes, in both instances, provided that the disability-related questions or medical examinations are job-related and consistent with business necessity.  This requirement is met

Attachment s A 5

where an employer reasonably believes that the occupational injury will impair the employee's ability to perform essential job functions or raises legitimate concerns about direct threat. However, the questions and examinations must not exceed the scope of the specific occupational injury and its effect on the employee's ability, with or without reasonable accommodation, to perform essential job functions or to work without posing a direct threat.[7]

8. May an employer ask disability-related questions or require a medical examination of an employee with an occupational injury in order to ascertain the extent of its workers' compensation liability?

Yes.  The ADA does not prohibit an employer or its agent from asking disability-related questions or requiring medical examinations that are necessary to ascertain the extent of its workers' compensation liability.[8]

However, the questions and examinations must be consistent with the state law's intended purpose of determining an employee's eligibility for workers' compensation benefits.  An employer may not use an employee's occupational injury as an  opportunity to ask far-ranging disability-related questions or to require unrelated medical examinations.  Examinations and questions must be limited in scope to the specific occupational injury and its impact on the individual and may not be required more often than is necessary to determine an individual's initial or continued eligibility for workers' compensation benefits.  Excessive questioning or imposition of medical examinations may constitute disability-based harassment which is prohibited by the ADA.

9. If an employee with a disability-related occupational injury requests a reasonable accommodation, may the employer ask for documentation of his/her disability?

Yes.  If an employee with a disability-related occupational injury[9] requests reasonable accommodation and the need for accommodation is not obvious, the employer may require reasonable documentation of the employee's entitlement to reasonable accommodation.  While the employer may require documentation showing that the employee has a covered disability and stating his/her functional limitations, it is not entitled to medical records that are unnecessary to the request for reasonable accommodation.

CONFIDENTIALITY OF MEDICAL INFORMATION

10. Do the ADA's confidentiality requirements apply to medical information regarding an applicant's or employee's occupational injury or workers' compensation claim?

Attachments A6

Yes.  Medical information regarding an applicant's or employee's occupational injury or workers' compensation claim must be collected and maintained on separate forms and kept in a separate medical file along with other information required to be kept confidential under the ADA.  An employer must keep medical information confidential even if someone is no longer an applicant or an employee.

The ADA allows disclosure of this information only in the following circumstances:

* supervisors and managers may be told about necessary restrictions on the work or duties of the employee and about necessary accommodations;[10]

* first aid and safety personnel may be told, when appropriate, if the disability might require emergency treatment;[11]

* government officials investigating compliance with the ADA must be given relevant information on request;[12]

* employers may give information to state workers' compensation offices, state second injury funds, and workers' compensation insurance carriers in accordance with state workers' compensation laws;[13] and

* employers may use the information for insurance purposes.[14]

HIRING DECISIONS

11. May an employer refuse to hire a person with a disability simply because it assumes, correctly or incorrectly, that s/he poses some increased risk of occupational injury and increased workers' compensation costs?

No, unless the employer can show that employment of the person in the position poses a "direct threat."  In enacting the ADA, Congress sought to address stereotypes regarding disability, including assumptions about workers' compensation costs.[15]  Where an employer refuses to hire a person because it assumes, correctly or incorrectly, that, because of a disability, s/he poses merely some increased risk of occupational injury (and, therefore, increased workers' compensation costs), the employer discriminates against that person on the basis of disability.  The employer can refuse to hire the person only if it can show that his/her employment in the position poses a "direct threat."  This means that an employer may not "err on the side of safety" simply because of a potential health or safety risk.  Rather, the employer must demonstrate that the risk rises to the level of a direct threat.

Attachments A7

"Direct threat" means a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation.[16]   The determination that a direct threat exists must be the result of a fact-based, individualized inquiry that takes into account the specific circumstances of the individual with a disability.

In determining whether employment of a person in a particular position poses a direct threat, the factors to be considered are:

* the duration of the risk;

* the nature and severity of the potential harm;

* the likelihood that the potential harm will occur; and

* the imminence of the potential harm.[17]

Some state health or safety laws may permit or require an employer to exclude a person with a disability from employment in cases where the ADA would not permit exclusion because employment of the person in the position does not pose a direct threat.  Because the ADA supersedes such state laws, an employer may not defend its exclusion of a person with a disability on the basis of such a law.

12. May an employer refuse to hire a person with a disability simply because s/he sustained a prior occupational injury?

No.  The mere fact that a person with a disability experienced an occupational injury in the past does not, by itself, establish that his/her current employment in the position in question poses a direct threat, i.e., a significant risk of substantial harm that cannot be lowered or eliminated by a reasonable accommodation.  However, evidence about a person's prior occupational injury, in some circumstances, may be relevant to the direct threat analysis discussed in question 11, above.

An investigator should consider the following factors regarding a prior occupational injury in applying the direct threat analysis set forth in question 11, above:

* whether the prior injury is related to the person's disability (e.g., if employees without disabilities in the person's prior job had similar injuries, this may indicate that the injury is not related to the disability and, thus, is irrelevant to the direct threat inquiry);

* the circumstances surrounding the prior injury (e.g., the actions of others in the workplace or the lack of appropriate safety devices or procedures may have caused or contributed to the injury);

*Attachments A 8*

* the similarities and differences between the position in question and the position in which the prior injury occurred (e.g., the prior position may have involved hazards not present in the position under consideration);

* whether the current condition of the person with a disability is similar to his/her condition at the time of the prior injury (e.g., if the person's condition has improved, the prior injury may have little significance);

* the number and frequency of prior occupational injuries;

* the nature and severity of the prior injury (e.g., if the injury was minor, it may have little or no significance);

* the amount of time the person has worked in the same or a similar position since the prior injury without subsequent injury; and

* whether the risk of harm can be lowered or eliminated by a reasonable accommodation.

Example A:  CP applies for a position operating a large saw with R, a lumber mill.  After making a conditional job offer,  R discovers that CP, who has insulin-dependent diabetes, was seriously injured while operating a similar saw for another  lumber mill.  The injury was caused by the failure of a safety device and was unrelated to CP's diabetes.  R assumes, however, that the injury was related to the diabetes and refuses to hire CP for safety reasons.  CP's prior occupational injury, which was unrelated to her disability, does not constitute evidence that she poses a direct threat in the saw operator position because of her disability.

Example B:  CP, who has a shoulder disability, applies to R restaurant for the position of bus person which requires frequent carrying of basins full of dirty dishes weighing 40-45 pounds.  After a conditional job offer, R discovers that CP has had five serious injuries to his left shoulder while carrying basins full of dirty dishes in other bussing jobs over the past four years. A medical examination and physical fitness test show that the condition of CP's shoulder has significantly deteriorated with each injury.  They also show that, if CP carries heavy basins, there is a high probability that his left shoulder will be immediately and permanently injured to the point where his left arm will be useless.  Assume that there is no reasonable accommodation that will enable CP to perform the essential functions of the bussing position.  The objective medical and other evidence (the number, frequency, nature, and severity of the prior injuries; the similarity of the position at issue to the positions in which the injuries occurred; the progressive deterioration of CP's shoulder with each injury; and the evidence that a further injury will render CP's arm useless) supports a finding that CP's employment in the position of bus person poses a significant risk of substantial harm.  The evidence further shows that the risk cannot be lowered or eliminated through a reasonable accommodation.  Therefore, CP's employment in the position of bus person poses a direct threat.

Attachment   #9

Example C:  CP applies for a position as a laborer with R, a construction company.  The position requires lifting equipment and other items weighing up to 100 pounds.  After making a conditional offer of employment to CP, R requires him to undergo its standard medical examination.  As a result, R discovers that CP previously injured his back while working for an automotive repair shop.  CP's prior on-the-job injury, which occurred when CP was helping a co-worker push a stalled vehicle, was not serious.  CP has completely recovered from the back injury.  Nevertheless, R rescinds its offer of employment because it is worried about increased workers' compensation costs and considers CP to be a poor risk for heavy labor.[18]  CP's prior occupational injury, which was not serious and which occurred in a position involving hazards not present in R's position, does not constitute evidence that employment of CP in the laborer position would pose a direct threat.


RETURN TO WORK DECISIONS


13. May an employer require that an employee with a disability-related occupational injury be able to return to "full duty" before allowing him/her to return to work?

No.  The term "full duty" may include marginal as well as essential job functions or may mean performing job functions without any accommodation.  An employer may not require that an employee with a disability-related occupational injury who can perform essential functions be able to return to "full duty" if, because of the disability, s/he is unable to perform marginal functions of the position[19] or requires a reasonable accommodation that would not impose an undue hardship.


14. May an employer refuse to return to work an employee with a disability-related occupational injury simply because it assumes, correctly or incorrectly, that s/he poses some increased risk of reinjury and increased workers' compensation costs?

No, unless an employer can show that employment of the person in the position poses a "direct threat."  Where an employer refuses to return an employee to work because it assumes, correctly or incorrectly, that his/her disability-related occupational injury creates merely some increased risk of further occupational injury and increased workers' compensation costs, it discriminates on the basis of disability.  The employer may not refuse to return to work an employee who is able to perform the essential functions of the job, with or without a reasonable accommodation, unless it can show that returning the person to the position poses a "direct threat."  (See the discussion of direct threat in questions 11 and 12, above.)


The fact that an employee has had a disability-related occupational injury does not, by itself, indicate that s/he is unable to perform the essential functions of the job or that returning

ATTACHMENT A 10

him/her to work poses a direct threat. In some circumstances, evidence about an employee's disability-related occupational injury may be relevant to whether s/he can perform the essential functions of the job, with or without a reasonable accommodation, or it may be relevant to the direct threat analysis. An employer should consider the pertinent factors listed in questions 11 and 12, above, in applying the direct threat analysis in this context.

Example A: CP, a clerk/typist, breaks her wrist while trying to move heavy office equipment with a co-worker. CP is unable to work for six weeks and receives workers' compensation. After CP's wrist completely heals, she asks to return to work. A physician indicates that there is little risk that repetitive motion will damage CP's wrist. However, R refuses her request to return to the clerk/typist position because it believes that any repetitive motion will cause serious and permanent reinjury of her wrist.[20] The following objective evidence supports a finding that returning CP to the clerk/typist position does not pose a significant risk of substantial harm (i.e., direct threat): (1) her injury was not caused by repetitive motion, (2) her wrist has completely healed, and (3) there is little risk that she will reinjure her wrist through repetitive motion. R has violated the ADA by not returning CP to her clerk/typist position.

Example B: CP, a maintenance worker, badly fractures both ankles in a workplace accident. She is unable to work for six months and receives workers' compensation. Although CP's ankles partially heal, she is unable to walk and stand for more than short periods of time. CP's maintenance job requires extensive walking and standing on cement floors. The report from CP's most recent medical examination shows that there is a high probability of immediate, severe, and permanent damage to CP's ankles if she walks or stands for more than short periods of time, especially on hard surfaces. Assume that there is no accommodation that will lower the risk of harm. R may refuse to return CP to her maintenance position because there is sufficient evidence to support a finding that her employment in the position poses a direct threat, i.e., a significant risk of substantial harm that cannot be eliminated or reduced through a reasonable accommodation. (However, R must reassign CP, as set forth in question 22, below, absent undue hardship.)

15. May an employer refuse to return to work an employee with a disability-related occupational injury simply because of a workers' compensation determination that s/he has a "permanent disability" or is "totally disabled"?

No. Workers' compensation laws are different in purpose from the ADA and may utilize different standards for evaluating whether an individual has a "disability" or whether s/he is capable of working. For example, under a workers' compensation statute, a person who loses vision in both eyes or has loss of use of both arms or both legs may have a "permanent total disability," although s/he may be able to work. A workers' compensation determination also may relate to a different time period. Such a determination is never dispositive regarding an individual's ability to return to work, although it may provide relevant evidence regarding an employee's ability to perform the essential functions of the position in question or to return to work without posing a direct threat.

Attachment A11

16. Under the ADA, is a rehabilitation counselor, physician, or other specialist responsible for deciding whether an employee with a disability-related occupational injury is ready to return to work?

No. The employer bears the ultimate responsibility for deciding whether an employee with a disability-related occupational injury is ready to return to work. Therefore, the employer, rather than a rehabilitation counselor, physician, or other specialist, must determine whether the employee can perform the essential functions of the job, with or without reasonable accommodation, or can work without posing a direct threat.

On the other hand, the employer may find it helpful to seek information from the rehabilitation counselor, physician, or other specialist regarding the employee's specific functional limitations, abilities, and possible reasonable accommodations.

In order to obtain useful and accurate information from a rehabilitation counselor, physician, or other specialist in making a return to work decision, an employer may wish to provide him/her with specific information about the following:

* the essential functions of the employee's position and the nature of the work to be performed;

* the work environment and the employer's operations, including any unavoidable health or safety hazards which may exist; and

* possible reasonable accommodations.

An employer also may obtain useful information from others who are not experts but who are knowledgeable about the employee's current abilities, limitations, and possible reasonable accommodations. Such information will enable the employer to make an independent and accurate determination about the employee's ability to return to work.

## REASONABLE ACCOMMODATION

The ADA requires that an employer make reasonable accommodation to the known physical or mental limitations of an otherwise qualified individual with a disability, unless the employer can demonstrate that the accommodation would impose an undue hardship. The general principles regarding reasonable accommodation and undue hardship are discussed in the Commission's ADA regulations and interpretive guidance (29 C.F.R. §§ 1630.2, 1630.9 and Appendix (1995)), and in the Technical Assistance Manual at 3.0, 8 FEP Manual (BNA) 405:6998 (1992). This section provides specific guidance regarding reasonable accommodation in the context of workers' compensation.

Attachment    A 12

17. Does the ADA require an employer to provide reasonable accommodation for an employee with an occupational injury who does not have a disability as defined by the ADA?

No.  The ADA does not require an employer to provide a reasonable accommodation for an employee with an occupational injury who does not have a disability as defined by the ADA.

18. May an employer discharge an employee who is temporarily unable to work because of a disability-related occupational injury?

No.  An employer may not discharge an employee who is temporarily unable to work because of a disability-related occupational injury where it would not impose an undue hardship to provide leave as a reasonable accommodation.[21]

19. What are the reinstatement rights of an employee with a disability-related occupational injury?

An employee with a disability-related occupational injury is entitled to return to his/her same position unless the employer demonstrates that holding open the position would impose an undue hardship.

In some instances, an employee may request more leave even after the employer has communicated that it would impose an undue hardship to hold open the employee's position any longer.  In this situation, the employer must consider whether it has a vacant, equivalent position for which the employee is qualified and to which the employee can be reassigned without undue hardship to continue his/her leave for a specific period of time.  For example, suppose that an employee needs six months to recover from a disability-related occupational injury, but holding his/her original position open for more than four months will impose an undue hardship.  The employer must consider whether it has a vacant equivalent position to which the employee can be reassigned for the remaining two months of leave.  If an equivalent position is not available, the employer must look for a vacant position at a lower level.  Continued leave is not required as a reasonable accommodation if a vacant position at a lower level is also unavailable.[22]

20. Must an employer, as a reasonable accommodation, reallocate job duties of an employee with a disability-related occupational injury?

Yes, if the duties to be reallocated are marginal functions[23] of the position that the employee cannot perform because of the disability.  Reasonable accommodation includes restructuring a position by reallocating or redistributing the marginal functions that the employee cannot perform because of the disability.  However, an employer need not eliminate essential functions of the position.

Attachment   A13

21. May an employer unilaterally reassign an employee with a disability-related occupational injury to a different position instead of first trying to accommodate the employee in the position s/he held at the time the injury occurred?

No. An employer must first assess whether the employee can perform the essential functions of his/her original position, with or without a reasonable accommodation. Examples of reasonable accommodation include job restructuring, modification of equipment, or a part-time work schedule. Reassignment should be considered only when accommodation within the employee's original position is not possible or would impose an undue hardship.[24]

22. Must an employer reassign an employee who is no longer able to perform the essential functions of his/her original position, with or without a reasonable accommodation, because of a disability-related occupational injury?

Yes. Where an employee can no longer perform the essential functions of his/her original position, with or without a reasonable accommodation, because of a disability-related occupational injury, an employer must reassign him/her to an equivalent vacant position for which s/he is qualified, absent undue hardship.[25] If no equivalent vacant position (in terms of pay, status, etc.) exists, then the employee must be reassigned to a lower graded position for which s/he is qualified, absent undue hardship.

23. If there is no vacancy for an employee who can no longer perform his/her original position because of a disability-related occupational injury, must an employer create a new position or "bump" another employee from his/her position?

No. The ADA does not require an employer to create a new position or to bump another employee from his/her position in order to reassign an employee who can no longer perform the essential functions of his/her original position, with or without a reasonable accommodation.

24. When an employee requests leave as a reasonable accommodation under the ADA because of a disability-related occupational injury, may an employer provide an accommodation that requires him/her to remain on the job instead?

Yes. An employer need not provide an employee's preferred accommodation as long as the employer provides an effective accommodation -- one that is sufficient to meet the employee's job-related needs.

Accordingly, an employer may provide a reasonable accommodation that requires an employee to remain on the job, in lieu of providing leave (e.g., reallocating marginal functions, or providing temporary reassignment).

Attachment A 14

The employer is obligated, however, to restore the employee's full duties or to return the employee to his/her original position once s/he has recovered sufficiently to perform its essential functions, with or without a reasonable accommodation.

However, if an employee with a disability-related occupational injury does not request a reasonable accommodation, but simply requests leave that is routinely granted to other employees (e.g., accrued paid leave or leave without pay), an employer may not require him/her to remain on the job with some type of adjustment unless it also requires employees without disabilities who request such leave to remain on the job with some type of adjustment.

(Note that, if an employee qualifies for leave under the Family and Medical Leave Act, an employer may not require him/her to remain on the job with an adjustment in lieu of taking a leave of absence.  29 C.F.R. § 825.702(d)(1) (1995).)

25. May an employer satisfy its ADA obligation to provide reasonable accommodation for an employee with a disability-related occupational injury by placing him/her in a workers' compensation vocational rehabilitation program?

No.  An employer cannot substitute vocational rehabilitation services in place of a reasonable accommodation required by the ADA for an employee with a disability-related occupational injury.  An employee's rights under the ADA are separate from his/her entitlements under a workers' compensation law.  The ADA requires employers to accommodate an employee in his/her current position through job restructuring or some other modification, absent undue hardship.[26]  If it would impose an undue hardship to accommodate an employee in his/her current position, then the ADA requires that an employer reassign the employee to a vacant position s/he can perform, absent undue hardship.[27]  (See question 22, above.)

26. May an employer make a workplace modification that is not a required form of reasonable accommodation under the ADA in order to offset workers' compensation costs?

Yes.  Nothing in the ADA prohibits an employer from making a workplace modification that is not a required form of reasonable accommodation under the ADA for an employee with an occupational injury in order to offset workers' compensation costs.  For example, the ADA does not require employers to lower production standards to accommodate individuals with disabilities.  However, an employer is clearly permitted to lower production standards for an occupationally injured employee as a way of returning him/her to work more quickly.

Attachment   A15

## LIGHT DUTY

The term "light duty" has a number of different meanings in the employment setting. Generally, "light duty" refers to temporary or permanent work that is physically or mentally less demanding than normal job duties. Some employers use the term "light duty" to mean simply excusing an employee from performing those job functions that s/he is unable to perform because of an impairment. "Light duty" also may consist of particular positions with duties that are less physically or mentally demanding created specifically for the purpose of providing alternative work for employees who are unable to perform some or all of their normal duties. Further, an employer may refer to any position that is sedentary or is less physically or mentally demanding as "light duty."

In the following questions and answers, the term "light duty" refers only to particular positions created specifically for the purpose of providing work for employees who are unable to perform some or all of their normal duties.

27. Does the ADA prohibit an employer from creating a light duty position for an employee when s/he is injured on the job?

No, in most instances. An employer may recognize a special obligation arising out of the employment relationship to create a light duty position for an employee when s/he has been injured while performing work for the employer and, as a consequence, is unable to perform his/her regular job duties. Such a policy, on its face, does not treat an individual with a disability less favorably than an individual without a disability; nor does it screen out an individual on the basis of disability.[28]

Of course, an employer must apply its policy of creating a light duty position for an employee when s/he is occupationally injured on a non-discriminatory basis. In other words, an employer may not use disability as a reason to refuse to create a light duty position when an employee is occupationally injured.

An employer need not create a light duty position for a non-occupationally injured employee with a disability as a reasonable accommodation. The principle that the ADA does not require employers to create positions as a form of reasonable accommodation applies equally to the creation of light duty positions. However, an employer must provide other forms of reasonable accommodation required under the ADA. For example, subject to undue hardship, an employer must: (1) restructure a position by redistributing marginal functions which an individual cannot perform because of a disability, (2) provide modified scheduling (including part time work), or (3) reassign a non-occupationally injured employee with a disability to an equivalent existing vacancy for which s/he is qualified. Accordingly, an employer may not avoid its obligation to accommodate an individual with a disability simply by asserting that the disability did not derive from an occupational injury.

Attachment A16

In some cases, the only effective reasonable accommodation available for an individual with a disability may be similar or equivalent to a light duty position. The employer would have to provide that reasonable accommodation unless the employer can demonstrate that doing so would impose an undue hardship.

Example: R creates light duty positions for employees when they are occupationally injured if they are unable to perform one or more of their regular job duties. CP can no longer perform functions of her position because of a disability caused by an off-the-job accident. She requests that R create a light duty position for her as a reasonable accommodation. R denies CP's request because she has not been injured on the job. R has not violated the ADA. However, R must provide another reasonable accommodation, absent undue hardship. If it is determined that the only effective accommodation is to restructure CP's position by redistributing the marginal functions, and the restructured position resembles a light duty position, R must provide the reasonable accommodation unless it can prove that it imposes an undue hardship.

28.   If an employer reserves light duty positions for employees with occupational injuries, does the ADA require it to consider reassigning an employee with a disability who is not occupationally injured to such positions as a reasonable accommodation?

Yes.[29] If an employee with a disability who is not occupationally injured becomes unable to perform the essential functions of his/her job, and there is no other effective accommodation available, the employer must reassign him/her to a vacant reserved light duty position as a reasonable accommodation if (1) s/he can perform its essential functions, with or without a reasonable accommodation; and (2) the reassignment would not impose an undue hardship. This is because reassignment to a vacant position and appropriate modification of an employer's policy are forms of reasonable accommodation required by the ADA, absent undue hardship.[30] An employer cannot establish that the reassignment to a vacant reserved light duty position imposes an undue hardship simply by showing that it would have no other vacant light duty positions available if an employee became injured on the job and needed light duty.

Example: R has light duty positions which it reserves for employees in its manufacturing department when they are unable to perform their regular job duties because of on-the-job injuries. CP, an assembly line worker, has multiple sclerosis (MS) which substantially limits a number of major life activities. Eventually CP is unable to perform the essential functions of her position, with or without a reasonable accommodation, because of the MS. As a reasonable accommodation, CP requests that she be reassigned to a vacant light duty position for which she is qualified. R says that the vacant light duty position is reserved for employees who are injured on the job and refuses to reassign CP, although it would not impose an undue hardship to do so. R has violated the ADA by refusing to reassign her to the vacant light duty position.

29. If an employer has only temporary light duty positions, must it still provide a permanent light duty position for an employee with a disability-related occupational injury?

Attachment A17

No.  The ADA typically does not limit an employer's ability to establish or change the content, nature, or functions of its positions.  So, for example, an employer is free to determine that a light duty position will be temporary rather than permanent.[31]  Thus, if an employer provides light duty positions only on a temporary basis, it need only provide a temporary light duty position for an employee with a disability-related occupational injury.

## EXCLUSIVE REMEDY PROVISIONS

30. Do exclusive remedy provisions in workers' compensation laws bar employees from pursuing ADA claims?

No.  The purpose of workers' compensation exclusivity clauses is to protect employers from being sued under common law theories of personal injury for occupational injury.  Courts have generally held that the exclusive remedy provisions of state workers' compensation laws cannot bar claims arising under federal civil rights laws,[32] even where a state workers' compensation law provides some relief for disability discrimination.  Applying a state workers' compensation law's exclusivity provision to bar an individual's ADA claim would violate the Supremacy Clause of the U.S. Constitution and seriously diminish the civil rights protection Congress granted to persons with disabilities.

INDEX (removed in ASCII version)

1. Codified as amended at 42 U.S.C. §§ 12101-12117, 12201-12213 (1994).

2. The analysis in this guidance also applies to federal sector complaints of non-affirmative action employment discrimination arising from the interaction between the Federal Employee's Compensation Act, 5 U.S.C. §§ 8101-8193 (1994), and section 501 of the Rehabilitation Act of 1973, 29 U.S.C. § 791(g) (1994), and to complaints of non-affirmative action employment discrimination arising from the interaction between sections 503 and 504 of the Rehabilitation Act of 1973, 29 U.S.C. §§ 793(d), 794(d) (1994), and state workers' compensation laws.

3. 42 U.S.C. § 12112(a); 29 C.F.R. § 1630.4.

4. Workers' compensation laws generally require employers to compensate employees who are injured or become ill in the course of employment for the resulting loss of earning capacity and for medical care.  See 1 Arthur Larson, The Law of Workmen's Compensation, § 1-1.10 (1994).

5. Basic information on this topic may be found in EEOC: Technical Assistance Manual on the Employment Provisions (Title I) of the Americans with Disabilities Act at 9.0, 8 FEP Manual

Attachment A18

(BNA) 405:7055 (1992) [hereinafter Technical Assistance Manual].

6. For a detailed discussion of whether an individual is covered under the "regarded as" portion of the ADA definition of disability, see EEOC: Definition of the Term "Disability" at 902.8(a), 8 FEP Manual (BNA) 405:7278-405:7286 (1995).

7. If, as a result of an examination or inquiry, an employer refuses to return an employee to work because of a disability, the reason for doing so must be job-related and consistent with business necessity. See 29 C.F.R. § 1630.10 and Appendix (1995). Where safety considerations are implicated, the employer can only refuse to return the employee to work where his/her employment in the position would pose a "direct threat." Direct threat is discussed in questions 11, 12, 14, and 15, below.

8. This is because the ADA does not invalidate the procedures of any federal, state, or local law "that provides greater or equal protection for the rights of individuals with disabilities" than is provided by the ADA. 42 U.S.C. § 12201(b) (1994). Those portions of state workers' compensation laws that protect the rights of individuals to be compensated for work-related injury provide such greater or equal protection. The same is true for the analogous portions of the Federal Employee's Compensation Act, 5 U.S.C. §§ 8101-8193 (1994).

9. An individual with a disability may have an occupational injury that has nothing to do with the disability. The term "disability-related occupational injury" is used herein when the ADA and workers' compensation statutes apply simultaneously, i.e., where there is a connection between an occupational injury and a disability as defined by the ADA.

10. 42 U.S.C. § 12112(d)(3)(B)(i) (1994); 29 C.F.R. § 1630.14(b)(1)(i), (c)(1)(i) (1995).

11. 42 U.S.C. § 12112(d)(3)(B)(ii); 29 C.F.R. § 1630.14(b)(1)(ii), (c)(1)(ii).

12. 42 U.S.C. § 12112(d)(3)(B)(iii); 29 C.F.R. § 1630.14(b)(1)(iii), (c)(1)(iii).

13. See 42 U.S.C. § 12201(b); 29 C.F.R. pt. 1630 app. § 1630.14(b).

14. See 42 U.S.C. § 12201(c); 29 C.F.R. pt. 1630 app. §§ 1630.14(b) and 1630.16(f). For example, an employer may submit medical information to the company's health insurance carrier if the information is needed to administer a health insurance plan in accordance with § 501(c) of the ADA.

15. H.R. Rep. No. 485 pt. 3, 101st Cong., 2d Sess. 31 (1990).

16. 29 C.F.R. § 1630.2(r) (1995).

17. "Direct threat" is discussed more fully in the Commission's ADA regulations and interpretive guidance, 29 C.F.R. § 1630.2(r) and Appendix (1995), and in the Technical Assistance Manual at 4.5, 8 FEP Manual (BNA) 405:7022-405:7026 (1992).

Attachment A19

18. CP has a disability as defined by the ADA because R regards CP as having a substantially limiting impairment. R, which disqualified CP from the heavy laborer position because it believed that CP was a poor risk for heavy labor, treated CP as unsuitable for the class of heavy labor jobs. Accordingly, R regards CP as substantially limited in the major life activity of working. See EEOC: Definition of the Term "Disability" at 902.8(f), 8 FEP Manual (BNA) 405:7282 (1995).

19. The employer can reallocate or redistribute to other employees the marginal functions that the employee is unable to perform because of the disability.

20. CP has a disability because R regards her as having an impairment that disqualifies her from a class of jobs (clerk/typist) and therefore as substantially limited in the major life activity of working. See EEOC: Definition of the Term "Disability" at 902.8(f), 8 FEP Manual (BNA) 405:7282 (1995).

21. Under the ADA, permitting the use of accrued paid leave or providing additional unpaid leave for treatment and/or recovery are forms of reasonable accommodation that an employer must provide, absent undue hardship. See 29 C.F.R. pt. 1630 app. § 1630.2(o) (1995); Technical Assistance Manual at 3.10(4), 8 FEP Manual (BNA) 405:7011 (1992). In addition, an injured employee may be entitled to leave under the Family and Medical Leave Act of 1993, 29 U.S.C. §§ 2601-2654 (1994), which is enforced by the United States Department of Labor.

22. For further information on an employer's obligations regarding reassignment, see questions 21 and 22, below.

23. For a discussion of essential and marginal job functions see 29 C.F.R. § 1630.2(n) and Appendix (1995) and the Technical Assistance Manual at 2.3(a)-(c), 8 FEP Man. (BNA) 405:6993-405:6998 (1992).

24. 29 C.F.R. pt. 1630 app. § 1630.2(o); Technical Assistance Manual at 3.10(5), 8 FEP Manual (BNA) 405:7011- 405:7012 (1992). Note, however, that the ADA does not prohibit an employer and an employee from choosing reassignment rather than accommodation in the original position, if both parties voluntarily agree that reassignment is preferable.

25. Id. Note, however, that the ADA does not prohibit an employer from removing an essential function that an employee is no longer able to perform, in lieu of reassignment, if removing the essential function does not result in a diminution of an employment opportunity or status. Where removing an essential function results in a diminution of an employment opportunity or status, an employer may remove the essential function in lieu of reassignment only if both parties voluntarily agree that it is preferable to reassignment. Of course, the ADA does not require an employer to remove an essential job function as a reasonable accommodation.

26. 29 C.F.R. pt. 1630 app. § 1630.2(o) (1995); Technical Assistance Manual at 3.10(5), 8 FEP Manual (BNA) 405:7011-405:7012 (1992).

Attachment A20

27. However, the ADA does not prohibit an employer and an employee from choosing vocational rehabilitation as an alternative to accommodating the employee in his/her current position, if both parties voluntarily agree that vocational rehabilitation is preferable.

28. A policy of creating light duty jobs for employees when they are occupationally injured in some instances may disproportionately exclude a class of individuals with disabilities. Where this is established by appropriate evidence of adverse impact, an employer must show that the policy is job-related and consistent with business necessity. Similarly, where such a policy has a disparate impact on a protected class under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e-2000e-17 (1994), or the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621-634 (1994), the employer must show that the policy is job-related and consistent with business necessity.

29. If it is established by appropriate evidence that a policy of reserving light duty jobs for employees who have been occupationally injured has an adverse impact on a protected class under any of the laws enforced by the EEOC, an employer must show that the policy is job-related and consistent with business necessity. See footnote 28, above. Of course, an employer may not apply the policy in a discriminatory manner.

30. 29 C.F.R. § 1630.2(o)(2)(ii) (1995).

31. Technical Assistance Manual at 9.4, 8 FEP Manual (BNA) 405:7057-405:7058 (1992).

32. The only federal court to have addressed the issue under the ADA has held that an individual's ADA rights are not precluded by a state workers' compensation exclusive remedy provision. Wood v. County of Alameda, 875 F. Supp. 659, 664, 4 AD Cas. (BNA) 43 (N.D. Cal. 1995). Prior to enactment of the ADA, it was well established that the exclusive remedy provisions of state workers' compensation laws could not bar claims arising under federal civil rights laws, including the Rehabilitation Act. See, e.g., Lopez v. S.B. Thomas, Inc., 831 F.2d 1184, 1190 (2d Cir. 1987) (while workers' compensation law might bar plaintiff's state common law claim, it cannot bar relief under 42 U.S.C. § 1981 for discriminatory discharge); Rosa v. Cantrell, 705 F.2d 1208, 1221 (10th Cir. 1982), cert. denied, 464 U.S. 821 (1983) (state statute's exclusivity provision does not bar a federal civil rights claim under 42 U.S.C. § 1983); Smith v. Lake City Nursing Home, 771 F. Supp. 985, 987, 1 AD Cas. (BNA) 1874 (D. Minn. 1991) (federal remedy under section 504 of Rehabilitation Act for disability discrimination cannot be limited by a state workers' compensation act).

Attachment A21

DC OFFICE OF RISK MGMT
RECVD NOV 4 '14 PM4:13

Nicole R. McCrea
5205 East Capitol St., SE
Washington, D.C.
Home ph: 202-582-4062
Cell ph: 202-491-9656
November 4, 2014

Office of Risk Management
ATTN: Claims
441 4th Street, NW, Suite 800 South
Washington, DC 20001
(202) 727-8600

I, Nicole R. McCrea, am submitting this correspondence  pursuant to DC Official Code § 12-309 with the expressed purpose of it serving as written notice to the Mayor of the District of Columbia, through the authorized agent, the Office of Risk Management, that suit will be filed against the District of Columbia, The DC Fire and EMS and The DC Police and Fire Clinic, for a hostile and abusive work environment with discrete discriminatory and retaliatory acts,  as well as aiding and abetting discrimination, constituting continuing violations,  resulting in the following unliquidated injuries and/or damages as outlined:

1. May 30-31, 2013: Sexual Harassment-Hostile Work environment; Humiliation; Intimidation; Negligent and Intentional Infliction of Emotional Distress- I was assaulted at the quarters of Engine Company 01 of the DC Fire and EMS while on official duty assignment as a DC Fire and EMS Firefighter/EMT.

2. May 31, 2013: Violation of Title VII of the Civil Rights Act of 1964; Violation of DC Human Rights Act; Violation of 42 U.S. Code 1981; Violation of 42 U.S. Code 1983; Violation of 42 U.S. Code 1985; Violation of 42 U.S. Code 1986; Violation of OHSA Workplace Safety Regulations; Disparate Treatment; Violation of Due Process; Humiliation; Intimidation; Negligent and Intentional Infliction of Emotional Distress  -While on duty at the quarters of Engine Company 01 of the DC Fire and EMS, I immediately reported the assault to the on duty Lieutenant of Engine Company 01 and the Captain of Truck Company 02. Neither officer did anything about my reports.  In fact I was expressly told not to do or say anything to anyone else about it.  I was discriminated against, on the basis of my race and sex.

3. June 1- 2, 2013: An official statement was given to Detective Yvette Maupin of the D.C. Metropolitan Police Department, during a taped oral interview, while on official duty assignment at the quarters of Engine company 13 of the DC Fire and EMS, and classified as Misdemeanor  Sexual Abuse in the resultant official police incident report case #13-074-198; subsequent written police reports of investigation of the Misdemeanor Sexual abuse; assignment of victim services advocate and Grand Jury investigations, case # 1-1916-13.

ATTACHMENT B1

4. **June 25, 2013:** <u>Intentional and Negligent infliction of Emotional Distress</u>- I was placed on SL/AL by the DC Police and Fire Clinic on June 25, 2013. I submitted an official request for Performance of Duty –Sick Leave at the DC Police and Fire Clinic (PFC).  In addition to the diagnosis and documentation of PTSD from PFC doctors, I was subsequently diagnosed with PTSD by three private doctors and/or counselors.

5. **July 09, 2013:** <u>Medical Malpractice; Medical Negligence; Intentional and Negligent infliction of Emotional Distress</u> - During my second session with Dr. Kenel at the D.C. Police and Fire Clinic she advised me to get over it.  I was subsequently assigned to begin working with Dr. Racquel Gordon on July 17, 2013.

6. **July 24, 2013:** <u>Violation of Due Process; Violation of DC Human Rights Act; Violation of 42 U.S. Code 1981; Violation of 42 U.S.Code 1983; Violation of 42 U.S. Code 1985; Retaliation; Hostile Work Environment</u> -I received oral notice of the denial of my POD injury claims through a voice-mail from my immediate supervisor Lieutenant Hosea Sampson at DCFEMS Engine Co 28, without cause or written documentation of grounds. I contacted BFC Michael Donlon via phone asking for written documentation of the grounds for the Non-POD ruling.  BFC Michael Donlon told me, "I couldn't prove which of the accused assaulted me...he did not have to give me anything and I could appeal if I didn't like his ruling."

7. **August 06, 2013:** <u>Medical Malpractice; Medical Negligence; Violation of 42 U.S. Code 1983; Violation of 42 U.S. Code 1985; Violation of 42 U.S. Code 1986</u>-I submitted my official written appeal of the Non-POD ruling, in accordance with DC Fire and EMS Policy, Rules  and regulations, through my immediate supervisor Lieutenant Hosea Sampson at the quarters of Engine Company 28 of the DC Fire and EMS,  to the Assistant Fire Chief of Services.  I was ordered to continue mandatory concurrent assessment and treatment with the doctors at the DC Police and Fire Clinic.

8. **August 14, 2013:** <u>Negligent retention; Breach of Contract; Violation of 42 U.S. Code 1981; Violation of 42 U.S.Code 1983; Violation of 42 U.S. Code 1985; Violation of 42 U.S. Code 1986</u>– I received oral notice via a phone call from US Attorney Jeff T. Cook that the Police and Grand Jury Investigation would be suspended because of lack of cooperation from the accused, specifically pleading the 5th and/or refusing to cooperate/respond to questions on the grounds that they may incriminate themselves, in direct violation of rights to employment outlined in The Collective Bargaining Agreement between the DC Fire and EMS Firefighters Association Local #36 and the District of Columbia; DC Fire and EMS guidelines, policies and protocols for investigations, as well as The DC- Official Code§ 1-506.

9. **September 20, 2013 - May 14, 2014:** <u>Violation of Due Process; Violation of DC Human Rights Act; Violation of 42 U.S. Code 1981; Violation of 42 U.S.Code 1983; Violaion of 42 U.S. Code 1985; Hostile Work Environment; Intentional Infliction of Emotional Distress</u> -DC Fire and EMS refused to investigate or acknowledge that there was an investigation; I called the EEOC and Diversity Manager for the DC Fire and EMS, Joshua Henline on September 20, 2013 and was

ATTACHMENT B2

informed that four individuals were charged by the DC Fire and EMS Office of Compliance. However, Joshua Henline refused to give me any information about the charges. Written and oral appeals and/or inquiries about the investigation and pending Trial Boards to Joshua Henline, as well as various administrative officials of DC Fire and EMS, were ignored and/or dismissed.

10. **On or around October 16, 2013:** <u>Medical Malpractice; Medical Negligence</u>- I began to complain to Lieutenant Randall Stroman at the Police and Fire Clinic about Dr. Racquel Gordon's interactions with me and its impact on our interactions.

11. **Jan 2014- March 2014:** <u>Violation of Title VII of the Civil Rights Act; Violation of the DC Human Rights Act; Violation of 42 U.S.Code 1983; Violation of 42 U.S. Code 1985; Retaliation; Hostile Work Environment; Intentional and Negligent Infliction of Emotional Distress</u> -I experienced adverse administrative actions from Battalion Fire Chief Michael Willis and various personnel at the DC Fire and EMS Training Academy as I attempted to complete processing and recertification of expiring work related documents for licensing.

12. **March 10, 2014:** <u>Violation of Due Process; Breach of Contract; Retaliation; Intentional Infliction of Emotional Distress</u>-I received oral notice of the denial of my appeal of the Non- POD ruling, through a voice-mail from my immediate supervisor Lieutenant Hosea Sampson at the quarters of Engine Company 28 of the DC Fire and EMS, and during a meeting with BFC William Baltimore at DCFEMS Engine Company 20, without cause and/or written documentation of the grounds for the ruling of the appeal to the Non-POD decision.

13. **March 31, 2014:** <u>Medical Malpractice; Medical Negligence;  Invasion of Privacy; Violation of HIPAA;  Violation of 42 U.S.Code 1983; 42 U.S. Code 1985; Intentional and Negligent Infliction of Emotional Distress</u>-I received a written order to report to the DC Police and Fire Clinic to take a comprehensive Psychological Fitness for duty exam, at the DC Police and Fire Clinic on March 31, 2014, outside of business necessity as I have been assessed, diagnosed and in treatment, with private physicians and counselors, for PTSD since June 2013, as well as mandatory, as ordered, concurrent assessment with doctors at the DC Police and Fire Clinic.

14. **April 02, 2014:** <u>Medical Negligence</u>- I meet with Battalion Fire Chief Raymond Gretz at the D.C. Police and Fire Clinic about my complaints to Lieutenant Randall Stroman regarding Dr. Racquel Gordon.  Battalion Fire Chief Raymond Gretz dismissed my concerns.

15. **April 05, 2014:** <u>Intimidation; Intentional and Negligent Infliction of Emotional Distress</u> – I received a certified letter, delivered to my home, from EEOC and Diversity Manager Josh Henline that contained implications of impending disciplinary actions against me.  Emphasizing that I could avoid impending disciplinary actions via immunity through an application for FMLA.

16. **April 19, 2014:** <u>Violation of Due Process;</u>-I submitted a response/request to Josh Henline, through my immediate supervisor Lieutenant Hosea Sampson at the quarters of Engine Company 28 of the DC Fire and EMS, requesting.  I never received a response to my request.

ATTACHMENT β3

17. **May 9, 2014:** <u>Violation of the Americans with Disabilities Act; Violation of the DC Human Rights Act; Violation of Title VII of the Civil Rights Act of 1964; Retaliation; Disparate Treatment; Intentional and Negligent Infliction of Emotional Distress</u>- Received oral notice of the denial of my official request for the advancement of sick leave through a voice-mail message from my immediate supervisor Lieutenant Hosea Sampson at the quarters of Engine Company 28 of the DC Fire and EMS, and a written copy of all endorsements, during a meeting with Battalion Fire Chief Fred Morris at the quarters of Engine Company 20 of the DC Fire and EMS. I submitted an official request for the advancement of sick leave to the Fire and EMS Chief Kenneth B. Ellerbe, through my immediate supervisor Lieutenant Hosea Sampson at the quarters of Engine Company 28 of the DC Fire and EMS, on March 26, 2014, pursuant to demonstrated need, to facilitate continuation of care.

18. **May 9, 2014:** <u>Fraud/Intentional Misrepresentation of facts; Breach of Contract; Tortious Interference; Retaliation; Violation of 42 U.S.Code 1983; Violation of 42 U.S. Code 1985; Hostile Work Environment; Retaliation</u> -I obtained a copy of a memorandum regarding the circumstances of my Non-POD appeal, referenced by Asst Fire Chief of Services Jackson to Josh Henline and Fire Chief Ellerbe in his endorsement /recommended actions for my request for the advancement of sick leave.

19. **May 09, 2014:** <u>Violation of Due Process; Violation of 42 U.S.Code 1983; Violation of 42 U.S. Code 1985</u> -I submitted an official written request to the Fire and EMS Chief Kenneth B. Ellerbe, through my immediate supervisor Lieutenant Hosea Sampson at the quarters of Engine Company 28 of the DC Fire and EMS, requesting written documentation of the grounds and cause for his disapproval of my official request for the advancement of sick leave, pursuant to demonstrated need, to facilitate continuation of care. I have not received a response to my request.

20. **May 14, 2014:** <u>Abuse of Due Process; Breach of Contract</u>-I received a certified letter, written notice of Trial Board to convene, from the Assistant Fire Chief Of Services of the DC Fire and EMS, with untimeliness/ due process of investigation, outside of standard DC Fire and EMS protocol and EEOC regulations for investigations.

21. **June 13, 2014:** <u>Disparate impact</u>-The denial of POD-Claims, denial of Non-POD appeal and denial for the advancement of sick leave, all actions executed without cause, culminated to a Leave Without Pay (LWOP) status creating a severe and indiscriminate financial hardship as well as significant changes in my health, retirement, union and leave benefits as a Firefighter/ EMT with the DC Fire and EMS. I contacted the DC Office of Human Resources, Benefits and Retirement Administration on June 16, 2014.

22. **August 04, 2014-October 07, 2014:** <u>Violation of the Americans with Disabilities Act; Violation of the DC Human Rights Act; Medical Malpractice; Medical Negligence; Hostile Work Environment; Disparate Treament; Intentional and Negligent Infliction of Emotional Distress</u>- Dr. Racquel Gordon and Dr. Marc Cottrell at the D.C. Police and Fire Clinic refused to accept

ATTACHMENT B4

two separate medical certification documents from my private doctors, certifying me to return to duty.  Dr. Racquel Gordon and Dr. Marc Cottrell refused to provide me with informed consent documentation of my rights as to being ordered to report to mandatory monitoring at the D.C. Police and Fire Clinic.

23. **September 02, 2014:** <u>Abuse of Due Process; Violation of 42 U.S. Code 1981; Violation of 42 U.S.Code 1983; Violation of 42 U.S. Code 1985</u>-I submitted an official written request to The Interim Fire and EMS Chief Eugene A Jones, through my immediate supervisor Lieutenant Hosea Sampson at the quarters of Engine Company 28 of the DC Fire and EMS,  for written notice in the determinations, recommendations and penalties regarding the disciplinary Trial Boards pertaining to Case No(s): U-13-245, U-13-246, U-13-247 and U-13-248. I have not received a response to my request.

Respectfully,

Nicole R. McCrea

District of Columbia: SS
Subscribed and sworn to before me, in my presence,
this 64 day of November, 2014
Notary Public, D.C.
My commission expires 10/14/2017

ATTACHMENT B5



# GOVERNMENT OF THE DISTRICT OF COLUMBIA
## Office of Risk Management



Phillip A. Lattimore, III
Chief Risk Officer

November 17, 2014

Nicole R. McCrae
5205 East Capitol Street, S.E.
Washington, D.C. 20019

Date of Loss:          May 30, 2013 – September 2, 2014
Claim Number:          1301184-000

Dear Ms. McCrae:

Please accept this letter as acknowledgement of receipt of your correspondence notifying the D.C. Office of Risk Management (ORM) of your claim against the District of Columbia. This claim has been assigned to me, a Claims Specialist with the DC Office of Risk Management Tort Liability Program to investigate.

An inquiry has been submitted to the Office of the General Counsel for the involved agency seeking any and all relevant information regarding this claim.

If you have not already done so, please forward ORM any and all other documents which may bear on the liability of the District of Columbia and damages alleged in this claim to assist in the claims process. When sending additional documents/information, please refer to the claim number identified above.

This letter does not waive the District of Columbia's right to timely and complete notice within six months of the incident as required by D.C. Code Section 12-309.

Very truly yours,

Janice P. Stokes
Claims Specialist
(202) 727-9308
e-mail: janice.stokes@dc.gov

441 4th Street, NW, Suite 800S, Washington, D.C. 20001
(202) 727-8600 – Main   (202) 727-8319
Website: orm.dc.gov



ATTACHMENT B6

DC OFFICE OF RISK MGMT
RECV'D MAR 26 '15 AM 11:3

Nicole R. McCrea
5205 East Capitol St., SE
Washington, D.C.
Home ph: 202-582-4062
Cell ph: 202-491-9656
March 26, 2015

Office of Risk Management
ATTN: Claims
441 4th Street, NW, Suite 800 South
Washington, DC 20001
(202) 727-8600

I, Nicole R. McCrea, am submitting this correspondence pursuant to DC Official Code § 12-309 with the expressed purpose of it serving as written notice to the Mayor of the District of Columbia, through the authorized agent, the Office of Risk Management, that suit will be filed against the District of Columbia, The DC Fire and EMS, The DC Police and Fire Clinic and the District of Columbia Police and Firefighters' Relief and Retirement Board, for a hostile and abusive work environment with discrete discriminatory and retaliatory acts, as well as aiding and abetting discrimination, constituting continuing violations, resulting in the following unliquidated injuries and/or damages as outlined:

1. **September 29, 2014:** Retaliation; Violation of the Americans with Disabilities Act; Violation of the DC Human Rights Act; Violation of HIPAA Patient Privacy Rights; Medical Malpractice; Medical Negligence; Hostile Work Environment; Disparate Treament; Intentional and Negligent Infliction of Emotional Distress- I was ordered to a follow up appointment with Dr. Marc Cottrell and Dr. Raquel Gordon at the DC Police and Fire Clinic. In this transition session I confronted Dr. Gordon about the wanton breach of my privacy that I discovered in her written treatment notes submitted to DC Police and Fire Clinic and her refusal to accept my first medical certification to return to work. I also insisted to Dr. Cottrell that I would like to receive a written informed consent document that outlines his relationship with me, my rights within that relationship and my written consent in agreement to interacting with him in any capacity; documentation of my informed rights in being forced to report to DC Police and Fire Clinic "to be monitored".

2. **October 07, 2014:** Retaliation; ; Violation of the DC Human Rights Act ; Violation of the Americans with Disabilities Act; Violation of HIPAA Patient Privacy Rights; Medical Malpractice; Medical Negligence; Hostile Work Environment; Disparate Treament; Intentional and Negligent Infliction of Emotional Distress-I was ordered to a follow up appointment with Dr. Marc Cottrell at the DC Police and Fire Clinic. Dr. Cottrell did not have my repeatedly requested written informed consent document that outlines his relationship

ATTACHMENT B7

with me, my rights within that relationship and my written agreement to interacting with him in any capacity.  He emphatically stated that one would never be provided. He even went as far to say as he did not know who at the DCPFC I should talk to about my insistence on receiving one. Dr. Cottrell refused to address the two written medical certifications previously provided for accommodations to begin my return to work, rather insisting that I give him authorization to speak to my doctors so that he could clarify the accommodations they outlined.

3.  **October 09, 2014**: Violation of the DC Human Rights Act ; Violation of the Americans with Disabilities Act; Violation of HIPAA Patient Privacy Rights; Medical Malpractice; Medical Negligence -Dr. Marc Cottrell of the DC Police and Fire Clinic contacted my private psychologist Dr. Carla Rhodes under the pretext of clarifying her medical certification clearing me to return to work with modifications/accommodations.  Instead of addressing the medical certification, as authorized in my signed release, Dr. Cottrell attempted to incite her to breach the stipulated constraints of the authorization; to reveal her protocol for my continued treatment; and provide him and DC Police and Fire Clinic with her detailed comprehensive medical notes.

4.  **October 14, 2014**: Retaliation; ; Violation of the DC Human Rights Act ; Violation of the Americans with Disabilities Act; Violation of HIPAA Patient Privacy Rights; Medical Malpractice; Medical Negligence; Hostile Work Environment; Disparate Treament; Intentional and Negligent Infliction of Emotional Distress -I was ordered to a follow-up appointment with Dr. Marc Cottrell at the DC Police and Fire Clinic.  Dr. Cottrell attempted to give me a two page list of questions.  He asserted to me that he was acting with the guidance of his supervisors at the DC Police and Fire Clinic; that he was not going to accept the medical certifications that my doctors provided to the DC Police and Fire Clinic and if I wanted to even be considered for return to work I needed to have my doctors answer his outlined questions in detail, immediately.  I inquired, once again, about the written informed consent document that outlines his relationship with me, my rights within that relationship and my written agreement to interacting with him in any capacity.  He again refused to provide me with a written informed consent form.

5.  **November 06, 2014**: Retaliation; ; Violation of the DC Human Rights Act ; Violation of the Americans with Disabilities Act; Hostile Work Environment; Disparate Treament; Intentional and Negligent Infliction of Emotional Distress- I attended a forced disability retirement hearing before the DC Police and Firefighters' Relief and Retirement Board, as ordered by the DC Police and Fire Clinic administrators, DC Fire and EMS Medical Services Officer BFC Michael Donlan; DC Metropolitan Police Department, Medical Services Officer William B. Sarvis; and DC Police and Fire Clinic Medical Director Dr. Olusola Maloma,  citing me a "permanently disabled" to the DC Police and Firefighters' Retirement and Relief Board. During the hearing I was interrogated by Chairperson Lois Hochhauser.  Chairperson Lois Hochhauser also dismissed my doctors' medical certifications and the outlined need for

ATTACHMENT B5

accommodations, telling me explicitly that I would be retired if I did not return to work immediately in a Full Duty capacity.

6. **November 14, 2014:** Retaliation; ; Violation of the DC Human Rights Act ; Violation of the Americans with Disabilities Act; Violation of HIPAA Patient Privacy Rights; Medical Malpractice; Medical Negligence; Hostile Work Environment; Disparate Treament; Intentional and Negligent Infliction of Emotional Distress -I was ordered to a follow up appointment with Dr. Marc Cottrell at the DC Police and Fire Clinic. Dr. Cottrell again refused to provide me with an outlined written informed consent document while insisting that I take his questions to my doctors.

7. **November 25, 2014:** Violation of the DC Human Rights Act ; Violation of the Americans with Disabilities Act; Disability Discrimination; Disability Harassment; Violation of HIPAA Patient Privacy Rights; Medical Malpractice; Medical Negligence; Hostile Work Environment -I requested a meeting with Dr Olusola Malomo, Dr. Marc Cottrell and Lieutenant Randall Stroman at the DC Police and Fire Clinic to document who is responsible/authorizing Dr Cottrell's orders to deliberately obstruct my return to work. Dr. Malomo, Dr. Cottrell, Lieutenant Stroman and Battalion Fire Chief Raymond Gretz were in attendance at the meeting. In the meeting Dr. Cottrell demanded that I have my doctors answer his questions. Dr. Malomo asserted that "she was the Medical Director of the DC Police and Fire Clinic, she is the policy maker and it is her policies that I have my doctors provide detailed answers to all of Dr. Cottrell's questions if I wanted to return to work...the DC Police and Fire Clinic and DC Fire and EMS do not have to accommodate me, as my private doctors have requested, as light duty is a privilege they can extend if they choose to... I would not be allowed to return to work in a modified capacity until I meet their demands." I once again reiterated my request for a written informed consent document that outlined my rights in being ordered to continue to report to the DC Police and Fire Clinic and "be monitored".

8. **December 18, 2014:** Retaliation; Violation of the DC Human Rights Act ; Violation of the Americans with Disabilities Act; Disability Discrimination; Disability Harassment; Violation of HIPAA Patient Privacy Rights; Hostile Work Environment; Intentional and Negligent Infliction of Emotional Distress -I received by mail to my home a written order from the DC Police and Firefighters' Relief and Retirement Board ordering me to have my private doctors provide the DC Police and Firefighters' Relief and Retirement Board and the DC Police and Fire Clinic with a third medical certification; ordered that this third medical certification should detail my provider's medical opinions/her medical notes, about my diagnosis as well as her treatment plan.

ATTACHMENT B9

9. **January 22, 2015:** <u>Retaliation; Violation of the DC Human Rights Act ; Violation of the Americans with Disabilities Act; Disability Discrimination; Disability Harassment; Violation of HIPAA Patient Privacy Rights; Hostile Work Environment; Intentional and Negligent Infliction of Emotional Distress; Violation of Due Process; Malicious Intent to Deter Due Process; Intimidation; Coercion; Professional Negligence</u> - I attended a continuation hearing for my forced disability retirement, as ordered, before the DC Police and Firefighters' Relief and Retirement Board. Acting Chairperson Andrea Comentale began her interrogation of me with veiled comments about how many times I have been disciplined/ put on charges/ investigated.  Acting Chairperson Andrea Comentale then advised me that  in spite of me having my doctor submit  the third medical certification to the DC Police and Firefighters' Relief and Retirement Board  and the DC Police and Fire Clinic, as ordered, the DC Police and Fire Clinic had submitted even more questions to the DC Police and Firefighters' Relief and Retirement Board and she was ordering me to have my doctor submit a fourth medical certification answering in detail their questions if I wanted to go back to work.  I vehemently asserted my federal rights; Acting Chairperson Andrea Comentale in turn became belligerent and berating.

10. **January 23, 2015:** <u>Violation of the DC Human Rights Act ; Violation of the Americans with Disabilities Act; Disability Discrimination; Disability Harassment; Violation of HIPAA Patient Privacy Rights; Violation of Due Process; Malicious Intent to Deter Due Process; Hostile Work Environment; Intentional and Negligent Infliction of Emotional Distress</u> -I received a written order to my home from the DC Police and Firefighters' Relief and Retirement Board ordering me to comply with the demands of the DC Police and Fire Clinic and the DC Police and Firefighters' Relief and Retirement Board; immediately submit to the DC Police and Fire Clinic and the DC Police and Firefighters' Relief and Retirement Board a fourth medical certification from my private doctors addressing the questions from the DC Police and Fire Clinic.

11. **February 12, 2015:** <u>Retaliation; Violation of the DC Human Rights Act ; Violation of the Americans with Disabilities Act; Disability Discrimination; Disability Harassment; Violation of HIPAA Patient Privacy Rights; Violation of Due Process; Malicious Intent to Deter Due Process;Hostile Work Environment; Intentional and Negligent Infliction of Emotional Distress-</u> I attended second continuation hearing for my forced disability retirement, before the DC Police and Firefighters' Relief and Retirement Board, as ordered.  Acting Chairperson Andrea Comentale began by asking me why I did not comply with the DC Police and Firefighters' Relief and Retirement Board's orders from January 22/23, 2015.  I once again asserted that they were a violation of my rights.  She disregarded my sentiments and began to interrogate me about my ability to go back to work in a Full Duty capacity, immediately.

12. **March 12, 2015:** <u>Retaliation; Violation of Due Process; Malicious Intent to Deter Due Process; Professional Negligence</u>-I submitted written requests to Denise S. Gardner and Lela Jones administrators for the DC Police and Firefighters' Relief and Retirement Board at the

ATTACHMENT B10

DC Office of Human Resources, as well as the DC Police and Firefighters' Relief and Retirement Board inquiring about the status and receipt of the Board's decision, in addition to the copies of the  transcripts of the last two hearings and written directives for my appeal to the Board and the DC Court of Appeals.  I have not received a response to my requests.  I have not received notice regarding the DC Police and Firefighters' Relief and Retirement Board's decision.  As of this date March 26, 2015, it has been forty-two (42) days since my last hearing for my forced disability retirement before the DC Police and Firefighters' Relief and Retirement Board.

In Correspondence,

Nicole R. McCrea

Subscribed and sworn to before me, in my presence, this
_26_ day of _March_ _2015_ a Notary Public
in and for the _District_ of _Columbia_
_____
Notary Public
My commission expires _March 31_ 20 _X5_

SHIRLEY S. M. McGALE
Notary Public, District of Columbia
My Commission Expires March 31, 2015

ATTACHMENT B11



GOVERNMENT OF THE DISTRICT OF COLUMBIA
EXECUTIVE OFFICE OF THE MAYOR
OFFICE OF RISK MANAGEMENT

441 4TH STREET, N.W. SUITE 800 SOUTH
WASHINGTON, DC 20001

OFFICIAL BUSINESS
PENALTY FOR MISUSE



RECEIVED
Mail Room

JUN 25 2018

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

ATTACHMENT B12




# GOVERNMENT OF THE DISTRICT OF COLUMBIA
## Office of Risk Management

**Phillip A. Lattimore, III**
**Chief Risk Officer**

April 22, 2015

Nicole R. McCrea
5205 East Capitol Street SE
Washington, DC  20019

Date of Loss:          September 9, 2014
Claim Number:       1400672-000

Dear Ms. McCrea:

This will acknowledge receipt of you notifying the Mayor of a claim against the District of Columbia.  Your claim notice letter was received in the D.C. Office of Risk Management and will be recorded.

This claim will not be handled by the Office of Risk Management, therefore as of the date of this letter, we will be closing our file.

Very truly yours,

LaShonda Wright
Claims Specialist
DCORM Tort Liability Division
202-724-6576

WARNING:  It is a crime to provide false or misleading information to the District of Columbia's Government, or to any department or agency thereof, regarding any claim upon or against the District of Columbia, or any department or agency thereof, knowing such claim to be false, fictitious, or fraudulent.  Such an act is subject to imprisonment not more than one year and assessed a fine of not more than $100,000 for each violation.

RECEIVED
Mail Room

JUN 2 5 2018

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

441 4th Street, NW, Suite 800S, Washington, D.C. 20001
(202) 727-8600 - Main   (202) 727-0249
Website: orm.dc.gov



ATTACHMENT B13

DC OFFICE OF RISK MGMT
REC'VD MAY 4 '15 PM 3:46

Nicole R. McCrea
5205 East Capitol St., SE
Washington, D.C.
Home ph: 202-582-4062
Cell ph: 202-491-9656
May 04, 2015

Office of Risk Management
ATTN: Claims
441 4th Street, NW, Suite 800 South
Washington, DC 20001
(202) 727-8600

I, Nicole R. McCrea, am submitting this correspondence pursuant to DC Official Code § 12-309 with the expressed purpose of it serving as written notice to the Mayor of the District of Columbia, through the authorized agent, the Office of Risk Management, that suit will be filed against the District of Columbia, The DC Fire and EMS, The DC Police and Fire Clinic and the District of Columbia Police and Firefighters' Relief and Retirement Board, for a hostile and abusive work environment with discrete discriminatory and retaliatory acts, as well as aiding and abetting discrimination, constituting continuing violations, resulting in the following unliquidated injuries and/or damages as outlined:

1. **November 06, 2014:** <u>Violation of Title VII of the Civil Rights Act of 1964; Violation of DC Human Rights Act; Violation of 42 U.S. Code 1981; Violation of 42 U.S. Code 1983; Violation of 42 U.S. Code 1985; Violation of 42 U.S. Code 1986; Sexual Harassment Hostile Work Environment; Violation of the Americans with Disabilities Act; Disability Hostile Work Environment; Retaliation; Retaliation Hostile Work Environment; Disparate Treatment; Intentional and Negligent Infliction of Emotional Distress</u>- I attended a forced disability retirement hearing before the DC Police and Firefighters' Relief and Retirement Board at the DC Office of Human Resources, as ordered, under the execution of The District of Columbia municipal policy and custom with the expressed intent to oppress and/or violate federal and constitutional rights. The District of Columbia municipal policies and customs asserted and cited being: DC- Official Code§ 5-633; DC- Official Code§ 5-634; DC- Official Code§ 5-709; and DC- Official Code§ 5-710. The District of Columbia knew of or should have known of these violations as official notice has been rendered on three separate occasions: Misdemeanor Sexual Abuse in the resultant official police incident report case #13-074-198 on June 1-2, 2013 with subsequent written police reports of investigation of the Misdemeanor Sexual abuse. In addition to the assignment of victim services advocate and Grand Jury investigations, case # 1-1916-13; Notarized written correspondence of Notice to the Mayor of the District of Columbia, hand delivered and stamped by the Office of Risk Management on November 04, 2014; Notarized written correspondence of Notice to the

ATTACHMENT 1314

Mayor of the District of Columbia, hand delivered and stamped by the Office of Risk Management on March 26, 2015.

2. **December 18, 2014:** Violation of Title VII of the Civil Rights Act of 1964; Violation of DC Human Rights Act; Violation of 42 U.S. Code 1981; Violation of 42 U.S. Code 1983; Violation of 42 U.S. Code 1985; Violation of 42 U.S. Code 1986; Violation of District of Columbia Mental Health Act; Sexual Harassment Hostile Work Environment; Violation of the Americans with Disabilities Act; Disability Hostile Work Environment; Retaliation ; Retaliation Hostile Work Environment; Disparate Treatment; Intentional and Negligent Infliction of Emotional Distress- I received written orders at my home from the DC Police and Firefighters' Relief and Retirement Board at the DC Office of Human Resources, ordering me to have my private doctors provide the DC Police and Firefighters' Relief and Retirement Board and the DC Police and Fire Clinic with a detailed report of their medical opinions/ medical notes,  as well as treatment plans, as they relate to my diagnosis of PTSD, under the guise of clarifying the two previous written requests for accommodation. The District of Columbia knew of or should have known of these violations as official notice has been rendered on three separate occasions: Misdemeanor Sexual Abuse in the resultant official police incident report case #13-074-198 on June 1-2, 2013 with subsequent written police reports of investigation of the Misdemeanor Sexual abuse. In addition to the assignment of victim services advocate and Grand Jury investigations, case # 1-1916-13; Notarized written correspondence of Notice to the Mayor of the District of Columbia, hand delivered and stamped by the Office of Risk Management on November 04, 2014; Notarized written correspondence of Notice to the Mayor of the District of Columbia, hand delivered and stamped by the Office of Risk Management on March 26, 2015.

3. **January 22-23, 2015:** Violation of Title VII of the Civil Rights Act of 1964; Violation of DC Human Rights Act; Violation of 42 U.S. Code 1981; Violation of 42 U.S. Code 1983; Violation of 42 U.S. Code 1985; Violation of 42 U.S. Code 1986; Violation of District of Columbia Mental Health Act; Sexual Harassment Hostile Work Environment; Violation of the Americans with Disabilities Act; Disability Hostile Work Environment; Retaliation ; Retaliation Hostile Work Environment; Disparate Treatment; Intentional and Negligent Infliction of Emotional Distress- I attended a continuation hearing for my forced disability retirement before the DC Police and Firefighters' Relief and Retirement Board at the DC Office of Human Resources, as ordered, under the execution of The District of Columbia municipal policy and custom with the expressed intent to oppress and/or violate federal and constitutional rights. I received written orders asserting The District of Columbia municipal policy and custom with the expressed intent to oppress and/or violate federal and constitutional rights. The District of Columbia municipal policies and customs asserted and cited being:  DC- Official Code§ 5-633; DC- Official Code§ 5-634; DC- Official Code§ 5-709; DC- Official Code§ 5-710; DC- Official Code§5-721; and DC- Official Code§5-722.  The District of Columbia knew of or should have known of these violations as official notice has been rendered on three separate occasions: Misdemeanor Sexual Abuse in the resultant official police incident report case #13-074-198 on June 1-2, 2013 with subsequent written police reports of investigation of the Misdemeanor Sexual abuse. In addition to the assignment of victim services

ATTACHMENT  B15

advocate and Grand Jury investigations, case # 1-1916-13; Notarized written correspondence of Notice to the Mayor of the District of Columbia, hand delivered and stamped by the Office of Risk Management on November 04, 2014; Notarized written correspondence of Notice to the Mayor of the District of Columbia, hand delivered and stamped by the Office of Risk Management on March 26, 2015.

4. **February 12, 2015**<u>Violation of HIPAA Patient Privacy Rights; Violation of Due Process; Malicious Intent to Deter Due Process; Violation of Title VII of the Civil Rights Act of 1964; Violation of DC Human Rights Act; Violation of 42 U.S. Code 1981; Violation of 42 U.S. Code 1983; Violation of 42 U.S. Code 1985; Violation of 42 U.S. Code 1986; Violation of District of Columbia Mental Health Act; Sexual Harassment Hostile Work Environment; Violation of the Americans with Disabilities Act; Disability Hostile Work Environment; Retaliation ; Retaliation Hostile Work Environment; Disparate Treatment; Intentional and Negligent Infliction of Emotional Distress-</u> I attended a second continuation hearing for my forced disability retirement, before the DC Police and Firefighters' Relief and Retirement Board at the DC Office of Human Resources, as ordered, under the execution of The District of Columbia municipal policy and custom with the expressed intent to oppress and/or violate federal and constitutional rights. The District of Columbia municipal policies and customs asserted and cited being:  DC- Official Code§ 5-633; DC- Official Code§ 5-634; DC- Official Code§ 5-709; DC- Official Code§ 5-710; DC- Official Code§5-721; and DC- Official Code§5-722.  The District of Columbia knew of or should have known of these violations as official notice has been rendered on three separate occasions: Misdemeanor Sexual Abuse in the resultant official police incident report case #13-074-198 on June 1-2, 2013 with subsequent written police reports of investigation of the Misdemeanor Sexual abuse. In addition to the assignment of victim services advocate and Grand Jury investigations, case # 1-1916-13; Notarized written correspondence of Notice to the Mayor of the District of Columbia, hand delivered and stamped by the Office of Risk Management on November 04, 2014; Notarized written correspondence of Notice to the Mayor of the District of Columbia, hand delivered and stamped by the Office of Risk Management on March 26, 2015.

5. **March 26, 2015:** <u>Retaliation; Retaliation Hostile Work Environment; Violation of Due Process; Malicious Intent to Deter Due Process; Professional Negligence-</u> I submitted  a second written request to Denise S. Gardner and Lela Jones administrators for the DC Police and Firefighters' Relief and Retirement Board at the DC Office of Human Resources, as well as the DC Police and Firefighters' Relief and Retirement Board inquiring about the status and receipt of the Board's final decision, in addition to the copies of the  transcripts of the last two hearings and written directives for my appeal to the Board and the DC Court of Appeals.  As of this date May 4, 2015, I have not received copies of the transcripts of the last two hearings.

6. **April 08, 2015:** <u>Violation of 42 U.S. Code 1981; Violation of 42 U.S. Code 1983; Violation of 42 U.S. Code 1985; Violation of 42 U.S. Code 1986; Violation of Due Process; Malicious Intent to Deter Due Process; Professional Negligence; Violation of Title VII of the Civil Rights Act of 1964; Violation of DC Human Rights Act; Sexual Harassment Hostile Work Environment; Violation of</u>

ATTACHMENT  B16

<u>the Americans with Disabilities Act; Disability Hostile Work Environment; Retaliation ;</u>
<u>Retaliation Hostile Work Environment; Disparate Treament; Intentional and Negligent Infliction</u>
<u>of Emotional Distress</u>- I received by certified mail to my home, a frivolous and vexatious Motion
to Dismiss of my first continuing violations claim, under the Charge of Sexual Harassment Hostile
Work Environment,  to the DC Office of Human Rights from DC Fire and EMS through its State
Actor, Gitana Stewart-Ponder Esq., DC Fire and EMS EEOC & Diversity Manager.

7. April 13, 2015: <u>Retaliation; Retaliation Hostile Work Environment; Violation of Due Process;</u>
<u>Malicious Intent to Deter Due Process; Professional Negligence</u>-I submitted  a third written
request to Denise S. Gardner and Lela Jones administrators for the DC Police and Firefighters'
Relief and Retirement Board at the DC Office of Human Resources, as well as the DC Police and
Firefighters' Relief and Retirement Board inquiring about the status and receipt of the Board's
final decision, in addition to the copies of the  transcripts of the last two hearings and written
directives for my appeal to the Board and the DC Court of Appeals.  As of this date May 4, 2015,
I have not received copies of the transcripts of the last two hearings.

8. May 02, 2015: <u>Constructive Dismissal/Termination; Violation of Title VII of the Civil Rights Act of</u>
<u>1964; Violation of DC Human Rights Act; Violation of 42 U.S. Code 1981; Violation of 42 U.S.</u>
<u>Code 1983; Violation of 42 U.S. Code 1985; Violation of 42 U.S. Code 1986; Sexual Harassment</u>
<u>Hostile Work Environment; Violation of the Americans with Disabilities Act; Disability Hostile</u>
<u>Work Environment; Retaliation ; Retaliation Hostile Work Environment; Disparate Treament;</u>
<u>Intentional and Negligent Infliction of Emotional Distress</u>- I received a written order from the DC
Police and Firefighters' Relief and Retirement Board, as presided by Andrea G. Comantale Esq.,
Acting Chairperson, at the DC Office of Human Resources, outlining its final decision,  forcing
disability retirement, under the execution of The District of Columbia municipal policy and
custom with the expressed intent to oppress and/or violate federal and constitutional rights.
The District of Columbia municipal policies and customs asserted and cited being:  District of
Columbia Omnibus Public Safety Agency Reform Amendment Act of 2004; DC Law 15- 194; DC-
Official Code§ 5-701; DC- Official Code§ 5-709; DC- Official Code§ 5-710; and DC- Official
Code§5-721(a).

In Correspondence,

Nicole R. McCrea

District of Columbia:  SS
Subscribed and sworn to before me, in my presence,
this ___4___ day of __MAy__, 2015.

Apryl C. Gates, Notary Public, D.C.
My commission expires May 31, 2015.



ATTACHMENT B17

GOVERNMENT OF THE DISTRICT OF COLUMBIA
EXECUTIVE OFFICE OF THE MAYOR
OFFICE OF RISK MANAGEMENT
441 4TH STREET, N.W. SUITE 800 SOUTH
WASHINGTON, DC  20001

OFFICIAL BUSINESS
PENALTY FOR MISUSE

CAP DISTRICT
WID 207
12 MAY '15
FM 2 L

UNITED STATES POSTAGE

$ 00.48w
MAY 12 2015

02  1M
000 4290253
MAILED FROM ZIP CODE 20001

20001861005

ATTACHMENT B18

 **GOVERNMENT OF THE DISTRICT OF COLUMBIA**
Office of Risk Management 

**Phillip A. Lattimore, III**
**Chief Risk Officer**
May 8, 2015

Nicole R. McCrea
5205 East Capitol St
Washington, D. C.  20019

Claim Number:   1401518-000
Date of Loss:   November 6, 2014

Dear Ms. McCrea:

This will acknowledge receipt of you notifying the Mayor of a claim against the District of
Columbia.  Your claim was received in the D. C. Office of Risk Management on May 4, 2015.
Your claim notice will be recorded as received.

This claim will not be handled by the Office of Risk Management.  Therefore as of the date of
this letter, we will be closing our file.

Very truly yours,

*Charlotte Fisher*

Charlotte Fisher
Claim Specialist
202-727-8299

**WARNING:** It is a crime to provide false or misleading information to the District of Columbia's Government, or to any
department or agency thereof, regarding any claim upon or against the District of Columbia, or any department or agency
thereof, knowing such claim to be false, fictitious, or fraudulent. Such an act is subject to imprisonment not more than one
year and a fine of not more than $100,000 for each violation.

RECEIVED
Mail Room

JUN 2 5 2018

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

441 4th Street, NW, Suite 800S, Washington, D.C. 20001
(202) 727-8600 – Main   (202) 727-8319
Website: orm.dc.gov



ATTACHMENT B19



**Corporate Support Bureau**
**Human Resource Management Division**
**Medical Services Branch**

920 Varnum Street NE, Washington, DC 20017   (202) 269-7400 (voice)   (202) 269-7314 (fax)

## MEMORANDUM

**TO:**        Larry Jackson
              Assistant Fire Chief
              Services Bureau
              Fire and Emergency Medical Services Department

**THRU:**      Michael S. Donlon
              Battalion Fire Chief
              Fire and Emergency Medical Services Department

**THRU:**      William B. Sarvis, Jr.
              Director/Privacy
              Medical Services Branch

**FROM:**      Frieda L. Cardwell, CPM, CSSGB, CWCP
              Medical Compensation Claims Specialist/
              Assistant Privacy Officer
              Medical Services Branch

**DATE:**      January 16, 2014

**SUBJECT:**   Firefighter Nichole McCrea, F/EMSD FD Form 44.4, Injury
              Reporting Form bearing Date of Illness/Injury: April 8, 2013

### Jurisdiction

Pursuant to DC Official Code § 5-708.01[1] (2008 repl.) and the District of Columbia Fire
and Emergency Medical Services (FEMS) Department Order Book, Article XI, Part II

---

[1] The **Director** (either the director of medical services for the Metropolitan Police Department, or the
medical services officer for the Fire and Emergency Medical Services Department) shall determine, based
on a review of the unit commander's report on the cause of the injury or illness and after consultation with
the Police and Fire Clinic physicians on the nature of the injury or illness, whether a member's injury or
illness was sustained by the member in the performance of duty within 30 calendar days of a claim being
reported to the Department. If the Director fails to meet the 30-day deadline, there shall be a rebuttable
presumption that the member's injury or illness was sustained in the performance of duty. Until the
presumption is rebutted by a finding by the Director that the injury or illness was not sustained in the

RECEIVED
Mail Room

JUN 25 2018

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

ATTACHMENT C1

Uniformed Personnel, Section 12, the Director of the DCMPD Medical Services Branch and the DCFEMSD Medical Services Officer have jurisdiction in this matter.

### Notice and Request for Appeal

On June 25, 2013, Firefighter Nichole McCrea filed an F/EMSD FD Form 44.4 claiming an on-duty emotional illness or injury. She described the nature or circumstances leading to her illness or injury as "physical stress due to hostile attack while on-duty 5/30/2013." The F/EMSD FD Form 44 was classified as Non-Performance of Duty by Battalion Fire Chief Michael Donlon, Medical Services Officer on July 24, 2013.

On August 6, 2013, Firefighter McCrea petitioned Assistant Fire Chief Larry Jackson appealing the Non-Performance of Duty classification of her claim report.

### Findings of Facts

Firefighter McCrea responded to the Police and Fire Clinic (PFC) on June 25, 2013, before the Behavioral Health Services (BHS) Physician. She reported suffering symptoms of "headaches, stomach upset, diarrhea, and sleep disturbance" as a result of "situational stress (claimed she was touched inappropriately while sleeping at the fire house)." The BHS Physician diagnosed with "ADJUSTMENT DISORDER WITH MIXED ANXIETY & DEPRESSED MOOD" and placed her in a sick leave status. She was also referred to COPE for an appointment with a counselor. Since June 25, 2013, she has been followed by BHS, COPE and her private medical doctor and remains in a sick leave status from a psychological standpoint.

### Discussion

Based upon a review of the relevant evidence including the available records on file at the FEMSD and the Police and Fire Clinic, the MPD Medical Services Branch carefully considered whether Firefighter McCrea had established that she suffered a psychological illness or injury that arose out of and in the course of her employment with FEMS.

The Federal Longshoreman's Act governs the occupational injuries and illnesses of private sector employees, and is codified in the District of Columbia Workers' Compensation Act (WCA), D.C. Official Code § 32-1501, et seq. The District's law governing the occupational injuries and illnesses of District employees is codified under Title 23 of the Comprehensive Merit Personnel Act (CMPA), D.C. Official Code §1-623, et seq. However, the District's police officers and firefighters are expressly exempt from coverage under Title 23 of the CMPA.

---

performance of duty, the member's Department shall be responsible for all treatment costs and disability compensation pay.

FF N. McCrea
F/EMSD Form 44.4: 4/8/2013
Appeal Date: 8/6/2013

ATTACHMENT C2

The WCA defines "injury" as "accidental injury or death arising out of and in the course of employment," D.C. Code § 32-1501 (12). While CMPA's "injury sustained while in the performance of his or her duty" provision has been interpreted as requiring that the "injury arise out of and in the course of employment," the same standard used under the WCA. *Wright v. D.C. Dep't of Public Works*, ECAB No. 88-40, 1991 D.C. Wrk. Comp.

The Police and Firefighters' Retirement and Disability Act is recognized as the workers' compensation plan for uniform employees in the District. *Vargos v. Barry citing Brown v. Jefferson, and Ray v. District of Columbia*, 535 A.2D 868 (1987), and *Brown, supra*, 451 A.2d at 76. The Act has been well-settled by the courts of the District of Columbia to be a workers' compensation law and that the rules governing workers' compensation equally apply to police and firefighters. It is the "exclusive remedy for MPD officers who are injured in the performance of duty." *Franchak v. D. C. Metro. Police Dept.*, 932 A.2d 1086, 1091 (D.C. 2007) (citing *Vargos v. Barry*, 667 A.2d 98, 101 (D.C. 1995) (the Act "was commonly understood to serve a purpose similar to that of the workers" compensation statute")). Where the Police and Firefighters Retirement and Relief Act and the cases decided under the Act, are silent with respect to workers compensation issues, the case law developed under the WCA and the CMPA carry great weight in determining the law od District of Columbia in these matters.

In cases where a member claims an emotional injury occurred in the course of such inherently stressful work, the MSB reviews the facts and evidence presented to determine whether the member's normal working conditions subjected him or her to endure more than the normal stressors customary to this type of employment. To define what constitutes "normal working conditions" the MSB reviewed the conditions in the context of the work involved. In other words, since the member's job is the type typically associated with a high amount of stress, such as a police officer or a firefighter, the member must prove that his or her working conditions were unusually stressful for the type of job, *City of Scranton v. Workmen's Compensation  Appeal Board (Hart)*, 136 Pa. Cmwlth. 483, 583 A.2d 852 (1990), appeal denied, 528 Pa. 625, 597 A.2d 1154 (1991). In this instance, the MSB considered whether the member showed that his or her normal working conditions, as distinguished from the mere job description, were unusually stressful for the type of employment or that an unusually stressful event occurred making the duties more stressful for the type of employment.

The "court has articulated a burden-shifting framework…in resolving the factual issue of whether a claimant's injury has been incurred during the performance of duty." *Pierce v. District of Columbia Police and Firefighters' Retirement and Relief Board* 882 A.2d 199, 203 (D.C. 2005). A claimant has the "initial burden of producing evidence that the disabling injury was incurred in the performance of duty." *Baumgartner v. Police and Firemen's Ret. & Relief Bd.*, 527 A.2d 313, 315 (D.C. 1987); *Lamphier v. District of Columbia Police and Firefighters' Ret. & Relief Bd.*, 698 A.2d 1027, 1032 (D.C. 1997). The "evidentiary burden to prove a prima facie case is not onerous; there merely needs to be a sufficient basis to permit a reasonable inference that the disabling injury was

FF N. McCrea
F/EMSD Form 44.4: 4/8/2013
Appeal Date: 8/6/2013

ATTACHMENT C3

incurred in the performance of duty." *Pierce*, supra at 205.  "Although the burden of proof shifts between the parties, the ultimate burden of persuasion remains with the person claiming entitlement" to performance of duty disability benefits.  *Britton v. District of Columbia Police & Firefighters' Retirement Bd.*, 681 A.2d 1152, 1155 (D.C.1996) (citing *Croskey v. District of Columbia Police & Firemen's Retirement & Relief Bd.*, supra, 596 A.2d 988, 990 (D.C.1991).  Therefore, the member is required to make a prima facie case showing that his or her injury or illness was incurred in the performance of duty in order to enjoy the inference of compensability.

### Recommendation

After carefully reviewing the evidence and facts available at the time of this writing, the MPD Medical Services Branch (MSB) finds that Firefighter McCrea has not provided any evidence or facts to make a prima facie case of a performance of duty emotional injury or illness pursuant to the Police and Firefighters Retirement and Relief Act or the DC Workers' Compensation Act (WCA).

The MSB recommends DCFEMSD sustain the Medical Services Officer's (MSO) original Non-Performance of Duty (Non-POD) classification for the following reasons:

1.  The member is required to make *a prima facie* case showing that his illness or injury was incurred in the performance of duty in order to enjoy the inference of compensability… ultimate burden of persuasion remains with the person claiming entitlement" to performance of duty disability benefits.  *Britton v. District of Columbia Police & Firefighters' Retirement Bd.*, 681 A.2d 1152, 1155 (D.C.1996) (citing *Croskey v. District of Columbia Police & Firemen's Retirement & Relief Bd.*, supra, 596 A.2d 988, 990 (D.C.1991).

    As of this writing, Firefighter McCrea has not met her evidentiary burden of proof, "initial burden of producing evidence that her emotional injury was incurred in the performance of duty" *Baumgartner v. Police and Firemen's Ret. & Relief Bd.*, 527 A.2d 313, 315 (D.C. 1987); *Lamphier v. District of Columbia Police and Firefighters' Ret. & Relief Bd.*, 698 A.2d 1027, 1032 (D.C. 1997), to establish a *prima facie* case of a performance of duty illness or injury.

2.  The member has not demonstrated that the actual conditions of her employment, as determined by an objective standard and not merely the member's subjective perception of her working conditions, were the cause of her "mental or physical stress." *McEvily v. District of Columbia Dep't of Employment Servs.*, 500 A.2d 1022 (D.C. 1985).

FF N. McCrea
F/EMSD Form 44.4: 4/8/2013
Appeal Date: 8/6/2013

ATTACHMENT C4

3.  "To support the ultimate finding that a psychological injury arises out of the employment there must be a finding, supported by the evidence, that within the conditions of the workplace there was a specific, articulable source of injury in the workplace and a finding, supported by medical evidence, that the alleged source of the injury could have produced the kind of injury the employee suffered." *McCamey v. District of Columbia Dep't of Employment Servs.*, No. 04-AA-211 (D.C. 2008).

Based upon the MSB's review of the relevant evidence including the available records on file at the FEMSD and the PFC, there have been no facts or evidence presented by either the member or FEMS to show proof of a finding, supported by evidence, of any sexual harassment in the workplace or any specific, articulable source of injury that could have could have produced the kind of injury the employee suffered.

*This document may contain privileged and confidential information. In accordance with the Health Insurance Portability and Accountability Act of 1996 (P.L. 101-191, 110 Stat 1936, 45 CFR 164.500 et seq.) commonly referred to as HIPAA; only the claimant and/or appropriate and authorized personnel shall have access to this document.*

FF N. McCrea
F/EMSD Form 44.4: 4/8/2013
Appeal Date: 8/6/2013

ATTACHMENT C5



**P F C**
**ASSOCIATES LLC**
Police & Fire Clinic

920 Varnum Street, NE
Washington, DC 20017-2145
Office: (202) 269-7400
Fax: (202) 269-7827

May 1, 2014

RE:   **NICOLE R. MCCREA**

Social Security Number: XXX-XX-

<u>MEMORANDUM</u>

TO:        Chairperson
           District of Columbia Police and Firefighter's Retirement and Relief Board

SUBJECT:   Recommendation that Nicole McCrea be considered for disability retirement from
           the DC Fire and Emergency Medical Services Department

It is the recommendation of the Police and Fire Clinic that Nicole McCrea, employed by the DC
Fire and Emergency Medical Services, be considered for disability retirement. The following is
in support of our recommendation:

**PERSONNEL INFORMATION:**

| | |
|---|---|
| Date of Birth: | 10/31/1969 (age 44) |
| Date of Appointment: | 01/3/2000 |
| Salary: | $65,568 |
| Grade/Step: | 01/09 |
| Rank: | Firefighter |

*ATTACHMENT D1*

*— Exhibit 13*

**HISTORY OF MEDICAL CONDITION FOR WHICH THE MEMBER IS PRESENTED
FOR RETIREMENT:**
Firefighter (FF) Nicole McCrea reports that she experienced a traumatic event at the Engine 1
Firehouse on May 30th, 2013; three individuals, two of whom she recognized in the light of her
air purifier, fondled her while she was sleeping.  FF McCrea elaborates that she woke to
someone touching her *aggressively*— she had been asleep on her stomach and felt them touching
her *private areas, between her legs and buttocks.*  FF McCrea states that when she turned to see
what was happening she saw the men coming towards her and did not immediately know w[ ]
was happening.

FF McCrea had been detailed to Engine 1 while her regular firehouse was under renovation[ ]
FF McCrea reports that on the day of the incident no one said anything to her; the men walk[ ]
away and she is not sure how much time elapsed before she was able to get up and talk to the[ ]

RECEIVED
Mail Room
JUN 25 2018
Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

*A joint partnership of Providence Hospital and Washington Hospital Center
to provide occupational medicine services for the District of Columbia's public safety officers.*

McCrea, Nicole R.
Report of Psychological Evaluation – Disability Retirement
Page 2

Lieutenant.  FF McCrea explains that she found his response to her report dismissive.  She attempted to report the incident a second time and felt her report was ignored.  She reports that Captain Nozeneskey instructed her *not to say anything to anyone.*  FF McCrea states that she felt angry at the lack of response and at the incident.  After speaking to both the Lt. and the Cpt., FF McCrea went home and spoke to her mother about the incident.  FF McCrea then escalated the issue to Fire Chief Morris, who informed Deputy Fire Chief Pearson and an investigation was opened with MPD.  The incident is still under investigation.

FF McCrea has been employed with DC FEMS since January 3, 2000.  She states she was in good physical and mental health when she first started with DC FEMS, but over the course of her employment she experienced deterioration in her health due to exposure to allergens in the various firehouses to which she has been assigned and several altercations with coworkers.

From 2000 to 2005 FF McCrea reports that she was the target of multiple incidents including what she describes as *verbal accosting,* thumb tacks in her seats, people opening the bathroom door while she was showering, and one incident where a water hose was used to soak her bed.

FF McCrea reports that there was also an incident were water was poured down the fire pole while she was using it and she fell off and broke her tibia.  FF McCrea went on leave due to stress in 2005 and was transferred to Engine 28 in June 2005.  According to FF McCrea there were no further incidents following the transfer and she did not experience any other issues until she was moved to Engine 21 due to renovations and she had an allergic reaction to something in the firehouse.  FF McCrea explains that she initially thought she was sick, but eventually noticed that she only felt ill while at work.  FF McCrea reports that her allergic reaction was severe; she experienced eye irritation, runny nose, and irritated/itchy skin to the extent that she sought treatment in the Emergency Department of Providence Hospital.

FF McCrea contacted OSHA's Infectious Control representative and was informed that no one else in the firehouse had reported a similar reaction.  In November or December 2012 FF McCrea was detailed to another Engine.  Over the next several months she was detailed to various Engines and it was while she was with Engine 1 that she was allegedly fondled.

As to her treatment following the incident, FF McCrea reports that she first sought individual therapy through COPE in June or July 2013 and was diagnosed with an Acute Stress Reaction. In August/September 2013 she attempted to reconnect with her former psychologist Dr. Roosevelt Johnson.  FF McCrea first sought individual therapy with Dr. Johnson in 2004 in order to address the stress that she was experiencing due to the harassment at work.  Dr. Johnson was not able to take her on as a patient, and FF McCrea spent the next several months attempting to find a therapist with whom she could connect.  FF McCrea reports that she eventually found Dr. Deanna Wall and has seen her two times.  She plans to continue in individual therapy with Dr. Wall.

*ATTACHMENT D2*

*A joint partnership of Providence Hospital and Washington Hospital Center*
*to provide occupational medicine services for the District of Columbia's public safety officers.*

McCrea, Nicole R.
Report of Psychological Evaluation – Disability Retirement
Page 3

FF McCrea is not currently taking medications. She explains that she has declined medication in the past due to the high number of side effects. FF McCrea has seen Dr. Raquel Gordon at the BHS/PFC. She has also added acupuncture and acupressure to her treatment and has found it helpful.

FF McCrea reports that she is currently in her third year of graduate study in Johns Hopkins University's engineering program. She had been taking three classes, but after the incident she found that she could not keep up with the coursework; she could not concentrate and did not have the energy. She is not currently taking any classes.

FF McCrea reports that she does not feel ready to retire and would like to remain with DC FEMS. She explains that although she feels ready to return to work, her psychologist, Dr. Wall, has expressed concerns regarding *her avoidance patterns*. FF McCrea reports that both Dr. Wall and Dr. Gordon have informed her that she is physically ready to return to duty.

FF McCrea reports that she feels that Dr. Gordon and other members of the administration (including the PFC) have not supported her and have not been *working on her behalf*. She reports that the administration determined that she was not injured on the job despite her lack of prior history of issues with stress or trauma.

FF McCrea explained that receiving justice would likely alleviate her continuing symptoms. She would like her injuries to be acknowledged and the men responsible to go before the Trial Board. She feels that the delays and lack of recognition are a gross injustice.

***Background History:*** FF McCrea was born in Washington, D.C. She is the second of five children, and to her knowledge there were no issues associated with her birth or development. FF McCrea was raised in an intact family. She characterizes her childhood home environment in positive terms and does not report exposure to parental substance abuse, domestic violence, neglect or abuse of any kind. She notes that her household was religious and strictly disciplined. FF McCrea's mother is a trained nutritional cook, and her father has worked as a mortician and cab driver.

FF McCrea earned her B.S. in Chemistry from Fisk University. She went on complete Post-Baccalaureate pre-med coursework at the University of the District of Columbia (2002-2006) and through Georgetown Medical School's Post-Bac program (2006/2007). FF McCrea planned to transition into Georgetown Medical School, but was forced to take leave due to medical issues (anemia caused by fibroids). FF McCrea was accepted into Johns Hopkins Biotechnology program in 2009 and started the program in 2011.

FF McCrea has been employed with DC FEMS since January 3rd, 2000. She describes herself as satisfied with the job/her responsibilities, but unhappy in her relationships with some of her coworkers. FF McCrea has never been fired from a position.   **ATTACHMENT D3**

*A joint partnership of Providence Hospital and Washington Hospital Center*
*to provide occupational medicine services for the District of Columbia's public safety officers.*

McCrea, Nicole R.
Report of Psychological Evaluation – Disability Retirement
Page 4

FF McCrea has never been married and does not have any children. She owns the house where she lives with her parents. FF McCrea does not have a history of brushes with the law.

As to her physical health history, FF McCrea underwent surgery to remove fibroid in 2007/2008. She had bunion surgery in the 1990's and underwent a Lasik procedure approximately 3-years-ago (suffered dry eye syndrome). FF McCrea reports that her allergy issues have improved *90 percent*. She does not report any other serious illnesses, medical conditions, or injuries.

Regarding her mental health history, FF McCrea participated in individual therapy in 2004-2005 (with Dr. Johnson) to address work-related stress. From June-to-August 2013 FF McCrea received therapy through COPE. She is currently in individual treatment with Dr. Wall. She does not report a history of anxiety or depression or other mental health issues prior to 2004/2005. FF McCrea does not report a history of alcoholism or other substance abuse.

**DATE OF LAST FULL DUTY:**     Sick Leave since June 25, 2013

**PAST MEDICAL HISTORY:**

- Adjustment Disorder with Anxiety and Depression, July 2013

**CURRENT MEDICATIONS:**     none

**PSYCHOLOGICAL EVALUATION:**
**Procedures Utilized:**

1. Signed Disclosure and Release Form for Fitness for Duty Information
2. Diagnostic Clinical Interview
3. Mental Status Review
4. Beck Anxiety Inventory (BAI)
5. Beck Depression Inventory-II (BDI-II)
6. Beck Hopelessness Scale (BHS)
7. Minnesota Multiphasic Personality Inventory-2 (MMPI-2)
8. Personality Assessment Inventory (PAI): Community and Law Enforcement Norms
9. Trauma Symptom Inventory-2nd Edition (TSI-2)
10. Review of Records:
    a. PFC Medical Clinic
    b. PFC Behavioral Health Services
    c. Memorandum of Referral Requesting Fitness for Duty Evaluation

ATTACHMENT D4

*A joint partnership of Providence Hospital and Washington Hospital Center
to provide occupational medicine services for the District of Columbia's public safety officers.*

McCrea, Nicole R.
Report of Psychological Evaluation – Disability Retirement
Page 5

**Confidentiality Statement:**
Prior to starting the interview and testing, Firefighter Nicole McCrea was informed verbally and in writing that the usual rules of confidentiality did not apply to this evaluation. Specifically, she was told that a report would be prepared using information obtained from a clinical interview, psychometric testing, review of available records, and collateral information. FF McCrea was informed that a report would be submitted to the Police and Fire Clinic, the referring agency, who would be free to use it as part of the final determination for Fitness for Duty. Having understood the nature and purpose of the present evaluation, FF McCrea agreed to proceed.

Please note that FF McCrea signed a Consent Form so I could obtain information from her therapist, Deanna Wall. I contacted Dr. Wall on 5/1/14 and was informed that the Consent for her to provide information to me had been withdrawn by FF McCrea. Therefore, Dr. Wall was not interviewed.

**Current Mental Status:**
FF Nicole McCrea is a right-handed, 44-year-old woman with a reported height of 5'9" and reported weight of 190 lbs. At the time of evaluation she presented as alert, fully oriented, dressed in formal attire. FF McCrea easily established rapport, maintained normal eye contact, and was cooperative with evaluation procedures. Her speech was normal in rate, tone, and volume, with no apparent issues regarding expressive or receptive language. Her stream of thought appeared organized and goal-directed; however, there were signs of rigidity/inflexibility in her thought processes, as well as recurrent ideas of having been unjustly treated. There were no apparent signs of psychotic content or processes. FF McCrea's affect was sad and tense, with bouts of tearfulness at times during the clinical interview process. Mood was characterized as *better,* however FF McCrea elaborated that she continues to be bothered by what she perceives as the marked injustice of her situation. Appetite, weight and energy levels are variable. Sleep is disrupted with frequent waking throughout the night, and fatigue at awakening.

FF McCrea denied any past or present suicidal or homicidal ideation. Visual and auditory hallucination, other unusual sensory experiences, and unusually elevated mood/activity levels were also denied. FF McCrea explains that after the incident she experienced episodes of panic and angry outbursts, but she is no longer experiencing these symptoms.

She continues to experience rumination/obsessive thinking, stating that she *spends all day thinking about the case.* She also reports social withdrawal and avoidant behavior patterns, explaining, *I watch movies a lot and avoid socializing... when I don't distract myself I think about the incidents.* FF McCrea was somewhat emotionally reactive throughout the interview process. She was not impulsive, overactive or fidgety. She did not demonstrate obvious sign of memory impairment or attention issues. On a cognitive screen she performed within normal limits and appeared to be of above average intelligence. Her short-term memory of three objects

*A joint partnership of Providence Hospital and Washington Hospital Center*
*to provide occupational medicine services for the District of Columbia's public safety officers.*

ATTACHMENT D5

Page 6 of 172

McCrea, Nicole R.
Report of Psychological Evaluation – Disability Retirement
Page 6

in an immediate recall trial was normal, as were her basic auditory attention span and verbal abstraction and reasoning abilities. Insight was limited and judgment appears unimpaired.

**Test Data:**
FF McCrea was administered several standardized, broad based clinical, inventory measures that measure psychopathology, developed to assess emotional and personality disorders, including the Personality Assessment Inventory (PAI), the Minnesota Multiphasic Personality Inventory - 2 - Restructured Form (MMPI-2), the Beck Depression Inventory - II (BDI-II), the Beck Hopelessness Scale (BHS), and the Beck Anxiety Scale (BAI). Additionally, FF McCrea was administered the Trauma Symptom Inventory-2nd Edition (TSI-2), to assess for possible symptoms and risk factors as related to this domain.

*Validity Data:* The PAI, MMPI-2, and TSI-2 contain embedded validity scales that assess the test taking response set of the examinee; that is attempts to feign, exaggerate, deny or minimize symptoms or problems. The validity scales of all of the tests were within normal limits.

*Personality Assessment Inventory (PAI):* The PAI profile was marked by a significant elevation of the scale that taps suspiciousness/paranoia. Individuals with similar profiles are hypervigilant and mistrustful of the motives of others. They are hypersensitive in their interactions with others, suspicious and quick to feel that they are being treated inequitably. FF McCrea's profile also signals high levels of situational/environmental stress, underlying anxiety and depression, and a preoccupation with her health/physical functioning.

*Minnesota Multiphasic Personality Inventory-2-RF (MMPI-2):* The MMPI-2 profile also yields clinical elevations of subscales that tap suspiciousness/paranoid thinking along with somatic preoccupation. Individuals with similar profiles have limited insight, difficulty recognizing anger, over-control feelings and tend to express affective/emotional conflicts or distress somatically. On the MMPI-2 FF McCrea tests as somewhat socially and emotionally withdrawn. Additionally, there is evidence that she feels mistrustful of the intentions of others and tends to be more suspicious/hesitant in her relationships.

*Beck Depression Inventory - II (BDI-II):* On the BDI-II, FF McCrea endorsed items indicative of clinically significant symptoms of depression of moderate/severe intensity. She noted persistent feelings of sadness, apathy, and pessimism for the future, as well as other vegetative symptoms associated with depression.

*Beck Anxiety Inventory - II (BAI):* The BAI signals clinically significant cognitive, affective and physiological symptoms of anxiety.

ATTACHMENT D6

*A joint partnership of Providence Hospital and Washington Hospital Center
to provide occupational medicine services for the District of Columbia's public safety officers.*

U0P17714                                                   PD14-2038

McCrea, Nicole R.
Report of Psychological Evaluation – Disability Retirement
Page 7

_Beck Hopelessness Scale (BHS):_  The BHS was within normal limits; that is, FF McCrea did not endorse items associated with heightened suicide risk, such as items that reflect marked pessimism/negativity regarding the future.

_Trauma Symptom Inventory-2 (TSI-2):_  The TSI-2 signals symptoms of anxiety and somatic preoccupation.  The profile is not indicative of Posttraumatic Stress Disorder.

**ASSESSMENT OF CLINICAL STATUS/DIAGNOSIS:**
Results of the current evaluation as a whole is indicative of an Unspecified Anxiety Disorder (DSM-V 300.00).

**IMPACT OF MEDICAL CONDITION ON ABILITY TO PERFORM FUNCTIONS OF JOB:**
Firefighter Nicole R. McCrea was last on active duty in June 2013.  She has been on Sick Leave status since reporting an alleged incident with co-workers which has caused her a great deal of distress.  FF McCrea reports that she was sexually assaulted while asleep in her bed at the firehouse.  She reports that following the incident she experienced episodes of panic, angry outbursts, problems with concentration and other symptoms of depression and anxiety.  FF McCrea is currently individual therapy.  She is not currently taking medications.  Results of the current evaluation provide evidence of continuing clinical severity symptoms of anxiety, depression, hypervigilance, mistrust, social and emotional withdrawal and other avoidance behavioral patterns.  The clinical picture is congruent with a diagnosis of an Unspecified Anxiety Disorder (DSM-V 300.00).

This woman's condition, in my opinion, is not the result of vicious habits of intemperance.

_Gloria Morote, Ph. D._ (signed electronically)
**Gloria Morote, Ph.D.**
Licensed Clinical Psychologist
Clinical Neuropsychologist

_This matter is submitted to the Board pursuant to DC Code Sections 5-633 and 5-634 which provide in pertinent part  "and regardless of whether the prognosis is that the member will be able to perform the full range of duties after achieving maximum medical improvement, the Director shall process for retirement pursuant to § 5-710, those Fire and Emergency Medical Services members who spend 64 cumulative work days in a less-than-full-duty status over any 2-year period as a result of any one performance-of-duty [or non- performance-of-duty] injury or illness, including any complications relating to the injury or illness."  Said member has exceeded 64 cumulative work days in a less than full_

ATTACHMENT  D7

_A joint partnership of Providence Hospital and Washington Hospital Center
to provide occupational medicine services for the District of Columbia's public safety officers._

McCrea, Nicole R.
Report of Psychological Evaluation – Disability Retirement
Page 8

*duty status and is unable to perform full duties; therefore the instant report is being submitted for the Board's consideration.*

It has been determined that the above member's **non-performance of duty** medical condition *permanently* prevents the performance of full duty.

BFC Michael Donlon
Medical Services Officer
DC Fire and Emergency Medical Services Department

William B. Sarvis, Jr.      5/14/2014
Director of Medical Services
DC Metropolitan Police Department

cc:      Olusola Malomo, MD, MPH
         Medical Director
         Police and Fire Clinic

ATTACHMENT 08

*A joint partnership of Providence Hospital and Washington Hospital Center to provide occupational medicine services for the District of Columbia's public safety officers.*

# PHYSICAL

# DEMAND

# CODES

ATTACHMENT 09

FD 14-2036

## POLICE AND FIREFIGHTERS' RETIREMENT AND RELIEF BOARD
### 441 4th Street, NW
### Suite 340 North
### Washington, DC 20001
### (202) 442-9622

MEMBER'S NAME: _Nicole McCree_

DEPARTMENT: _Fire & EMS_

**Please place a (✓) in the blocks shown**

| | TEMPERAMENT CODES | Work Outside of the Police/Fire Departments | | | | Work Inside of the Police/Fire Departments | | | |
|---|---|---|---|---|---|---|---|---|---|
| | CATEGORY | No Concerns | Mild Concerns | Moderate Concerns | Significant Concerns | No Concerns | Mild Concerns | Moderate Concerns | Significant Concerns |
| **D** | **DIRECTING**, Controlling or Planning Activities of Others. Taking responsibility for telling others what to do or planning their tasks (not your own work). Making rules and decisions that others must follow. | | | ✓ | | | | | ✓ |
| **R** | Performing **REPETITIVE** or Short-Cycle Work. Doing the same task or following the same steps over again many times a day each day. | | ✓ | | | ✓ | | | |
| **I** | **INFLUENCING** People in their Opinion, Attitudes and Judgments. Getting them to do the things you want them to do. | | | | ✓ | | | | ✓ |
| **V** | Performing a **VARIETY** of Duties. Being able to change tasks quickly. Doing many different types of work during a day. | | | | | | ✓ | | |
| **E** | **EXPRESSING** Personal Feelings. Creating art or criticizing the art of others. Using imagination and creativity. | | | | ✓ | | | | ✓ |
| **A** | Working **ALONE** or Apart in Physical Isolation from Others. For long periods of time you don't see other people face-to-face. | | ✓ | | | ✓ | | | |
| **S** | Working Effectively under **STRESS**. Working under stress caused by emergencies danger or criticism | | ✓ | | | | | | ✓ |
| **T** | Attaining Precise Set Limits, **TOLERANCES** and Standards. Being very precise in making things, dong arithmetic, recording data or inspecting things. | | ✓ | | | ✓ | | | |
| **U** | Working **UNDER** Specific Instructions. There is little or no room for independent action or judgment | | ✓ | | | ✓ | | | |
| **P** | Dealing with **PEOPLE**. Working together with others or helping them (more than just giving or receiving instructions. | | ✓ | | | | | | ✓ |
| **J** | Making **JUDGMENTS** and Decisions. Making decisions based on what you see, hear, smell, or touch. | | ✓ | | | | | | ✓ |

RECEIVED
APR - 2 2014
POLICE & FIRE CLINIC

Source: 1995, Enhanced Guide for Occupational Exploration-10/95

PHYSICIAN'S SIGNATURE _Clara Martz, DO_   DATE: _4/2/14_
Revised 2/20/06-PFC

Page 11 of 172

ATTACHMENT D10

# LABOR

# MARKET

# SURVEY



RECEIVED
Mail Room

JUN 2 5 2018

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

ATTACHMENT D11



# REHABILITATION
## PERSPECTIVES, INC.

P.O. Box 11432 • Burke, Virginia 22009 • (703) 912-6960 • Fax (703) 912-9632

METROPOLITAN POLICE & FIRE DEPT.
RECEIVED
MAY 2 1 2014

## LABOR MARKET SURVEY

**Date of Report:** 05/19/2014

**Name:** # NICOLE R. MCCREA

**DOB:** 10/31/1969
**SSN:** XXX-XX-7176
**Customer:** PFC Associates, LLC
**Insured:** DC Police and Firefighters' Retirement and Relief Board
**Class:** DCFD
**Date of Occurrence:** 05/30/2013

## INTRODUCTION

A Labor Market Survey (LMS) requested by the Police and Firefighters' Retirement and Relief Board was conducted from 04/08/2014 to 05/19/2014 to identify employment opportunities that were currently available in the Washington, DC and Metropolitan Area for Firefighter Nicole R. McCrea.

The LMS report is based on an interview with Firefighter McCrea on 04/08/2014 regarding her medical status, employment history, education, and computer skills. Temperament Codes, dated 04/02/2014, and provided to us by the PFC on 04/03/2014 were used to identify her psychological capabilities and limitations.

Firefighter McCrea's medical status has been documented in other reports; therefore, only a synopsis pertinent to the scope of conducting a LMS will be provided in this report.

RECEIVED
Mail Room
JUN 2 5 2018
Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

## MEDICAL HISTORY

Between the evening of Thursday, 05/30/2013, and the early hours of Friday, 05/31/2013, Firefighter McCrea was reportedly fondled while sleeping in her bunk by three male Firefighters on the same shift at Engine-1.

After reporting the assault to her direct supervisor (a Lieutenant who reportedly ignored the information), she was also required to remain on duty at the end of her work shift because no personnel from the next shift were available to relieve her. At some point during the morning hours, she reported the assault to her Captain who instructed her to

ATTACHMENT D12
Page 13 of 172

say nothing about the incident and who also failed to follow through on reporting the assault. After finally being relieved from her shift, she reportedly went to her parent's home and cried herself to sleep.

While responding to a call during her shift on Saturday, 06/01/2013, she reported the assault to a Fire Chief and Deputy Fire Chief and was instructed to return to the Firehouse and check-out of service. That afternoon and evening, she met with a sexual assault advocate and the Police Officers investigating the assault and reportedly left the firehouse at approximately 2 am on Sunday, 06/02/2013.

Firefighter McCrea reportedly continued working her assigned shifts until the evening of 06/21/2013, when she experienced a nightmare and woke up screaming while sleeping in the ladies restroom. She reported back to work on 06/23/2013; however, subsequently went home. On 06/25/2013, she reported her case to the PFC, was removed from active duty, and began to use sick leave.

The member reportedly utilized the COPE EAP (Employee Assistance Program) at work and began treatment with a Dr. Roosevelt Johnson who diagnosed her with Post Traumatic Stress Disorder (PTSD). She was then referred to another mental health professional who reportedly suggested that she "get over it." Firefighter McCrea has been receiving weekly treatment from Dr. Diana Wall since mid-March 2014 and last saw her on 04/05/2014.

Firefighter McCrea's condition is also being addressed by the PFC where she was reportedly administered a battery of tests with Behavioral Health on 03/31/2014. At the time of our meeting, she did not have a follow up appointment scheduled with the PFC.

In addition to cognitive behavioral therapy with Dr. Wall, Firefighter McCrea started acupuncture treatments in November 2013 and is now participating in acupressure. She reports a reduction in the frequency of nightmares.

## CURRENT SYMPTOMS

Firefighter McCrea reports:

- a reduction in nightmares
- improved sleep
- weight gain since her reported assault
- significant stress due to the way the assault was handled by her employer

## OTHER MEDICAL CONDITIONS

- Past history (2010-2012) of allergies that an immunologist identified as being related to a firehouse she worked in that was reportedly inspected and closed for renovations and cleaning.

ATTACHMENT D13
Page 14 of 172

Nicole R. McCrea                                    3                                    May 19, 2014

- Firefighter McCrea reports a time period in 2004/2005 when she met with a psychologist for stress related symptoms.

## TEMPERAMENT CODES

As of 04/02/2014, Firefighter McCrea's Temperament Codes indicate:

- **Significant** concerns regarding the categories of Influencing (opinions, attitudes and judgments), Expressing (feeling, criticizing), working effectively under Stress (caused by emergency, danger or criticism), dealing with People, and making Judgments and Decisions based on what she hears or sees.
- **Moderate** concerns with Directing (controlling or planning the activities of others)
- **Mild** concerns for performing a Variety of Duties (doing many different types of work during a day).
- **No Concerns** for 1) Repetitive or Short-Cycle Work, 2) working Alone or Apart, 3) Attaining Precise Set Limits, Tolerances and Standards, and 4) Working Under Specific Instructions.

Based on the aforementioned Temperament Codes provided by the PFC, Firefighter McCrea is unable to perform the full duties of a DCFD Firefighter and EMT.

## EDUCATION / MILITARY BACKGROUND

- Currently pursuing a Master's degree in Biomedical Engineering at Johns Hopkins University (JHU).
- Earned an M.S. in Biotechnology, JHU, 2009.
- Attended a pre-med program at Georgetown University between 2006-2007.
- Earned a B.S. in Chemistry, Fisk University, 1992
- Completed prerequisite course work for her undergraduate degree at the University of the District of Columbia.
- Graduated from Cardozo Senior High School in 1987
- Did not serve in the military

## COMPUTER SKILLS

Firefighter McCrea reports having computer proficiency with Microsoft Windows, Office applications, and typing skills as well.

## EMPLOYMENT HISTORY

Before becoming a Firefighter, Ms. McCrea worked in research at the National Eye Institute (part of NIH) between 1991 and 1993. Afterwards, she worked at a copy center through 2000 when she entered the DC Fire Training Academy. She has been employed through DCFD as a Firefighter I &II and EMT-B for 13 years.

ATTACHMENT D1

## TRANSFERABLE / OFFICE SKILLS / VOCATIONAL INTERESTS

Firefighter McCrea has 13 years of experience as a Firefighter, approximately six years experience in a copy center and two years experience as a research assistant. The transferable skills of a Firefighter include active listening; communication; critical thinking; inductive and deductive reasoning; selective attention; the ability to analyze and cope with situations; apply general intelligence; demonstrate emotional stability; speak effectively; and cooperate with the general public and others.[1]

Her work experience and academic attainment is consistent with specific vocational preparation (SVP) levels of 4.0 to 8.0 within the Dictionary of Occupational Titles and vocational preparation guidelines described in Job Zone 1 through Job Zone 5 of the Department of Labor's Occupational Information Network (http://online.onetcenter.org/).

However, Firefighter McCrea's Temperament Codes are more consistent with Job Zones 1 through 3.

Description of Job Zones:

### Job Zone 1 (No Preparation needed) (SVP <4.0) [2]
No previous work-related skill, knowledge, or experience is needed for these occupations. For example, a person can become a cashier even if he/she has never worked as one before. These occupations may require a high school diploma or GED certificate and some may require a formal training course to obtain a license. Examples include cashier, crossing guard, and attendants.[3]

### Job Zone 2 (Some Preparation needed) (SVP 4.0-6.0)
Some previous work-related skill, knowledge, or experience may be helpful in these occupations, but usually is not needed. For example, a teller might benefit from experience working directly with the public but an inexperienced person could still learn to be a teller with little difficulty. Employees in these occupations need anywhere from a few months to one year of working with experienced employees.

Occupations in Job Zone 2 often involve using knowledge and skills to help others. Examples include: emergency dispatcher, hotel desk clerk, customer service representative, order clerks, parking enforcement workers, general office clerks, office machine operators, and tellers.[4] These occupations usually require a high school diploma and may require some vocational training or job-related course work. In some cases, an Associate's or Bachelor's degree could be preferred.

---

[1] This list is not all-inclusive.
[2] For additional information on O*Net Job Zones visit this link: http://online.onetcenter.org/help/online/svp
[3] http://online.onetcenter.org/find/zone?z=1&g=Go
[4] Additional occupations available at http://online.onetcenter.org/find/zone?z=2&g=Go


ATTACHMENT D15
Page 16 of 172

## Job Zone 3 (Medium Preparation needed) (SVP 6.0-7.0)

Previous work-related skill, knowledge, or experience is required for these occupations. These occupations usually involve using communication and organizational skills to coordinate, supervise, manage, or train others to accomplish goals. Most occupations in this zone require training in vocational schools, related on-the-job experience, or an Associate's degree. Some may require a Bachelor's degree.

Examples include: police patrol officer, police identification and records officer, private detective and investigator, file clerk, records clerk, bill and account collector, correctional officers and jailers, emergency medical technician, administrative assistants, first line supervisors/police and detectives, fire inspectors and investigators, municipal clerks, procurement clerks, travel agents, and traffic technicians.[5]

## Job Zone 4: Considerable Preparation Needed (SVP 7.0 - <8.0)

Most of these occupations require a four-year bachelor's degree. A considerable amount of work-related skill, knowledge, or experience is needed for these occupations. Employees in these occupations usually need several years of work-related experience, on-the-job training, and/or vocational training. Many of these occupations involve coordinating, supervising, managing, or training others. Examples include accountants, sales mangers, chemists, database administrators, teachers, chemists, biochemical and biomedical engineers, clinical research coordinators, environmental engineers, criminal investigators, and special agents.

## Job Zone 5: Extensive Preparation Needed (SVP 8.0 >)

Most of these occupations require graduate school. For example, they may require a master's degree, and some require a Ph.D., M.D., or J.D. Extensive skill, knowledge, and experience are needed for these occupations. Many require more than five years of experience. For example, surgeons must complete four years of college and an additional five to seven years of specialized medical training to be able to do their job. Employees may need some on-the-job training, but most of these occupations assume that the person will already have the required skills, knowledge, work-related experience, and/or training. These occupations often involve coordinating, training, supervising, or managing the activities of others to accomplish goals. Very advanced communication and organizational skills are required. Examples include librarians, lawyers, aerospace engineers, wildlife biologists, school psychologists, surgeons, treasurers, and controllers.

---

[5] Additional occupations available at http://online.onetcenter.org/find/zone?z=3&g=Go

ATTACHMENT D16
Page 17 of 172

Nicole R. McCrea                                          6                                          May 19, 2014

## LABOR MARKET SURVEY

| | |
|---|---|
| **Company:** | Fairfax County Government (Virginia) |
| **Location:** | Training Division, Fire and Rescue Department - Fairfax, VA |
| **Contact:** | HR Central - Application Center |
| **Telephone:** | 703-222-5872 |
| **Position:** | Administrative Assistant II |
| **Duties:** | Incumbent provides general administrative support for the Training Division staff, including data entry, training scheduling, front office management records maintenance, office equipment management; supports various projects and provides assistance as needed; manages, tracks and maintains database and files; and performs data entry and analyzes, verifies, and generates reports for Advanced Life Support (ALS) internship skills and protocols in support of the ALS internship program. |
| **Physical Requirements:** | Sedentary Level (reasonable accommodations are available to persons with disabilities during application and/or interview processes). |
| **Wage:** | $30,611 - $40,815 per annum (AVG: $35,713) |
| **Hours:** | Full-Time Position |
| **Minimum Qualifications:** | Any combination of education, experience, and training equivalent to graduation from high school or a GED plus one year providing administrative support.  A criminal background check is required.  Preferred qualifications include:  at least two years of public safety experience; ability to work quickly and efficiently; extensive experience and proficiency using automated technologies; and experience using Scheduler Plus and Microsoft Office Suite computer software. |

| | |
|---|---|
| **Company:** | Integrated Dermatology of K Street |
| **Location:** | 2141 K St., NW, Washington, DC |
| **Contact:** | Office |
| **Telephone:** | 202-293-3990 |
| **Position:** | Patient Service Representative |
| **Duties:** | Incumbent serves patients by greeting them and helping them; scheduling appointments; and maintaining records and accounts. |
| **Physical Requirements:** | Sedentary Level |
| **Wage:** | $12 - $19 per hour / $24,960 - $39,520 per annum (AVG: $32,240) |
| **Hours:** | Full-Time Position |
| **Minimum Qualifications:** | High School graduate; possess telephone, work processing, customer service, and scheduling skills. |

ATTACHMENT     D17

Page 18 of 172

Nicole R. McCrea                          7                          May 19, 2014

| | |
|---|---|
| **Company:** | Arlington County Government |
| **Location:** | 1425 N. Courthouse Road, Arlington, Virginia (METRO-accessible) |
| **Contact:** | Human Resources |
| **Telephone:** | 703-228-3000 |
| **Position:** | Supply Clerk |
| **Duties:** | The Property Management Unit of the Police Department is looking for a warehouse technician to perform technical and administrative duties such as inventory and management; and distribution and control functions. Specific responsibilities include: Maintaining manual and automated inventory systems as materials are ordered, received and dispensed; Conducting periodic inventories of office and police specific supplies; Producing and analyzing usage reports to identify items that need ordering or need to be discarded; |
| | Researching and responding to inquiries related to inventory levels; Downloading reports and data to assist in monitoring the budget; Developing written materials for inclusion in the inventory system; Ensuring the efficient and safe storage of materials; Researching availability of equipment, using catalogs, the internet, and existing vendor contracts; |
| | Initiating the purchase approval process and ordering supplies and equipment using standard purchasing policy, procedures and the County's automated financial system; Recommending equipment or office supply substitutions; |
| | Tracking purchasing requests; Following through with discrepancies on orders; |
| | Assisting with stocking, inventory, and distribution of supplies; and Overseeing the receipt process and/or receiving supplies and equipment delivered to the Police Department and placing the items in the proper location and/or notifying employee of arrival of item. |
| **Physical Requirements:** | Medium to Heavy - Work is performed with extended periods of standing, walking, reaching, bending, and lifting light to heavy objects and equipment weighing 50 or more pounds on a regular basis. |
| **Wage:** | $35,692+ per annum |
| **Hours:** | Full-Time Position (designated as emergency personnel position and will supervise rotating shifts, be required to work weekends, holidays, and during special events) |
| **Minimum Qualifications:** | High school diploma or equivalent plus two years of responsible technical and/or administrative work related to warehouse operations: buying, receiving, storing and issuing supplies/tools, materials, parts and equipment and maintaining the associated records. Successful completion of college coursework from an accredited college or university can be substituted for the experience requirement on the following basis: two (2) years = six (6) months of experience; four (4) years = one (1) year of experience. Applicant must possess, or obtain by time of appointment, a valid motor vehicle operator's license from the applicant's place of residence. The applicant must authorize Arlington County to obtain, or the applicant must provide a copy of the applicant's official state/district driving record. Any offer of employment may be contingent upon a favorable review of the applicant's driving record. |

ATTACHMENT D18

Nicole R. McCrea                         8                        May 19, 2014

| | |
|---|---|
| **Company:** | US Medical Innovations |
| **Location:** | 6930 Carroll Avenue, Takoma Park, MD |
| **Contact:** | Headquarters |
| **Telephone:** | 301-270-0147 |
| **Position:** | Research Laboratory Technician |
| **Duties:** | Incumbent provides technical knowledge and expertise in Research laboratory analysis by assisting with bench top experiments, preparing and assisting with the experiments, collecting and analyzing data, assisting in the preparation and analysis of laboratory experiments as requested, and preparing reports. |
| **Physical Requirements:** | Sedentary Level |
| **Wage:** | $35,000 - $40,000 per annum (AVG: $37,500) |
| **Hours:** | Full-Time Position |
| **Minimum Qualifications:** | Bachelor's degree and 1-2 years experience in biomedical or research laboratory preferred; demonstrate knowledge of basic molecular, biochemistry, and tissue culture techniques; computer skills including intermediate level experience with Excel and other Microsoft Office software; and familiarity with biomedical terminology and abbreviations. |

| | |
|---|---|
| **Company:** | Express Scripts (United BioSource Corporation - UBC) |
| **Location:** | McLean, VA  20598 |
| **Contact:** | Office |
| **Telephone:** | 703-663-2920 |
| **Position:** | Communications Analyst |
| **Duties:** | Incumbent supports directors and/or managers and lead UBC program teams to deliver program milestones; assists with design and development of program processes; participates in team communication and collaboration during development and start-up; assists with training of employees for programs, as assigned; and assists with improvement of program processes. |
| **Physical Requirements:** | Sedentary Level |
| **Wage:** | $41,250 - $68,750 per annum (AVG: $55,000) |
| **Hours:** | Full-Time Position |
| **Minimum Qualifications:** | Bachelor's degree is preferred; computer skills with specific aptitude in Microsoft Office; working knowledge of customer service processes preferred; working knowledge of ICH-GCP guidelines preferred; minimal travel as required; and previous managerial experience preferred. |

ATTACHMENT D14

## SUMMARY

The positions identified in the LMS are deemed appropriate based on Firefighter McCrea's educational attainment, employment history, transferable skills, and work capabilities.

Several higher paying jobs consistent with her academic attainment in chemistry and biotechnology were also identified. They included clinic trial associate, research associate, and researcher. Unfortunately, many of the jobs required duties inconsistent with her Temperament Codes.

Considering her qualifications, we can conclusively say that there are a sufficient number of alternative employment opportunities available in the local job market. The jobs identified in this LMS include wages that range from $32,240 up to $55,000.

It is our professional opinion that Firefighter McCrea's work history and transferable skills would enable her to earn in the above average wage range for the identified positions.

Her annual wage earning potential based on the five positions identified in this LMS would be $35,713 or higher.[6]

Submitted by:

*Debbie Moreau*

Debbie Moreau, CRC, CCM, CDMS
Rehabilitation Supervisor

Richard Gallanti. MSC
Rehabilitation Counselor

---

[6] Median annual wage earning is based on the average wage-range of identified positions with the following employers:  Integrated Dermatology ($32,240), Arlington County ($35,692), Fairfax County ($35,713), US Medical Innovations ($37,500), and Express Scripts ($55,000).

ATTACHMENT D20

# GOVERNMENT OF THE DISTRICT OF COLUMBIA

★ ★ ★

## BEFORE
## THE POLICE AND FIREFIGHTERS' RETIREMENT
## AND RELIEF BOARD

In the Matter of:

**Nicole McCrea, Firefighter**

> D.C. Fire and Emergency Medical
> Services Department
> Case No.: FD14-2038
> Disability Retirement

## ORDER

The Police and Firefighters' Retirement and Relief Board has determined that Nicole McCrea, Member, who was appointed to the District of Columbia Fire and Emergency Medical Services Department on January 3, 2000, is incapacitated from further duty by reason of a disability not incurred in the performance of duty after more than five years of creditable service. It is therefore

**ORDERED:** The Member shall be retired on a percentage of disability, pursuant to D.C. Code §§ 5-709(b) and 5-710 (e)(2)(A-D) (2012 Repl.), in the amount of 54% of 70% of the Member's basic salary, or 30% of her basic salary, whichever is higher, effective close of business **May 15, 2015,** pursuant to the provisions of the Police and Firefighters' Retirement and Disability Act, as amended by Public Law 96-122. The amount of the disability retirement annuity shall be determined by the District of Columbia Retirement Board (DCRB) upon receipt of this Order based on the Member's certified individual retirement record and related information.[1]

**ORDERED:** The Member shall appear before the Police and Fire Clinic (PFC) for an annual medical and/or psychological examination beginning the calendar year 2016 and every year thereafter, during the month of her date of birth, until such time as the Member has reached the age of 50, pursuant to D.C. Code § 5-721 (2012 Repl.). The Member shall contact the Clinic at least 30 days prior to the month of her date of birth to schedule an appointment for such annual examination.

---

[1] Any dispute in the amount of the Member's disability retirement is reviewed by DCRB pursuant to D.C. Code §1-751 (2012 Repl.).

441 4th Street, NW, Suite 330S, Washington, D.C., 20001



RECEIVED
Mail Room

JUN 25 2018

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

*ATTACHMENT E1*

FD14-2038

Page 2

**ORDERED:** The Member shall file a notarized Annual Earned Income Report with the District of Columbia Retirement Board ("DCRB") beginning for calendar year 2016 in 2017, and every year thereafter until the date of her 50th birthday, pursuant to D.C. Code § 5-714 (2012 Repl.), to determine the Member's continued eligibility for the disability retirement annuity. The notarized report shall be documented on the forms provided, or in a format suggested by DCRB, and must be filed by May 15th whether or not the Member earns any earned income. Finally, the Member may be required to submit additional notarized statements and information as required by DCRB.

This Order serves as notification to the Member regarding the current requirements as stated above. The Member is cautioned, however, that these requirements are subject to change.

By **ORDER** of the Police and Firefighters' Retirement and Relief Board.

Dated: _4/30/15_
AGC/jg

Andrea G. Comentale, Acting Chairperson

441 4th Street, NW, Suite 330S, Washington, D.C. 20001

ATTACHMENT E2

FD14-2038

## CERTIFICATE OF SERVICE

I, Alicia D. Cooper, hereby certify that on _Nov 30_, 2015, I sent a copy of the foregoing Order to each of the individuals listed below at the email addresses provided with the exception of the copy sent to Nicole McCrea, which was sent by first class mail, postage prepaid, at the address listed below. I also sent a copy of the decision to William Sarvis, Jr. and Nicole McCrea, by first class mail, postage prepaid, at the addresses listed below.

Edward Mills III, Acting Chief
D.C. Fire and Emergency Medical
Services Department
edward.mills@dc.gov

Turna R. Lewis, Esq., M.P.A.
Executive Officer
D.C. Fire and Emergency Medical
Services Department
turna.lewis@dc.gov

William Sarvis, Jr.
Director, Medical Services
Police & Fire Clinic
920 Varnum Street, N.E.
Washington, D.C. 20017
William.Sarvis@dc.gov

Diann Martin
Administrative Specialist
Police & Fire Clinic
dmartin@pfcassociates.org

Nicole McCrea
5205 E. Capitol Street, S.E.
Washington, D.C. 20019

Kameron Kima-Cherry, Associate Director
Benefits & Retirement Administration
D.C. Department of Human Resources
Kameron.kima-cherry@dc.gov

Shawn Winslow
Supervisory Human Resources Specialist
shawn.winslow@dc.gov

Benefits & Retirement Administration Box
dchr.benefits@dc.gov

Johnetta Bond
Chief Benefits Officer
D.C. Retirement Board
Johnetta.bond@dc.gov

Daniel Hernandez
Director, Policy Program Dev. & Evaluation
D.C. Retirement Board
Daniel.hernandez@dc.gov

Sylvia Treadwell
Retirement Services Manager
D.C. Retirement Board
Sylvia.treadwell@dc.gov

Alicia D. Cooper
Human Resources Specialist
Police & Firefighters' Retirement
and Relief Board
D.C. Department of Human Resources

441 4th Street, N.W., Suite 330 South, W...

ATTACHMENT E3

# GOVERNMENT OF THE DISTRICT OF COLUMBIA

★ ★ ★

## BEFORE
## THE POLICE AND FIREFIGHTERS' RETIREMENT
## AND RELIEF BOARD

In the Matter of:

### Nicole McCrea, Firefighter

**D.C. Fire and Emergency Medical Services Department**
**Case No.: FD14-2038**
**Disability Retirement**

## DECISION[1]

Andrea G. Comentale, Esq., Acting Chairperson
D.C. Office of the Attorney General

Aubrey Mongal, Captain
D.C. Metropolitan Police Department

Mark Wynn, Deputy Chief
D. C. Fire and Emergency Medical Services Department

Charles Epps, M.D.
Public Member

Henry Wyatt, M.D.
Public Member



RECEIVED
Mail Room

JUN 25 2018

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

---

[1] Pursuant to D.C. Code §5-721(a)(2012 Repl.), the District of Columbia Retirement Board completed its review on April 29, 2015.

---

441 4th Street. NW. Suite 330S. Washington. D.C.. 20001

ATTACHMENT E4

FD14-2038

## INTRODUCTION

The proceedings in this case took place on November 6, 2014, January 22, 2015, and February 12, 2015, before the Police and Firefighters' Retirement and Relief Board regarding Nicole McCrea, Member,[2] who was appointed to the District of Columbia Fire and Emergency Medical Services Department ("Department") on January 3, 2000.[3] The hearing was initiated by the Police and Fire Clinic ("PFC")[4], which on May 1, 2014, recommended that the Member be considered for disability retirement having concluded that she was permanently disabled based on a diagnosis of Unspecified Anxiety Disorder (DSM-V 300.00). At the hearing, witnesses testified under oath. The Member, who appeared *pro se*, had the opportunity to, and did in fact, present testimonial and documentary evidence as well as argument. The record was entered into evidence and the record was closed at the end of the February 12, 2015, hearing.

## ISSUES

1. Is the Member disabled from performing useful and efficient service?

2. Was the Member's disability incurred in the performance of duty?

3. Has the Member completed five years of creditable service with the Department?

4. What is the Member's percentage of disability, and what jobs, if any, can the Member perform?

## SUMMARY OF EVIDENCE

The Member was appointed to the Department on January 3, 2000. At the time, her case was referred to the Board for disability retirement consideration, the Member was a Firefighter Grade 01, Step 09, with an annual base salary of $65,568.00.[5] (R. at 2).[6]

On June 25, 2013, the Member reported to the PFC and informed Taunya Brownlee, M.D., that she suffered a "specific event" which she said occurred at her firehouse on May 30, 2013. Dr. Brownlee noted that the Member did not elaborate, but she told Dr. Brownlee that since the incident she had been suffering headaches, diarrhea

---

[2] Member's social security number is xxx-xx-7176.
[3] This information was obtained from FEMSD's creditable service verification form.
[4] The PFC is the entity authorized by the City Council of the District of Columbia to treat work-related injuries and make fitness-for-duty assessments for Metropolitan Police Department Officers, D. C. Fire and Emergency Medical Services Firefighters and Paramedics, United States Secret Service Agents and uniformed White House Police Officers, and for United States Park Police Officers.
[5] Board staff members reviewed the Member's salary in the District's PeopleSoft computer system and found it increased to $75,962, effective October 5, 2014.
[6] The documentary evidence is contained in the Official Hearing Record, which is cited as "R." followed by the page number.

441 4th Street, NW, Suite 330S, Washington, D.C., 20001

ATTACHMENT E5

FD14-2038

and an upset stomach. (R. at 580). While at the PFC, the Member prepared a Department FD-44 Report of Illness or Injury to Uniform Member reporting an illness due to "chronic symptoms of mental [and] physical stress due to hostile attack while on duty [on] [May 30, 2013]." (R. at 578-579).

Dr. Brownlee referred the Member to the PFC's Behavioral Health Services section ("BHS"), where she was interviewed by Mary Kenel, Ph.D., a licensed psychologist. Dr. Kenel noted that the Member told her that she was touched inappropriately while sleeping at her firehouse. The Member told Dr. Kenel that she had been subject to racial and sexual harassment at the Department in the past and was discriminated against due to her educational accomplishments. She noted that she did not have a high level of trust in the Department as she felt that there were past "cover-ups" at her expense and others were taking pleasure in her distress. She told Dr. Kenel that she was told not to discuss the incident, but both the D.C. Metropolitan Police Department ("MPD") and the Department's Equal Employment Opportunity officer, Joshua Henline, were investigating the matter. (R. at 71-72).

Dr. Kenel further noted that the Member was tearful throughout the interview, her behavior and affect were "inappropriate" and she was "very, very angry," depressed, and frustrated. At the end of the session, Dr. Kenel diagnosed the Member with Adjustment Disorder with Mixed Anxiety and Depressed Mood. Dr. Kenel then placed her on sick leave. *Id.*

On July 9, 2013, the Member again met with Dr. Kenel. She told Dr. Kenel that the incident was consuming her thoughts and she did not have confidence in her supervisors. She told Dr. Kenel that she felt everything would be pushed under the rug and she wanted the Department to start an investigation immediately. She felt that the incident was done to humiliate her. (R. at 69).

On July 16, 2013, Battalion Fire Chief Michael Donlon informed Dr. Kenel that the Member had called and complained that she felt worse after her previous session with Dr. Kenel. She did not state what had upset her but she told Chief Donlon that she "did not wish to injure [her]self by working with Dr. Kenel." After meeting with the Member again on July 17, 2013, the PFC agreed to have the Member meet with a different BHS psychologist, Raquel Gordon, Ph.D. (R. at 68).

On August 6, 2013, the Member addressed a memorandum to Assistant Fire Chief Larry Jackson. In that memorandum she wrote that her request to classify her medical leave as performance of duty was verbally denied. In addition, she denied receiving anything in writing from the Department to justify its decision or any documentation on how to appeal this ruling. (R. at 204).

On September 9, 2013, Mr. Henline sent a letter to the Member informing her that the MPD had suspended its investigation due to her lack of cooperation. Mr. Henline further wrote that he also made several attempts to contact her; however, she failed to respond. (R. at 505).

---

441 4th Street, NW, Suite 330S, Washington, D.C., 20001

ATTACHMENT E6

FD14-2038

Page 4

On January 16, 2014, Medical Compensation Specialist Frieda Cardwell reviewed the Member's appeal of the classification of her injury and denied her request. Ms. Cardwell found that the Member had not provided any evidence to establish a *prima facie* case that her injury or illness was incurred in the performance of duty. (R. at 216-220).

On May 1, 2014, Gloria Morote, Ph.D., a psychologist consultant with the PFC, recommended the Member to the Board for disability retirement with a diagnosis of Adjustment Disorder with Anxiety and Depression. (R. at 2- 9). Dr. Morote noted that the Member has been on sick leave since June 25, 2013, and had a past medical history of "adjustment Disorder with Anxiety and Depression." (R. at 5). Dr. Morote administered several standardized tests to the Member to assess whether she was suffering from any emotional or personality disorders. Those tests included the Personality Assessment Inventory; the Minnesota Multiphasic Personality Inventory -2 Restructured Form; the Beck Depression Inventory – II, the Beck Hopelessness Scale; and the Beck Anxiety Scale. (R. at 7).

Based on her testing, Dr. Morote diagnosed the Member with "Unspecified Anxiety Disorder" as defined by the Diagnostic and Statistical Manual of Mental Disorders, 5th Edition ("DSM-V"). Dr. Morote noted that her testing revealed evidence of anxiety, depression, hypervigilance, mistrust, and social and emotional withdrawal at clinically severe levels. She opined that the Member's illness prevents her from performing the full duties of a firefighter albeit the illness is not related to the performance of her duties. (R. at 8).

Based on her test results, Dr. Morote prepared temperament codes in which she expressed "significant concerns" regarding the Member's ability to influence people, express her feelings, work under stress, make judgments, and deal with people in general. (R. at 11).

On May 8, 2014, the Member was interviewed by rehabilitation experts at Rehabilitation Perspectives, Inc., ("RPI") with the goal of identifying skills the Member possessed which would be transferrable to employment if she was retired from the Department. The Member informed RPI that she has a high school diploma, a Bachelor of Science in Chemistry and Master of Science in Biotechnology. She is also working on a Master's Degree in Biomedical Engineering. The Member also informed RPI that she is generally proficient in the use of computers, Microsoft Windows and Microsoft Office applications. (R. at 15).

The Member also told RPI that prior to employment with the Department, she was a researcher at the National Eye Institute (a part of the National Institutes of Health) from 1991 to 1993. She also worked at a copy center, trained as a Firefighter I and II, and has been an EMT[7]-B for 13 years. *Id.*

---

[7] EMT-B is the abbreviation for emergency medical technician – basic.

441 4th Street, NW, Suite 330S, Washington, D.C., 20001

ATTACHMENT E7

FD14-2038

On May 19, 2014, based on the Temperament Codes prepared by Dr. Morote, and the interview it conducted with the Member, RPI prepared a Labor Market Survey ("LMS") listing five positions in the D.C. Metropolitan Area which it determined she has the skills and psychological temperament to perform. (R. at 18-20).   Those positions are as follows:

1. Administrative Assistant II, a sedentary level, full-time position with an average annual salary of $35,713.00. The incumbent provides general administrative support for the staff, including data entry, scheduling, front office management, records maintenance, office equipment management; supports various projects and provides assistance as needed; manages, tracks and maintains database and files; and performs data entry and analyzes, verifies, and generates reports for Advanced Life Support internship skills and protocols in support of the ALS internship program. *Id.*

2. Patient Service Representative, a sedentary level, full-time position with an annual salary of $32,240.00. The incumbent serves patients by greeting them and helping them; scheduling appointments; and maintaining records and accounts. *Id.*

3. Supply Clerk, a medium to heavy work, full-time position with an annual salary of $35,692.00. The incumbent is responsible for technical and administrative duties such as inventory and management; and distribution and control functions. Specific responsibilities include: Maintaining manual and automated inventory systems as materials are ordered, received and dispensed; conducting periodic inventories of office and police specific supplies; producing and analyzing usage reports to identify items that need ordering or need to be discarded; researching and responding to inquiries related to inventory levels; downloading reports and data to assist in monitoring the budget; developing written materials for inclusion in the inventory system; ensuring the efficient and safe storage of materials; researching availability of equipment, using catalogs, the internet, and existing vendor contracts; initiating the purchase approval process and ordering supplies and equipment using standard purchasing policy, procedures and the County's automated financial system; recommending equipment or office supply substitutions; tracking purchasing requests; following through with discrepancies on orders; assisting with stocking, inventory, and distribution of supplies; and overseeing the receipt process and/or receiving supplies and equipment delivered to the Police Department and placing the items in the proper location and/or notifying employees of their arrival. *Id.*

4. Research Laboratory Technician, a sedentary level, full-time position with an average annual salary of $37,500.00. The incumbent provides technical knowledge and expertise in research laboratory analysis by assisting with bench top experiments, preparing and assisting with the experiments, collecting and analyzing data, assisting in the preparation and analysis of laboratory experiments as requested, and preparing reports. *Id.*

441 4th Street, NW, Suite 330S, Washington, D.C., 20001

ATTACHMENT E8

5. Communications Analyst, a sedentary level, full-time position, with an average annual salary of $55,000.00. The incumbent supports directors and/or managers and lead program teams to deliver program milestones; assists with design and development of program processes; participates in team communication and collaboration during development and start-up; assists with training of employees for programs, as assigned; and assists with improvement of program processes. *Id.*

On August 3, 2014, the Member submitted a request to the Board to reschedule her August 28, 2014, hearing. The Member stated that she was in need of additional time to prepare for the proceeding. Since this was the Member's first request, the Board granted it and continued the matter to November 6, 2014. (R. at 468-470).

On November 6, 2014, the Board convened a disability retirement hearing on the Member's behalf. (R. at 1163 - 1314). The Member appeared *pro se* and testified that she did not want to be retired and had been attempting to convince the PFC to return her to full duty. She testified that her doctor had given the PFC two certifications to allow her to work in a limited-duty status and transition back to full duty and she felt the PFC should follow that recommendation. (R. at 1169). Member also argued that there is substantial evidence in the record proving that the incident at the fire station did occur as she described. (R. at 1181)

Dr. Morote testified at the November 6, 2014, hearing on behalf of the PFC. She testified that she is a clinical psychologist and neuropsychologist. She specializes in diagnostic assessments and psychological and neuropsychological evaluations and she consults with various agencies including the PFC. (R. 1182-1183).

Dr. Morote testified that she reviewed the Member's psychological records and evaluated the Member in March of 2014. She had not, however, seen any of the Member's psychological records after that date. (R. at 1184).

Dr. Morote testified that her clinical interview and evaluations were designed to identify an individual's symptoms and chief psychological complaint. As part of this process she observed the Member's mental status, communicative skills and demeanor, and she administered a battery of standardized psychological tests which measure emotional and personality functions. (R. at 1185-1186).

After administering her tests and conducting her clinical interview, Dr. Morote noted that the Member's paranoia level was extremely high. That meant that she was highly suspicious, distrustful, hypersensitive to feedback, and was prone to feeling that she was being treated unfairly or unjustly. Her scores also indicated the Member was exhibiting high levels of stress. (R. at 1187). In addition, the Member also exhibited "moderate to severe" symptoms of depression and anxiety which in turn are negatively impacting her concentration. (R. at 1188-1189). In Dr. Morote's opinion, the Member's symptoms were not indicative of post-traumatic stress disorder, but rather an unspecified anxiety disorder. (R. at 1189). Dr. Morote testified that the Member's symptoms were

441 4th Street, NW, Suite 330S, Washington, D.C., 20001

ATTACHMENT E9

FD14-2038

Page 7

"quite intense." She noted that the Member believed that they were related to the incident she reported which occurred while at work but Dr. Morote had no evidence that those events actually occurred. Dr. Morote opined there must be a link to an actual event in order to diagnose Post Traumatic Stress Disorder ("PTSD"), not just a belief that such an event occurred. (R. at 1190-1195).

Based on her testing and interview, Dr. Morote concluded that the Member could no longer perform the full duties of a firefighter because her degree of paranoia, anxiety, and distrust of others prevents her from working as a member of a team. The Member does not trust enough to maintain relationships with others and consequently, she would not be able to work with a team. (R. at 1196-1198, 1202-1203). Dr. Morote also wrote that the Member could not work effectively under stress (R. at 1202-1203). Dr. Morote concluded that the Member's impairment is moderate to severe in nature. (R. at 1200).

At the final hearing, Dr. Morote reviewed the jobs listed in the LMS and opined that the Member would not be able to perform the positions of Administrative Assistant 2 and Patient Service Representative, because they involve regular social interaction because her psychological impairment inhibits her ability to be flexible and interact with others. (R. at 1204). Dr. Morote also opined that the Member would not be able to perform the position of Communications Analyst because it would require her to interact extensively with others while administering training. (R. at 1207-1208). However, she determined the positions of Supply Clerk and Research Laboratory Technician would be suitable positions for the Member because they did not demand much teamwork. (R. at 1205-1206).

Dr. Morote testified that she did not diagnose the Member with PTSD because her interview of the Member and the Member's standardized test data did not support that diagnosis. They identified the Member's symptoms as anxiety, suspiciousness, distrust/paranoia, depression and somatic or bodily concerns. She also identified the data as "glaring." Of those symptoms, the most striking ones were the Member's paranoia and anxiety. (R, at 1215-1216).

Dr. Morote testified that the Member strongly believes that the event she described is causing her symptoms, but she reiterated that the Member's levels of distrust and paranoia were "very, very high" and at "clinically significant levels" and this was causing a "disturbance in [her] thinking." (R. at 1225). Dr. Morote also testified that she cannot say whether the incident the Member reported did or did not happen, she can only say that her interview with the Member and the Member's test data most strongly support a diagnosis related to anxiety and paranoia, which suggests a disturbance in thinking rather than PTSD. (R. at 1217). She testified that a psychologist cannot diagnose PTSD based on an alleged incident. There has to be a confirmed event. (R. at 1218).

The Member testified that when she was first appointed she requested that she be sent to an active station because she wanted a challenge. She was sent to Engine 11, which she described as an "all boys club." She testified that she was the first black female to be at that firehouse in ten to eleven years. When she arrived, she felt that the mentality

441 4th Street, NW, Suite 330S, Washington, D.C., 20001

ATTACHMENT E10

FD14-2038

at Engine 11 was that she was taking away their fun. She felt they did not consider her to be part of the team. (R. at 1232). She testified that she was not trying to change the environment but she just wanted to do her job. She received glowing evaluations and high test scores, and she enjoyed her job, but no matter what she did, it was not good enough. (R. at 1233).

The Member testified that while at the Engine 11 she suffered through incidents of aggressive touching, having her bed soaked with water, tacks in her seat, other firefighters entering the bathroom while she was inside, and pouring water down the fire pole which caused her to fall and tear a tendon in her foot. (R. at 1234). The Member testified that she reported all of this to her commanding officer Chief Timothy Jefferies, but a lot of the information was "suppressed" because Engine 11 is the chief's firehouse and it was considered to be "elite." She testified that "demands" were made to her to "not let stuff get outside of the firehouse." *Id.*

The Member testified that after water was poured on the pole, she fell and tore a tendon and was off work for 7 months. She also testified that this injury was considered to be a performance of duty ("POD") injury, but that there is no mention of this injury in the medical records the Department provided to the Board because they did not provide complete records.[8] (R. at 1236-1237). The Member then testified that in 2004, on New Year's Eve, she was threatened with bodily harm on a fire ground. (R. at 1237).

The Member alleged that much of this information was not in the Board's record and asked why the records were redacted. The Chairperson then informed her that to the Board's knowledge, the records provided were complete. The Board has no way of knowing if records are missing unless one of the parties identifies which records are missing.[9] (R. at 1239).

The Member then testified that one day, when her company was responding to a fire, the driver from her shift had a problem with the amount of time it took for her to get on the truck, and he proceeded to call her names and threatened her. (R. at 1241). She ultimately went out on sick leave for stress in 2005, but she testified that was due to a culmination of a number of stressful events. (R. at 1239-1240).

The Member testified that after she came back she was detailed to Engine 1. On May 30th to 31st, while at that firehouse, she was awakened by fondling between her legs. She woke up and saw three firefighters coming toward her. (R. at 1251). She immediately reported the incident to her lieutenant but he did not take any other action. (R. at 1252). She eventually told the fire captain and he told her not to tell anyone. (R. at 1253). The Member then reported it to Chief Morris and Deputy Chief Pearson once she came off of her assignment. (R. at 1256–1257). The D.C. Metropolitan Police Department ("MPD")

---

[8] Chairperson Hochhauser informed the Member that if she was alleging that the Department did not provide complete records she should identify the missing records so the Board could order the Department to produce them. (R. at 1236-1239). However, the Member did not comply with this request.
[9] To date, the Member has not provided any records to support her allegation that she suffered a tendon tear caused by water placed on her fire pole.

ATTACHMENT E11

FD14-2038

began an investigation. *Id.* Afterwards, the Member testified that she tried to return to work in the firehouse but she woke up screaming. Since then she has not returned to full duty. (R. at 1257-1258).

The Member testified that she initially met with Dr. Roosevelt Martin Johnson, a psychologist, in 2005, but after her most recent incident she could not find another doctor she liked so she returned to Dr. Johnson. (R. at 1259). She said she eventually changed to Dr. Deanna Wall as her treating provider upon Dr. Johnson's recommendation because he was downgrading his practice (R. at 1262). Carla Rhodes, Psy.D., however, is her current treating psychologist. (R. at 1263).

The Member testified that she filed a complaint with the Equal Employment Opportunity Commission ("EEOC") and the Office of Human Rights, but she has not received a right to sue letter because they are still investigating. (R. at 1267).

The Member testified that she disagreed with Dr. Morote's assessment of her inability to continue to function as a firefighter. (R. at 1268-1269). The Member felt that she could return to full duty. *Id.* The Member also testified that she reviewed the LMS and she is able to perform all of the jobs recommended by RPI. (R. at 1278-1281).

The Member testified that MPD classified the incident as "misdemeanor sexual abuse" but she also testified that a grand jury "suspended it" and did not return an indictment. (R. at 1289). The Member also asserted that she did not want to be retired, but if she were retired, her injury was a Performance-Of-Duty ("POD") injury. (R. at 1292).

On November 7, 2014, the Member met with Marc Cottrell, Psy.D., a psychologist at the PFC. Dr. Cottrell presented the Member with a list of questions to give to her treating psychologist so that the PFC could determine whether she was fit to return to full duty. (R. at 1332).

On November 14, 2014, the Member reported to Behavioral Health Services ("BHS"), a division of the PFC, for a scheduled appointment. Dr. Cottrell noted that the Member would only meet him in the lobby. She asked Dr. Cottrell for paperwork returning her to light duty to which Dr. Cottrell responded that BHS needed her psychologist to answer questions before they could return her to light-duty status. Dr. Cottrell noted that the Member asserted this was a violation of the Health Insurance Portability and Accountability Act ("HIPAA") and the Americans with Disabilities Act ("ADA") and ethics codes prescribed to practicing psychologists. Dr. Cottrell noted that the Member insisted that BHS has enough information to return her to light duty status; however, she refused to cooperate and take a copy of the questions to her treating psychologist. (R. at 1330).

On November 25, 2014, the Member returned to BHS and met with Dr. Cottrell, Olusola Malomo, M.D., Medical Director of the PFC, Battalion Fire Chief Raymond Gretz, and MPD Lieutenant Randall Stroman. Dr. Cottrell noted that the Member

441 4th Street, NW, Suite 330S, Washington, D.C., 20001

ATTACHMENT E12

FD14-2038

demanded to know who his supervisors were and who "ordered him to interfere with [her] employment." She continued to argue that requiring her to provide additional information from her psychologist was illegal and violated her "human rights." Dr. Cottrell told her he did not disagree with the course of treatment that her psychologists were following for her, but BHS needed the questions they provided to her to be answered by her psychologist so they could insure that she could safely return to the workplace in the event that any additional anxiety or distress should arise. Dr. Cottrell wrote that the Member again refused to accept the list of questions or take them to her psychologist. (R. at 1328).

On December 18, 2014, the Board issued an Order directing the Member to submit a report from her treating psychiatrist detailing: 1) her present diagnosis; 2) the provider's opinion as to whether that diagnosis resulted from a work-related incident; 3) the Member's current treatment plan; and 4) the provider's opinion as to whether the Member can return to full duty. (R. at 1315-1316).

On December 23, 2014, Dr. Cottrell, a psychologist at BHS, noted that the Member would not meet with them and was refusing to adhere to Department general orders requiring her to include the PFC in her health care decisions. (R. at 1326). The Department was unsure how to address the matter without antagonizing the Member further but it noted that she had not been seen there for the PFC to review her treatment for over 30 days. Id.

On January 12, 2015, Beverli Mormile, Psy.D., provided a treatment update. Dr. Mormile opined that the Member has "mild" symptoms of PTSD which was caused when she was "sexually violated" while performing her duties with the Department. (R. at 1321-1322). Dr. Mormile noted that the Member has difficulty sleeping, negative alterations in cognition, irritability, and anger, and those symptoms were affecting her ability to function outside of the workplace. Id.

Dr. Mormile reviewed the Member's treatment records and opined that she met the diagnostic criteria for Post-Traumatic Stress Disorder ("PTSD"), Adjustment Disorder with Mixed Anxiety and Depressed Mood. Id. She noted that the Member agreed to begin gradual exposure therapy by visiting firehouses in an off-duty capacity and learning strategies for handling peer-related psychosocial stressors. Id. Dr. Mormile felt that the Member's mild symptoms did not prevent her from performing any essential job tasks. Id. Dr. Mormile recommended that the Member return to work on a part-time schedule with a gradual increase to a full-time shift and that she sleep in a secured area which allows gradual exposure to male co-workers. Id.

On January 12, 2015, Dr. Cottrell reviewed Dr. Mormile's report and noted that the treatment update "does not present a differential diagnosis articulating and supporting the presence of both PTSD and Adjustment Disorder." (R. at 1325). He noted that the update does not clarify whether the disorders share the same etiology or whether they stem from different sets of circumstances. Id.

441 4th Street, NW, Suite 330S, Washington, D.C., 20001

ATTACHMENT E13

FD14-2038

Page 11

On January 22, 2015, the Board reconvened the disability retirement hearing on the Member's behalf. It was at that hearing that the Board became aware of the Member's refusal to comply with BHS's request to convey its list of question to her treating psychologist so they could assess whether she could be returned to full duty. The Board asked the Member why she had not provided the questions to her provider. The Member responded that she did not believe that she had to provide them to her doctor because she felt they were not "assessing" her but rather her doctor. (R. at 1342). She felt that because the Department ruled her injury or illness to be non-POD, they were not treating her and therefore any consent she signed to allow them to speak with her doctor was "null and void". The Member felt that she was experiencing additional retaliation. (R. at 1342-1343).

The Board attempted to explain to the Member that she is required to provide medical records and access to her doctor regardless of whether an injury is POD or non-POD pursuant to the Department's general orders.  However, the Member insisted that was not true. (R. at 1343-1344). The Member further testified that she felt the treatment update provided by her doctor was sufficient for the PFC to return her to full duty. *Id.*

The Board again explained to the Member that the PFC makes the decision on whether a member is physically and psychologically fit to return to full duty and they need those questions answered in order to do so. The Member again responded that it was "a violation of her rights" and was "illegal." The Board then verbally ordered the Member to give her provider the list of questions to answer as the PFC requested and it continued the hearing. (R. at 1346-1349). The Board followed the verbal order with a written one issued later that day ordering the Member to provide her treating psychologists with the list of questions requested by the PFC and directing her to tell the provider to answer them to the best of her ability and return them to the PFC by February 5, 2015. (R. at 1254).

On January 19, 2015, Dr. Morote provided an addendum reporting that she had nothing further to add to her initial report. (R. at 1324).

On February 12, 2015, the Board reconvened the Member's disability retirement hearing. At the hearing Acting Chairperson Comentale inquired whether the Member had complied with the Board's January 22, 2015, order. The Member responded that she did not. She argued that the order was a violation of her rights "under the Americans with Disabilities Act, the Privacy Act, and the HIPAA Act." She argued that she cannot be compelled to violate her rights and provide health information not relating to the essential functions of her job. (Tr.[10] 10).

The Member argued that she has demonstrated that she is not disabled and her referral for disability retirement was discrimination and harassment. She argued that the PFC has not provided evidence of "imminent, direct threat" or any evidence of permanent disability. (Tr. 13). The Member reiterated that her doctor believes she can resume duty on a limited basis and work up to full employment and argued that the concept of "full

---

[10] "Tr." refers to the page of the February 12, 2015, transcript.

441 4th Street, NW, Suite 330S, Washington, D.C., 20001

ATTACHMENT E14

FD14-2038

Page 12

duties" is not covered by the ADA. She also argued that being referred for disability retirement was due to "malicious intent to defer due process." She further argued that she was being subjected to "disability discrimination" and "harassment." The Member then asked the Board to make a decision so she could "move to the next stage." (Tr. 15).

At that hearing, Dr. Morote testified that she reviewed the January 9, 2015, evidence from the Member's treating psychologist and it did not change her opinion that the Member should be retired. (Tr. 12). The Board then concluded the proceeding.

## ANALYSIS, FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Board has the authority to hear this matter pursuant to D.C. Code § 5-721(a) (2012 Repl.) which states in pertinent part:

The Mayor shall consider all cases for the retirement of members and all applications for annuities under this subchapter subject to review and final determination by the District of Columbia Retirement Board. In each case of retirement of a member the Mayor shall certify in writing the physical condition of the member for whom retirement is sought. The Mayor shall give written notice to any member under consideration by him for retirement to appear before him and to give evidence under oath. . . The Mayor is authorized to administer oaths and affirmations, and may require by subpoena or otherwise the attendance and testimony of witnesses and the production of documents at any designated place... In order to carry out his responsibilities under this subchapter with respect to retirement and disability determinations, and related functions, the Mayor of the District of Columbia shall establish a Police and Firemen's Retirement and Relief Board.

1. **Is the Member disabled for useful and efficient service with the Department?**

D.C. Code § 5-701(2) (2012 Repl.) states:

The terms "disabled" and "disability" mean disabled for useful and efficient service in the grade or class of position last occupied by the member by reason of disease or injury, not due to vicious habits or intemperance as determined by the Board of Police and Fire Surgeons, or willful misconduct on his part as determined by the Mayor.

The Department's *Limited Duty and Useful and Efficient Service Policy* requires that, "*all firefighters, regardless of their current assignments, have to be capable of performing the full duties of a firefighter.*" (*Emphasis added*). See *District of Columbia Fire and Emergency Medical Service Useful and Efficient Service Statement* (as amended April 14, 2004), which specifically states:

441 4th Street, NW, Suite 330S, Washington, D.C., 20001

# ATTACHMENT E15

FD14-2038

Accordingly, "[w]hile not exclusive, to be considered full duty members regardless of rank or assignment must be able to perform all of the following essential duty functions:

1) Perform firefighting tasks (e.g., hose line operations, extensive crawling, lifting and carrying heavy objects, ventilating roofs or walls using power or hand tools, forcible entry, etc.), rescue operations, and other emergency response actions under stressful conditions while wearing PPE and SCBA, including working in extremely hot or cold environments for prolonged time periods…

2) Wear an SCBA, which includes a demand valve type positive pressure face piece or HEPA filter masks, which require the ability to tolerate increased respiratory workloads.

3) Endure exposure to toxic fumes, irritants, particulates, biological (infectious) and non-biological hazards, and/or heated gases, despite the use of PPE including SCBA.

4) Climb ten or more flights of stairs while wearing fire protective ensemble weighing at least 50 pounds or more and carrying equipment/tools weighing an additional 20 to 40 pounds.

5) Wearing fire-fighting ensemble that is encapsulating and insulated. Wearing this clothing will result in significant fluid loss that frequently progresses to clinical dehydration and can elevate core temperature to levels exceeding 102.2 degrees F.

6) Searching, finding, and rescue-dragging or carrying victims weighing over 200 lbs to safety despite hazardous conditions and low visibility.

7) Advancing water-filled hose lines up to 2.5 inches in diameter from fire apparatus to occupancy (approximately 150') can involve negotiating multiple flights of stairs, ladders and other obstacles.

8) Climbing ladders, operating from heights, walking or crawling in the dark long narrow and uneven surfaces, and operating in proximity to electrical power line and/or other hazards.

9) Perform in unpredictable emergency requirements for prolonged periods of extreme physical exertion without benefit of warm-up, scheduled rest periods, meals, access to medication (s) or hydration.

10) Operating fire apparatus or other vehicles in an emergency mode with emergency lights and sirens.

11) Critical, time-sensitive, complex problem solving during physical exertion in stressful, hazardous environments (including hot, dark, tightly enclosed spaces), further aggravated by fatigue, flashing lights, sirens, and other distractions.

12) Ability to communicate (give and comprehend verbal orders) while wearing PPE and SCBA under conditions of high background noise, poor visibility, drenching from hose-lines, and/or fixed protection systems (sprinklers).

13) Functioning as an integral component of a team, where sudden incapacitation of a member can result in mission failure or in risk of

441 4th Street, NW, Suite 330S, Washington, D.C., 20001

ATTACHMENT E16

FD14-2038

Page 14

injury or death to civilians or other team members." (Board Exhibit 1, pages 3EA-5EA).

D.C. Code § 5-701 (19) (2012 Repl.) describes the term "full range of duties" as:

> [T]he ability of a sworn member of the Metropolitan Police Department or the Fire and Emergency Medical Services Department to perform all of the essential functions of police work or fire suppression as determined by the established policies and procedures of the Metropolitan Police Department or the Fire and Emergency Medical Services Department and to meet the physical examination and physical agility standards.

Following the events of September 11, 2001, the Council of the District of Columbia determined that the mandatory staffing levels at both the Metropolitan Police Department ("MPD") and D.C. Fire and Emergency Medical Services Department ("FEMSD") were negatively impacted by the large number of employees in each Department who were on extended medical leave or limited duty since those employees could not respond during this crisis. On June 24, 2004, the Council passed the Omnibus Public Safety Agency Reform Amendment Act of 2004 ("Omnibus Act"), which requires that uniformed members who have not worked in full duty status due to injury or illness for a specified time period to be recommended for disability retirement. FEMSD recommends a firefighter who has spent at least 64 cumulative work days in a less-than-full-duty status in any two year period due to an injury or illness, other than a pregnancy, for disability retirement. (Sept 30, 2004, D.C. Law 15-194).

The Board reviews each individual case on its own merits. The Board reviewed the record and the testimony presented at all three (3) of the Member's hearings. The Board took special note of the PFC's recommendation that the Member is suffering from an Unspecified Anxiety Disorder which prevents her from performing useful and efficient service with her Department. The Board also took note of Dr. Mormile's assessment that the Member has mild symptoms of PTSD and her opinion that those symptoms did not prevent the Member from performing any essential job task.

The Board also took note of the Member's refusal to comply with both the BHS request and the Board Order to provide additional information from her treating psychologist. The Member argued that it was a violation of her rights under the ADA, the Privacy Act, and HIPAA although she did not explain precisely what "rights" those statutes gave her that she felt were violated. The Member asserted that she could not be compelled to provide the information because she did not believe it was related to the essential functions of her job and she felt that BHS was actually evaluating her psychologist. The Member continued to refuse even after the Board explained that it has the statutory authority to make that determination and it needs BHS to review her doctor's reports and recommendation in order to assess whether the Member can perform the full duties of a firefighter.

---

441 4th Street, NW, Suite 330S, Washington, D.C., 20001

ATTACHMENT E17

FD14-2038

Lastly, the Board took note of the Member's demeanor during her three (3) hearings. The Board noted that the Member was visibly and extremely mistrustful and paranoid of the requests made by BHS and the Board although reasonable and clearly within each respective entity's authority. The Board noted that Member's mistrust was so strong that she refused to follow any directive BHS or the Board gave to her to relay additional questions to her psychologist despite being advised that if the psychologist answered favorably, it may have resulted in BHS clearing her to return to full duty as she initially requested.

The Member's conduct, which the Board observed, strongly supports Dr. Morote's opinion that the Member's paranoia and distrust is so pervasive that it would prevent the Member from performing the full duties of a firefighter because she could no longer work effectively with a team. The Board's interaction with the Member strongly suggests that the Member's psychological condition impairs her ability to follow orders. The Board recognizes that the ability to work as a team and follow orders are essential functions of a firefighter. As a result, the Member must be able to perform those functions safely in life-or-death situations; otherwise, she poses an unacceptable risk to herself and to the public.

The Board reviewed Dr. Mormile's assessment that the Member can return to full duty but was unable to give it much weight. The Board found it to be contradictory because she recommended that the Member could return to full duty, but then listed a number of limitations which prevented less-than-full duty status. Specifically, Dr. Mormile recommended that the Member return to duty on a part-time schedule and sleep in a secured area with limited or gradual exposure to male co-workers. Based on this recommendation, a firefighter working a part-time schedule is not performing full duty. Additionally, if the Member needs a segregated sleeping area with limited exposure to her co-workers she cannot function as an effective member of the team.[11]

The Board also noted that the Member did not provide any documentation in support of Dr. Mormile's diagnosis. She did not provide any diagnostic test result or clinic notes to enable the Board to better understand how Dr. Mormile arrived at a diagnosis of PTSD or to explain her recommendation that the Member could return to duty as a firefighter. Dr. Cottrell noted this is why he asked the Member to convey additional questions to Dr. Mormile. (R. at 1325). The Member's refusal to comply with Dr. Cottrell's request to convey additional questions to Dr. Mormile, and the Board's

---

[11] The Board recognizes that had the Member cooperated with BHS and relayed their additional questions to Dr. Mormile, it may have been possible to reconcile the inconsistencies in her recommendation.

The Board also reviewed Dr. Mormile's opinion that the Member is suffering from mild PTSD incurred in the performance of duty and compared it with Dr. Morote's conflicting opinion that she does not suffer from PTSD at all. Although, Dr. Mormile does not believe this condition disables the Member from performing the duties of a firefighter, Dr. Morote maintains that the Member's diagnosis of Unspecified Anxiety Disorder does disable her from performing the full duties of a firefighter. Consequently, the Board finds that the PTSD diagnosis cannot serve as the basis for the Member to be retired on disability.

---

441 4th Street, NW, Suite 330S, Washington, D.C., 20001

ATTACHMENT E18

subsequent order to do as Dr. Cottrell requested, prevents the Board from giving greater weight to Dr. Mormile's opinion.

In sum, the Board weighed the evidence from Dr. Morote and BHS, against the evidence from Dr. Mormile, and found the former to be significantly stronger and better supported both by the evidence in the record and the Board's observations of the Member's demeanor during the hearings. The Board, therefore, finds a preponderance of the evidence in the record supports the conclusion that the Member is suffering from Adjustment Disorder with Anxiety and Depression. The Board further finds that this illness results in the Member exhibiting high levels of anxiety and paranoia which prevents her from following orders and working effectively as a member of a team. A firefighter who cannot work as part of a team poses an unacceptable danger to herself and to the public; therefore, the Board finds the Member's illness disables her for useful and efficient service with the Department.

2.     **Was the Member's disability incurred in the performance of duty?**

D.C. Code § 5-709(b) (2012 Repl.) provides, in pertinent part, that:

Whenever any member who is an officer or member of the Metropolitan Police force or the Fire Department of the District of Columbia and who first becomes such a member after the end of the 90-day period beginning on November 17, 1979, completes 5 years of police or fire service and is found by the Mayor to have become disabled due to injury received or disease contracted other than in the performance of duty, which disability precludes further service with his department, such member shall be retired on an annuity which shall be 70% of his basic salary at the time of retirement multiplied by the percentage of disability for such member as determined in accordance with § 5-710(e)(2)(B), except that such annuity shall not be less than 30% of his basic salary at the time of retirement...

D.C. Code § 5-710(e)(1) (2012 Repl.) provides, in pertinent part, that:

Whenever any Member who is an officer or Member of the Metropolitan Police force or the Fire Department of the District of Columbia and who first becomes such a Member after the end of the 90-day period beginning on November 17, 1979, is injured or contracts a disease in the performance of duty or such injury or disease is aggravated by such duty at any time after appointment and such injury or disease or aggravation permanently disables [him] for the performance of duty, [he] shall upon retirement for such disability, receive an annuity computed in accordance with paragraph (2) of this subsection.

The Member bears the initial *prima facie* burden of proof on the issue of whether an injury is POD. *Lamphier v. District of Columbia Police and Firefighters' Retirement and Relief Board*, 698 A.2d 1027, 1032. (D.C. 1997). To satisfy the *prima facie* burden.

441 4th Street, NW, Suite 330S, Washington, D.C., 20001

ATTACHMENT E19

FD14-2038

the Member must establish a sufficient basis to permit a reasonable inference that the disabling injury was incurred in the performance of duty. If the Member makes such a showing the burden shifts to the Board to rebut, by substantial evidence, why the injury was not incurred in the performance of duty. *Pierce v. PFRRB*, 882 A.2d 199 (D.C. 2005). If the Board rebuts the *prima facie* evidence, it shifts the burden to the Member to show by a preponderance of the evidence that the disability was incurred in the performance of duty. *Pierce* at 205: *Upchurch v. District of Columbia Dept. of Employment Services*, 783 A.2d 623, 628 (D.C. 2001).

The prima facie standard requires the Member to provide a "sufficient basis to permit a reasonable inference that the disabling injury was incurred in the performance of duty." *Pierce* at 205. In further defining *prima facie*, the Court clarified that the Member does not have to provide dispositive proof, but "it must at least have some substance" and it isn't enough merely to allege that an event occurred. *In re Public Defender Service*, 831 A.2d 890 (D.C. 2003) quoting *Crane v. Crane*, 614 A.2d 935, 941 (D.C. 1992), and *In re Grand Jury Proceedings (Corporation)*, 87 F.3d 377 (9th Cir. 1996).

The Board has no independent investigative power and is therefore reliant on the Member and the Department (through the PFC) to provide it with evidence drawing a causal link between a particular incident and a particular injury. The Member alleged (both in writing, and verbally at the November 6, 2014, hearing) that her illness was caused by an incident of sexual harassment or assault which occurred while she was on duty in her firehouse. After reviewing the record, the Board finds that the Member has not provided any evidence to make a *prima facie* showing of a causal link between any POD event and the illness which is disabling her, Adjustment Disorder with Anxiety and Depression.[12]

The Member testified that the Department conducted an investigation and convened a trial board but she *did not present the Board with any of the evidence* the trial board relied upon or the results from any of the proceedings. She also testified that a grand jury was convened to investigate the matter but the investigation was "suspended". (*See* R. at 1289). The Member also presented evidence that MPD initiated its own investigation of the incident, but then suspended it when she did not cooperate. (*See* R. at 505). Finally, the Member also alleged that EEOC and the Office of Human Rights were investigating the incident, but again she did not provide any information on the status of those investigations or their conclusions.

The only evidence the Member provided which purports to support her allegation is the FD-44 which she filled out on June 25, 2013, and Dr. Mormile's report. Neither document, however, offers any corroboration to the Member's argument that her illness is related to any performance of duty incident. The FD-44 and Dr. Mormile's report are

---

[12] The Board only has jurisdiction to determine whether disabling injuries were incurred in the performance of duty. Since none of the Member's psychologists are relating the Member's PTSD to a specific incident or are recommending that the illness is disabling, the Board has no jurisdiction to make a ruling as to whether it is related to a POD incident.

ATTACHMENT E2c

FD14-2038

both merely written versions of the Member's verbal allegations, not corroborating evidence.

In sum, the Board finds that the Member only offered her own unsubstantiated allegation to support her argument of a causal link between an on-duty incident and the illness for which she is being retired.[13] The Board further finds that these allegations do not satisfy the Member's *prima facie* burden. Therefore, the Board concludes the Member has not provided a sufficient basis to permit a reasonable inference that the illness for which she is being retired was incurred in the performance of duty.[14]

3.   **Has the Member completed five years of service with the Department?**

D.C. Code § 5-709(b) (2012 Repl.) provides, in pertinent part, that:

Whenever any member who is an officer or member of the Metropolitan Police force or the Fire Department of the District of Columbia and who first becomes such a member after the end of the 90-day period beginning on November 17, 1979, completes 5 years of police or fire service and is found by the Mayor to have become disabled due to injury received or disease contracted other than in the performance of duty, which disability precludes further service with his department, such member shall be retired on an annuity which shall be 70% of his basic salary at the time of retirement multiplied by the percentage of disability for such member as determined in accordance with § 5-710(e)(2)(B), except that such annuity shall not be less than 30% of his basic salary at the time of retirement...

Based on a review of the record, the Board finds that the Member was appointed to the Department on January 3, 2000. At the time of this hearing, the Member had accumulated more than five years of creditable service with the Department. Accordingly, the Board concludes that there is sufficient evidence in record that the Member has more than five years of creditable service with the Department consistent with D.C. Code § 5-709(b).

4.   **What is the Member's percentage of disability and what jobs, if any, can the Member perform?**

D.C. Code § 5-709(b) (2012 Repl.) provides, in pertinent part, that:

---

[13] The preponderance of the evidence in the record (MPD's suspension of its investigation, the grand jury's suspension of its investigation, and Dr. Morote's opinion) actually refutes the Member's allegation of a causal link. Furthermore, even if the Member had provided *prima facie* evidence, and there was a preponderance of evidence in the record that her injury was caused by a POD incident, under *Estate of Underwood v. National Credit Union Administration*, 665 A.2d 621 (D.C. 1995), the Board, as a workers' compensation tribunal, is precluded from finding that an illness caused by sexual harassment or sexual assault was incurred in the performance of duty.
[14] The Board also noted that Medical Compensation Claims Specialist Cardwell reviewed the Member's allegation that her injury was related to her duty and denied it for the same reason. (R. at 216-220)

441 4th Street, NW, Suite 330S, Washington, D.C., 20001

ATTACHMENT E21

FD14-2038

> Whenever any member who is an officer or member of the Metropolitan Police force or the Fire Department of the District of Columbia and who first becomes such a member after the end of the 90-day period beginning on November 17, 1979, completes 5 years of police or fire service and is found by the Mayor to have become disabled due to injury received or disease contracted other than in the performance of duty, which disability precludes further service with his department, such member shall be retired on an annuity which shall be 70% of his basic salary at the time of retirement multiplied by the percentage of disability for such member as determined in accordance with § 5-710(e)(2)(B), except that such annuity shall not be less than 30% of his basic salary at the time of retirement…

D.C. Code § 5-710(e)(2)(B) (2012 Repl.) then directs that the Board calculate the percentage of disability for members appointed after February 15, 1980, based on the following criteria:

i.   The nature of the injury or disease:
     The percentage of impairment reported pursuant to subparagraph (A) of this paragraph:
ii.  The position in the Metropolitan Police force or the Fire Department of the District of Columbia held by the member immediately prior to his retirement:
iii. The age and years of service of the Member; and
iv.  Any other factors or circumstances which may affect the capacity of the Member to earn wages or engage in gainful activity in his disabled condition, including the effect of the disability as it may naturally extend into the future.

The Board reviewed the evidence in the record regarding the Member's physical abilities and qualifications to determine if any of the positions recommended in the LMS is appropriate, in accordance with *Breen v. D.C. Police & Firefighters' Retirement and Relief Bd.*, 659 A.2d 1257 (D.C. 1995).

The Member argues that she has the psychological ability and skills to perform all of the positions listed in the LMS. Dr. Morote opined that the Member does not have the temperament to perform the positions of Administrative Assistant II, Patient Service Representative and Communications Analyst because she cannot reliably work with others as a team given her current psychological condition. However, Dr. Morote opined the Member has the temperament to perform the positions of Supply Clerk and Research Laboratory Technician because those positions do not require extensive interaction with others.

The Board has already found that a preponderance of the evidence in the record supports Dr. Morote's opinion that the Member cannot perform tasks which require extensive teamwork. Since the positions of Administrative Assistant II, Patient Service Representative, and Communications Analyst all appear to require the ability to work

---

441 4th Street, NW, Suite 330S, Washington, D.C., 20001

ATTACHMENT E22

FD14-2038

well with others, the Board concludes that the Member does not have the psychological temperament to perform those positions.

Dr. Morote and the Member both believe she has the psychological temperament to perform the positions of Supply Clerk and Research Laboratory Technician. The Board also noted that RPI has reviewed the Member's skills and qualifications and has determined that the she has the skills to perform those two positions. The Member reviewed the skill requirements of those positions as well and concurred that she has the skills to perform them. The Board, therefore, concludes that there is substantial evidence in the record to support the conclusion that the Member has the skills and psychological capability to occupy the positions of Supply Clerk and Research Laboratory Technician.

The following table contains the two (2) salaried positions recommended by the LMS that the Board found the Member has the capacity to perform. Positions listed with a salary range were calculated using the entry-level salary:

| Position | Salary |
|---|---|
| Supply Clerk | $35,692 |
| Research Laboratory Technician | $35,000 |

The Board utilized the formula provided in 7 DCMR §2515.3 to calculate the Member's percentage of disability and annuity:

**Formula:** A minus B divided by A equals C multiplied by D equals E

$$\text{or} \quad \frac{(A - B)}{A} = C \times D = E$$

The actual figures used in the formula to determine the Member's annuity are as follows:

| Symbol | Definition | Amount |
|---|---|---|
| A | Current salary of the position last held by Member. | $75,962[15] |
| B | Average salary of positions Member has the capacity to occupy. | $35,346 |
| C | Percentage of disability. | 54% |
| D | 70 percent of Member's basic salary. | $53,174 |
| E | Amount of annuity using the formula. | $28,714 |
| F | Amount of annuity using 30 percent of the current salary for the position last held by Member. | $22,789 |

[15] See footnote 5.

441 4th Street, NW, Suite 330S, Washington, D.C., 20001

ATTACHMENT E23

FD14-2038

The annuity is calculated at $28,714, the higher figure, which represents 54% of her basic salary at the time of retirement rather than $22,789, the annuity used in subsection "E" in the table above.[16]

## DECISION

In sum, based on the foregoing Findings of Fact and Conclusions of Law, it is the decision of the Police and Firefighters' Retirement and Relief Board that Nicole McCrea, who has been found to be incapacitated from further duty with the Department by reason of a disability not incurred in the performance of duty, shall be retired under the provisions of D.C. Code § 5-701 (2) and (19), § 5-709(b) and § 5-710 (e)(2)(A-D) (2012 Repl.).

The Board's Final Order is issued separately on this day.

Dated: ___4/30/15___
AGC/jg

Andrea G. Comentale, Acting Chairperson

Certificate of Service Attached

---

[16] This annuity is a preliminary calculation. The District of Columbia Retirement Board determines the actual amount of the annuity awarded to the Member pursuant to D.C. Code § 1-716 (2008).

441 4th Street, NW, Suite 330S, Washington, D.C., 20001

ATTACHMENT E24

EOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | 570-2014-00278 |

| D.C. Office Of Human Rights | and EEOC |
|---|---|
| *State or local Agency, if any* | |

| Name *(indicate Mr., Ms., Mrs.)*<br>Ms. Nicole McCrea | Home Phone *(Incl. Area Code)*<br>**(202) 582-4026** | Date of Birth |
|---|---|---|

| Street Address<br>5205 East Capitol Street, S.E., Washington, DC 20019 | City, State and ZIP Code | |
|---|---|---|

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name<br>DC FIRE AND EMS | No. Employees, Members<br>**500 or More** | Phone No. *(Include Area Code)*<br>**(202) 673-7220** |
|---|---|---|

| Street Address<br>2000 14th Street, N.W.,  Washington, DC 20009 | City, State and ZIP Code | |
|---|---|---|

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|

| Street Address | City, State and ZIP Code | |
|---|---|---|

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

| | | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|---|
| ☒ RACE   ☐ COLOR   ☒ SEX   ☐ RELIGION   ☐ NATIONAL ORIGIN | | Earliest   05-30-2013     Latest   11-21-2013 |
| ☒ RETALIATION   ☐ AGE   ☐ DISABILITY   ☐ GENETIC INFORMATION | | |
| ☐ OTHER *(Specify)* | | ☒ CONTINUING ACTION |

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

I began employment with the D.C. Fire & EMS in January 2000, as a Firefighter.  On May 30, 2013, I was subjected to racial harassment when my male coworkers referenced a concert where a White male touched Beyonce on her buttock.  I stated that it was wrong for a White man to touch a Black woman in that way without her consent.  A male Firefighter berated me by calling me names after I disagreed with his opinion.  On or around May 30/31/2013, I was subjected to sexual harassment when two coworkers fondled me by placing their hands between my legs, while I was asleep.  I reported the incident to management.  I was told to not say anything and to keep it inside the firehouse.  I filed an official report with the Metropolitan Police Department and the Diversity Management Officer.  To my knowledge, no action has been taken.  In early June, 2013, I was placed on Administrative Leave.  In retaliation for my complaining and the MPD investigation, my employer is refusing to investigate and/or rule on my Performance of Duty injury claims.

I believe that I have been discriminated against based on my race, Black and my sex, female (sexual harassment) in violation of Title VII of the Civil Rights Act of 1964, as amended.  I further believe that I have been retaliated against for complaining about sexual harassment.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| Nov 21, 2013<br>Date         *Charging Party Signature* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |

ATTACHMENT  F1

RECEIVED<br>Mail Room<br>JUN 25 2018<br>Angela D. Caesar, Clerk of Court<br>U.S. District Court, District of Columbia





**Office of Human Rights**
DISTRICT OF COLUMBIA

*RECEIVED*
*2014 MAY 20 PH 3:*
*OFFICE OF HUMAN RIGHTS*

# EMPLOYMENT INTAKE QUESTIONNAIRE
## COMPLETING THIS INTAKE QUESTIONNAIRE DOES NOT CONSTITUTE THE FILING
## OF A DISCRIMINATION CHARGE.

*Required Fields

### I. COMPLAINANT

| | |
|---|---|
| *Today's Date: May 20, 2014 | *Name: NICOLE R. McCREA |

*Address: 5205 East Capitol St, SE. Washington DC, 20009

E-mail: NMcCREA1@JHU.edu

*What language do you prefer to communicate in?
X English __ Spanish __ Amharic __ Chinese __ Vietnamese __ Korean __ Other (Please list) _____

*Home Tel #: 202/491-9656

Work Tel #: 202/673-3228

**IF REPRESENTED BY COUNSEL, PLEASE PROVIDE THE FOLLOWING:**
Name: N/A     Telephone/Fax: _____     E-mail: _____
Address: _____
Please note: If you are represented by counsel or retain counsel prior to your scheduled intake interview, the counsel must either (1) be present with you for the duration of your intake interview, or (2) withdraw his/her appearance from the interview by submitting a letter to the Office indicating that the interview may take place without his/her representation.

Do you require a reasonable accommodation?  If so, please explain: No

Do you require language interpretation?  If so, what language? N/A

### II. RESPONDENT

Name of company or organization: DC Fire & EMS

Name and Title of principal officer (i.e. President, Owner, Human Resources Manager):
Fire & EMS Chief Kenneth B. Ellerbe
Address 2000 14th St. NW Suite 500 City/State/Zip Washington, DC 20009
Tel #: 202/673-3320 Fax #: _____     E-mail Address: _____

### III. BASIS OF COMPLAINT
The basis is one of the laws based categories to which you belong and believe that you were treated differently because of, or that you are perceived to belong to that group.

**Do you feel you were discriminated against because of your: (Please check appropriate box).**

| | | |
|---|---|---|
| ☐ Race | ☒ Sex | ☐ Age | ☐ Family Responsibilities | ☐ Sexual Orientation |
| ☐ Political Affiliation | ☐ Disability | ☐ Genetic Information | ☐ Gender Identity or Gender expression | ☐ Marital Status |
| ☐ National Origin | ☐ Religion | ☐ Personal Appearance | ☐ Color | ☐ Matriculation |

### IV. JURISDICTION
Please check all that apply.

☒ Alleged violation occurred in the District of Columbia.

☒ Alleged violation occurred 365 days or less from today's date.

☐ You have not commenced any other action, civil, criminal, or administrative in any other forum based on the same unlawful discriminatory practice described herein.

ATTACHMENT G1

RECEIVED
Mail Room

JUN 25 2010

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

## 5. ISSUES
### What action was taken that made you feel you were treated improperly

☐ Family Medical Leave   ☐ Promotion   ☐ Transfer   ☐ Demotion

☒ Retaliation   ☒ Sexual Harassment   ☒ Hostile Work Environment   ☐ Failure to Hire

☒ Discharge   ☐ Discipline   ☒ Failure to Accommodate (i.e. Religion, Disability)

☒ Other: _Continuing Violations_

## 6. DISTRICT OF COLUMBIA GOVERNMENT EMPLOYEES OR APPLICANTS

☒ You have filed an informal complaint with an agency assigned EEO Officer/ Counselor.

Counselor's Name: _Joshua Henline, Esq. EEO & Diversity Manager_

Counselor's Agency: _DC Fire & EMS_

Counselor's Telephone Number: _202/673-3396_

Date Filed: _Sept 12, 2013_   Date of Exit Letter: _____

## 7. DC FAMILY AND MEDICAL LEAVE ACT
### Only complete this section if your complaint relates to the FMLA

*Have you been employed with this company for at least one (1) year and have worked at least one thousand (1,000) hours?

☒ YES   ☐ NO

## 8. WITNESSES
### List persons who have seen or otherwise have knowledge and provide evidence about your complaint.

Name: _BFC William Baltimore_   Name: _Lt. Ray Sneed_   Name: _Dr. Raquel Gordon_

E-mail Address: _____   E-mail Address: _rsneede256@01_   E-mail Address: _____

Telephone: _202/276-3680_   Telephone: _202/359-4282_   Telephone: _202/269-7000_

## 9. YOUR COMPLAINT

_Please see Notarized and attached sheets 1-2 of 2:_
_"Supplement for Employment Intake Questionnaire for_
_DCOHR"._

---

**SUBMITTING THIS INTAKE QUESTIONNAIRE DOES NOT CONSTITUTE THE FILING OF A CHARGE.**

**Please return this form by mail or in-person to: 441 4th Street NW, Suite 570N, Washington DC, 20001.**

The DC Office of Human Rights was established to eradicate discrimination, increase equal opportunity and protect human rights for persons who live, work, or visit the District of Columbia. The receipt of this complaint form by the Office of Human Rights will lead to an intake interview.

_[signature]_   _May 20, 2014_

*Signature of Potential Charging Party   *Date

District of Columbia: SS

Subscribed and sworn to before me, in my presence,
this _20_ day of _May_ 20__

_[notary seal: NOTARY PUBLIC DISTRICT OF COLUMBIA]_

ATTACHMENT G2

**Supplement to Employment Intake Questionnaire for DCOHR**

9. Your Complaint

   a. May 30-31, 2013; I was assaulted by three (3) co-workers while on official duty as a DC Firefighter/EMT. I was able to identify two of the individuals involved in the assault, Firefighter T. Chase and Firefighter Michael Harrison. The assault was reported to Lieutenant John Thornton immediately. Lieutenant Thornton's response was "what do you want me to do about it"; nothing was done. Hours later I reported the assault to Captain Alan Noznesky. Captain Alan Noznesky's response was "that I not tell this to anyone else...let him handle it...let him talk to Firefighter Harrison...thou he did not know Firefighter Chase, Firefighter Harrison was his friend, and he was certain that his friend was just playing with me"; nothing was done.

   b. July 24, 2014; I have been on sick leave since June 25, 2014 with documented diagnosis of PTSD with anger manifestation, due to the May 30-31, 2014 assault. On July 24, 2013, then Fire and EMS Medical Services Officer, Battalion Fire Chief Michael Donlon made a Non Performance of Duty (Non-POD) ruling, outside of standard DC Fire and EMS protocols, in response to my submitted, on June 25, 2013, DC Form 44 Administrative Leave-Sick (POD) documenting my injuries. Refused to give me documentation justifying his ruling.

   c. January 2014 – March 2014; I experienced adverse administrative actions from Battalion Fire Chief Michael Willis and various personnel at the DC Fire and EMS Training Academy as I attempted to complete processing and recertification of expiring work related licenses.

   d. March 10, 2014; I submitted an appeal to the Non-POD ruling on August 06, 2013. My appeal of the Non-POD ruling was officially denied on March 10, 2014 by the Assistant Fire Chief of Services Larry B. Jackson; without documentation outside of standard DC Fire and EMS protocols.

   e. April 05, 2014; I received notification from EEO & Diversity Manager Joshua Henline with regards to FMLA, implying that I utilize it to protect me from impending disciplinary actions.

District of Columbia: SS
Subscribed and sworn to before me, in my presence,
this 20 day of MAY 2014

Notary Public, D.C.
My commission expires 10/14/2017

Page 1 of 2

ATTACHMENT G3

f.  May 05, 2014; In light of the DC Fire and EMS administration's refusal to acknowledge my injury's and document them as related to Performance of Duty, I submitted, on March 26, 2014, an official request for the advancement of Sick Leave pursuant to demonstrated needs, to facilitate continuation of care. The Fire and EMS Chief Kenneth B. Jackson "disapproved" my request for accommodation through the advancement of Sick Leave, creating a financial hardship; outside of standard DC Fire and EMS protocols.

g.  May 14, 2014; After months of appeals and inquiries, I was notified by Assistant Fire Chief of Services Larry Jackson and DC Fire and EMS Office of Compliance paralegal Deborah Scott of "Kangaroo" discipline to convene on May 21, 2014; outside of standard DC Fire and EMS protocol.  The referenced discipline is the Trial Board for Captain Alan Noznesky and Lieutenant John Thornton.



District of Columbia: SS
Subscribed and sworn to before me, in my presence,
this _70_ day of ____ may ____, 2014

Notary Public, D.C.

My commission expires ___10/14/2017___

Page 2 of 2

ATTACHMENT G4

3/20/2015                                   Print

**Subject:** RE: Letter of release

**From:** Taylor, Alexis (EOM) (alexis.taylor@dc.gov)

**To:** nicole.mccrea@dc.gov;

**Cc:** Rahsaan.coefield@dc.gov;

**Date:** Sunday, August 24, 2014 3:19 PM

Dear Ms. Coefield:
Thank you for your email. As I stated earlier, the Intake Officer and Director of Investigations will determine what is needed for your intake interview. Although EEOC did not require an Exit Letter, the DC Human Rights Act precludes simultaneous investigations at both offices for the same matter. OHR will review your documentation and inform you of your options.

Alexis Taylor
Interim Director
Executive Office of the Mayor
Office of Disability Rights
441 4th Street, NW
Suite 729 North
Washington, DC 20001

-----Original Message-----
From: Mccrea, Nicole (FEMS)
Sent: Sunday, August 24, 2014 3:04 PM
To: Taylor, Alexis (EOM)
Subject: RE: Letter of release

Dear Ms. Taylor:

Thank- you for your efforts in this matter. I apologize for the late response, aside from the scheduled meetings and hearings of last week I had a few unforeseen emergencies.

I assure you that Josh Henline did not give me an Exit letter and whatever he presented to you as a representation of this is false. I went to EEOC on my own, without an exit letter, nor was I asked to present one. Nevertheless, I will be attending the OHR intake on September15, 2014. Does Josh Henline's lies mean I am exempt from having to present one at the intake interview?

From: Taylor, Alexis (EOM)
Sent: Tuesday, August 19, 2014 2:47 PM
To: Mccrea, Nicole (FEMS)
Cc: Coefield, Rahsaan J. (OHR)
Subject: RE: Letter of release



Dear Ms. McCrea:

After speaking with you on August 13, 2014, I called Mr. Henline to determine the status of your Exit Letter. As you stated, he informed me that you received an Exit Letter prior to the initiation of your

ATTACHMENT H1

3/20/2015                                                   Print

active case at EEOC. Since the same matter cannot be at EEOC and OHR simultaneously, you may be asked to amend your Charge at the EEOC. Based on our discussion and Mr. Henline's representations, your present allegations appear to be included in your present Charge at EEOC. During your Intake Interview at OHR, you may discuss with the Intake Officer whether the allegations are similar and should be investigated at the same office. Again, the same matter may not be investigated at both EEOC and OHR. I've cc'd Mr. Coefield, the Director of Investigations and he will review your documentation after your interview.

Alexis Taylor
Interim Director
Executive Office of the Mayor
Office of Disability Rights
441 4th Street, NW
Suite 729 North
Washington, DC 20001

-----Original Message-----
From: Mccrea, Nicole (FEMS)
Sent: Tuesday, August 19, 2014 2:32 PM
To: Taylor, Alexis (EOM)
Subject: FW: Letter of release
Importance: High

Good Afternoon Ms. Taylor (Alexis.Taylor @dc.gov):

My name is Nicole R. McCrea; the DCFEMS employee that meet with you briefly on the afternoon of August 13, 2014 regarding challenges I was facing in my attempts to obtain an exit letter from my agency. I am following up on our conversation as it has been almost a week since I talked with you. The evening after my meeting with you on August 13, 2014 I received a voicemail from Lt. Bernard Roach stating that "he had been out of town"... "he had talked to Josh Henline"... to call him back. I had not heard from Lt. Roach since July 02, 2014, despite leaving several messages, at various contact numbers.
    Having met with you earlier, I did not return his call. Monday, August 18, 2014 I checked my employee email and found the (forwarded) e-mail from Lt. Roach, dated August 13, 2014, stating that Josh Henline told him that he gave me an exit letter in 2013.

On June 02, 2014, I contacted Lt Bernard Roach because he is a DCFEMS EEOC counselor, regarding receiving an exit letter; after being informed on May 22, 2014, in my DCOHR notice for a scheduled intake appointment that as a DC government employee, an exit letter was required. On June 03, 2014, I meet with Lt. Roach. I was candid and explicit to Lt. Roach throughout this meeting; my purpose for meeting with him, another DCFEMS EEOC counselor was to obtain an exit letter. During this meeting, I fully disclosed to Lt. Roach that I had talked to Josh Henline periodically in the days following the assault and had met with Josh Henline only once, September 13, 2014. On September 13, 2014, after an extensive discussion about the assault, Josh Henline advised me of my right to file an official EEOC complaint with the DCOHR, he never informed me that I needed an exit letter. Josh Henline did not give me an exit letter.

As I mentioned to you on August 13, 2014, I have had contact with two DCFEMS EEOC counselors. I have never received an exit letter and I am still at a lost to further actions/options I can take to obtain an exit letter from any DC government EEOC counselor before my scheduled intake appointment with DCOHR on September 15, 2014.

ATTACHMENT   H2

Print

Thank-you, again, for your time and consideration regarding this matter.

Sincerely,
Nicole R. McCrea

From: Roach, Bernard (FEMS)
Sent: Wednesday, August 13, 2014 9:29 AM
To: Mccrea, Nicole (FEMS)
Cc: Henline, Joshua L. (FEMS)
Subject: Letter of release

I spoke to Mr. Joshua Henline this morning about the information you requested for. (Letter of release)
Mr. Joshua Henline informed me that you were given an exit letter last year for the EEOC.
I left a message on your answering service to contact me as well.  You may contact him for further
information per your request:

Joshua Henline, Esq.
EEO & Diversity Manager
Office of the Fire & EMS Chief
2000 14th Street NW
Suite 500
Washington, DC 20009

Direct - (202) 673-3396
General - (202) 673-3320
Fax - (202) 462-0807
Joshua.Henline@dc.gov<mailto:Joshua.Henline@dc.gov>

Bernard T. Roach
Lieutenant
Administration
District of Columbia Fire & EMS Department Fire Prevention Divivsion
(202) 727-0853  Office
(202) 345-7127 (Work - Cell)
(202) 727-3238 Fax
[cid:image001.png@01CFB6D5.E3ABF360]          [cid:image002.png@01CFB6D5.E3ABF360]
<http://dc.gov/DC>

Help DC become an Age-Friendly<http://agefriendly.dc.gov/> city by participating in the Block-by-
Block Walk on Saturday, September 6. Sign up here<http://agefriendly.dc.gov/page/age-friendly-dc-
block-block-walk> to volunteer.

ATTACHMENT H3

11/7/2014                                    Print

**Subject:** Re: Fw: Written Request to Transfer Charges to The DC Office of Human Rights

**From:** DAVID GONZALEZ (DAVID.GONZALEZ@EEOC.GOV)

**To:** nic_mack@yahoo.com;

**Cc:** albert.santiago@dc.gov;

**Date:** Friday, October 17, 2014 11:04 AM

Ms McCrea,

As a public employee, you should be aware that process is of utmost importance. When procedures are not followed, problems may ensue. In order to better assist you, I asked for guidance. I have contacted the St. Louis office, I will contact you when I hear from them.

David Gonzalez

>>> Nicole McCrea <nic_mack@yahoo.com> 10/14/2014 1:35 PM >>>
To Whom It May Concern:
I am e-mailing the DC EEOC once again, as per my visit with Mr. Santiago at the DCOHR today, in reference to the transfer of my case/ charge from the EEOC to the DCOHR. It has been 4 weeks since my initial written request to David Gonzalez in the DC office of EEOC for the transfer of the charge. As stated to me, the DC EEOC's prolonged actions or lack of action on my request, is "unusual" and a hindrance to the DCOHR's ability to begin effective measures regarding my charges submitted to them. The fact that David Gonzalez needed to contact the Director on how to proceed on a routine transfer request and the fact that it has yet to be done speaks volumes about DC EEOC's efforts in handling the serious nature of the original charges that I filed.

In the event that David Gonzalez sent my written request to "St. Louis to expedite it", here is the information from my original written request. Once again, my name is Nicole R. McCrea. I submitted a Charge of Discrimination to the DC office of EEOC, Charge no: 570-2014-00278, on November 21, 2013. May this e-mail serve as my official written request to transfer my charge and any supporting documents to the DC Office of Human Rights.

On Wednesday, September 17, 2014 2:51 PM, DAVID GONZALEZ <DAVID.GONZALEZ@EEOC.GOV> wrote:

Ms McCrea,

I mistakenly sent you an email meant for the Acting Director. You charge was transferred to our St. Louis office to expedite the investigation. I don't foresee any complications to your request. I will notify when we do.

David Gonzalez

>>> Nicole McCrea <nic_mack@yahoo.com> 9/17/2014 1:36 PM >>>
Why would my charge me sent to "St. Louis" on 08/05/2014?
On Wednesday, September 17, 2014 11:06 AM, DAVID GONZALEZ <DAVID.GONZALEZ@EEOC.GOV> wrote:

>>> Nicole McCrea <nic_mack@yahoo.com> 9/15/2014 4:09 PM >>>
Good Afternoon Mr. Gonzalez:

My name is Nicole R. McCrea. I submitted a Charge of Discrimination to the DC office of EEOC, Charge no: 570-2014-00278, on November

about:blank                          ATTACHMENT H4                          1/2

Print

21, 2013.  May this e-mail serve as my official written request to transfer my charge and any supporting documents to the DC Office of Human Rights.

ATTACHMENT H5

9/17/2014                    ███████ - nic_mack- Yahoo Mail

Home    Mail    News    Sports    Finance    Weather    Games    Groups    Answers    Screen    Flickr    Mobile  |  More

[                                      ]    Search Mail    Search Web          Home  ▨ Nicole

✉ ▨ 17 ▨ ☺

✐ Compose        ▨ ▾  ⇦  ⇦⇦ ⇨  🗑 Delete   ▨ Move ▾   ☰ More ▾   ☰ Collapse All          View ▾

**Inbox**███     ▨  Answers Tech    **9 of the Funniest Glitches in Video Games**              ☼
Drafts (9)          Sponsored      Depending on the situation, a glitch can be good, bad or...
Sent              ☐ ☺ Me...Me     Written Request to Transfer Charges to The DC Office  ▨ 📎   1:36 PM
Spam (113)        ☐ ☺ Me, Carla   Fax Number and the Release (5)  Hello Nicole, I will coord   Sep 15
Trash
▾ Folders ███     ☐ ███████████████████████████████████████

                  ● **Written Request to Transfer Charges to The DC Office of Hum... (4)**

                  **Me**                                                          Sep 15 at 4:09 PM
                  To  david.gonzalez@EEOC.gov
                  BCC  Me

                  Good Afternoon Mr. Gonzalez:

                  My name is Nicole R. McCrea.  I submitted a Charge of Discrimination to the DC office of EEOC, Charge no.: 570-2014-
                  00278, on November 21, 2013.  May this e-mail serve as my official written request to transfer my charge and any
                  supporting documents to the DC Office of Human Rights.

                  Reply, Reply All or Forward | More

                  ● Me   Good Afternoon Mr. Gonzalez: My name is Nicole R. McCrea. I su   Sep 15 at 4:17 PM

                  **DAVID GONZALEZ**                                           Today at 11:06 AM
                  To  Me

                  Hi Mindy,

                  How should we proceed? The charge was transferred to St. Louis on 8/5/2014.

                  David

                  >>> Nicole McCrea <nic_mack@yahoo.com> 9/15/2014 4:09 PM >>>
                  ▸ Show message history

                  Reply, Reply All or Forward | More

                  **Me**                                                       Today at 1:36 PM
                  To  albertsantiago@dc.gov, DAVID.GONZALEZ@EEOC.GOV
                  BCC  Me

                  Why would my charge me sent to "St. Louis" on 08/05/2014?
                  ▸ Show message history

                  Reply, Reply All or Forward | More

Available on iOS
and Android
[          ]
Text me a link

▨

ATTACHMENT H6

UNITED STATES POSTAGE
PITNEY BOWES
$ 000.48
02 1P
0000306092   DEC 22 2014
MAILED FROM ZIP CODE 63103

ST. LOUIS DISTRICT OFFICE
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
ROBERT A. YOUNG BLDG., ROOM 8.100
1222 SPRUCE STREET
ST. LOUIS, MISSOURI 63103

OFFICIAL BUSINESS

ATTACHMENT H7



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
St. Louis District Office

Robert A. Young Building
1222 Spruce Street, Room 8.100
St. Louis, MO 63103
Intake Information Group: (800) 669-4000
Intake Information Group TTY: (800) 669-6820
St. Louis Direct Dial: (314) 539-7800
TTY (314) 539-7803
FAX (314) 539-7894
Website: www.eeoc.gov

Ms. Nicole McCrea
5205 East Capitol Street SE
Washington, DC 20019

Re: Nicole McCrea v DC Fire and EMS
Charge #: 570-2014-00278

Dear Ms. McCrea:

This letter notifies you that your potential Charge of Discrimination has been transferred to our Kansas City Area Office for processing. The address and telephone number for that Equal Employment Opportunity Commission (E.E.O.C.) office is:

Equal Employment Opportunity Commission
Kansas City Area Office
Attn: Alfred Kirk
400 State Avenue, Suite 905
Kansas City, KS 66101
(913) 551-6613

If you have any questions or need clarification, you may contact the Enforcement Manager at (314) 539-7937.

Sincerely,

Dana M. Engelhardt

DEC 1 9 2014.

Date

Dana Engelhardt
Enforcement Manager

RECEIVED
Mail Room

JUN 2 5 2018

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

ATTACHMENT H8

KANSAS CITY
MO 640
26 MAR "15
PM 1 L

KANSAS CITY AREA OFFICE
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
GATEWAY TOWERS II
400 STATE AVENUE, SUITE 905
KANSAS CITY, KS 66101

OFFICIAL BUSINESS

Ms. Nicole McCrea
5205 East Capitol Street, SE
Washington, District of Columbia 20019

2001 9661 005

ATTACHMENT  119



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Kansas City Area Office**

Gateway Tower II
400 State Avenue, Suite 905
Kansas City, KS  66101
(913) 551-5655
TTY (913) 551-5657
FAX (913) 551-6956

March 26, 2015

Ms. Nicole McCrea
5205 East Capitol Street, SE
Washington, District of Columbia 20019

**RE:  McCrea vs. DC Fire and EMS**

Dear Ms. McCrea:

This letter is being sent to advise you that your charge (570-2014-00278) regarding employment discrimination, which was submitted to the Kansas City Area Office of the Equal Employment Opportunity Commission (EEOC) on December 19, 2014, has been transferred to the District of Columbia Office of Human Rights at your request.

Contact information for them is listed below.  Please address all further correspondence and/or concerns to their office.

If you have any questions, please do not hesitate to directly contact our Supervisory Investigator, Mr. Alfred C. Kirk, Jr. at (913) 551-6613.

Director of Investigations
District of Columbia Office of Human Rights
Attn: Mr. Rashaan J. Coefeild
414 4th Street NW, Suite 570 North
Washington, District of Columbia 20001

Sincerely,                                          Date  03-26-15

Alfred C. Kirk, Jr.
Supervisory Investigator
EEOC/KCAO

RECEIVED
Mail Room

JUN 2 5 2018

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

ATTACHMENT H10





**Office of Human Rights**
DISTRICT OF COLUMBIA

## OHR QUESTIONNAIRE-EMPLOYMENT

*Required Fields

### 1. COMPLAINANT

*Today's Date: MARCH 26, 2015    *Name: NICOLE R. MCCREA

*Address: 5205 East Capital St. SE. Washington, DC 20019
*City/State/Zip:

E-mail: NIC-MACK @ Yahoo.com

Home Tel #: 202/491-9656

Work Tel #: 202/673-3228

**What is your language preference?**
☒ English ☐ Spanish ☐ Amharic ☐ Chinese ☐ Vietnamese ☐ Korean
☐ Other (Please list) _____

IF REPRESENTED BY COUNSEL, PLEASE PROVIDE THE FOLLOWING:   N/A
Name: _____   Telephone/Fax: _____
Address: _____   E-mail: _____
Please note: If you are represented by counsel or retain counsel prior to your scheduled Intake interview, the counsel must either (1) be present with you for the duration of your Intake interview, or (2) withdraw his/her appearance from the interview by submitting a letter to the Office indicating that the interview may take place without his/her representation.

Do you require a reasonable accommodation?  If so, please explain:   N/A

Do you require language interpretation?  If so, what language?   N/A

### 2. RESPONDENT

Name of company or organization: Please see attached 5 page document "Supplement to DC OHR Employment Intake Questionnaire"

Name and Title of principal officer (i.e. President, Owner, Human Resources Manager):

Address: _____   City/State/Zip _____
Tel #: _____   Fax #: _____   E-mail Address: _____

### 3. BASIS OF COMPLAINT

The basis is one of the below listed categories to which you belong and believe that you were treated differently because you belong or are perceived to belong in that category.

*Do you feel you were discriminated against because of your: (Check all that apply)

☒ Race            ☒ Sex            ☐ Age              ☐ Family Responsibilities        ☐ Sexual Orientation
☐ Political Affiliation  ☒ Disability      ☐ Genetic Information   ☐ Gender Identity or Gender expression  ☐ Marital Status
☐ National Origin    ☐ Religion        ☐ Personal Appearance   ☐ Color                ☐ Matriculation

### 4. JURISDICTION

*Please check all that apply

☒ Alleged violation occurred in the District of Columbia.

☒ Alleged violation occurred 365 days or less from today's date.

☒ You have not commenced any other action, civil, criminal, or administrative in any other forum based on the same unlawful discriminatory practice described herein.

ATTACHMENT I1

RECEIVED
Mail Room
JUN 25 2018
Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

## 5. ISSUES
### What action was taken that made you feel you were treated differently?

- [ ] Family Medical Leave
- [ ] Promotion
- [ ] Transfer
- [ ] Demotion
- [x] Retaliation
- [ ] Sexual Harassment
- [x] Hostile Work Environment
- [ ] Failure to Hire
- [ ] Discharge
- [ ] Discipline
- [x] Failure to Accommodate (i.e. Religion, Disability)
- [x] Other: CONTINUING VIOLATIONS

## 6. DISTRICT OF COLUMBIA GOVERNMENT EMPLOYEES OR APPLICANTS

Please note: Pursuant to §105 of DCMR Title IV, all District Government employees must first consult an agency EEO counselor within 180 days of the alleged discriminatory act prior to filing with the Office of Human Rights, unless the District Government employee is alleging unlawful discrimination based on sexual harassment. The Office of Human Rights cannot process a complaint from a current or former District Government employee unless (1) the employee has received an exit letter from his/her agency EEO Counselor, (2) twenty-one days have passed since the matter was called to the attention of the agency's EEO Counselor and no exit letter has been written; or (3) the employee is alleging unlawful discrimination based on sexual harassment.

- [x] You have filed an informal complaint with an agency assigned EEO Officer/ Counselor.

Counselor's Name: William BRIAN RAMSEY

Counselor's Agency: Univ of D.C. (Human Resources)

Counselor's Telephone Number: 202/274-5442

Date Filed: March 04, 2015 Date of Exit Letter:

## 7. D.C. FAMILY AND MEDICAL LEAVE ACT
### (Only complete section if your complaint deals with FMLA.)

*Have you been employed with this company for at least one (1) year and have worked at least one thousand (1,000) hours?

- [ ] YES
- [ ] NO

## 8. WITNESSES
### List whom you feel can corroborate your experience and provide evidence in your support.

| | | |
|---|---|---|
| Name: H. Randall STROMAN | Name: Ms. Little (DCFPC) | Name: DENISE Gardner |
| E-mail Address: | E-mail Address: | E-mail Address: Denise.Gardner@dc.gov |
| Telephone: 202/269-7500 | Telephone: 202/269-7400 | Telephone: 202/442-9884 |

## 9. YOUR COMPLAINT

Describe in detail the incident(s) that led you to file a complaint of discrimination. Please list dates as well as the name(s) of the person(s) who discriminated against you in denying employment, promotion, training, etc. If this is a disability-based complaint, please specify whether an accommodation was requested, the person the request was submitted to and the date Respondent was notified of your disability.

Please see attached 5 page document "Supplement to DC OHR Employee Intake Questionnaire"

Subscribed and sworn to before me, in my presence, the
26 day of March 2015
and for the District of Columbia
My commission expires March 31, 20 15

THE SUBMISSION OF THE OHR QUESTIONNAIRE CONSTITUTES THE DATE OF FILING FOR STATUTE OF LIMITATIONS PURPOSES.
A COMPLETE AND SUBMITTED OHR QUESTIONNAIRE SATISFIES THE REQUIREMENTS OF 4 DCMR 705.4, 705.6, and 705.7

**Please return this form by email to ohr.intake@dc.gov or 441 4th Street NW, Suite 570N, Washington DC, 20001.**

The DC Office of Human Rights was established to eradicate discrimination, increase equal opportunity and protect human rights for persons who live, work, or visit the District of Columbia. The receipt of this complaint form by the Office of Human Rights will lead to an intake interview.

*Signature of Complainant
(please type full name) Nicole RENA McCRea

*Date: March 26, 2015

SHIRLEY S. M. McGALE
Notary Public, District of Columbia
My Commission Expires March 31, 2015

# ATTACHMENT I2

Supplement to DC OHR Employment Intake Questionnaire

2. Respondent

    a.   DC Fire and EMS
          Interim Fire and EMS Chief  Jones
          2000 14th Street NW Suite 500
          Washington, DC 20009
          202/673-3320

    b.   DC Police and Fire Clinic
          PFC Associates, LLC
          Medical Director, Dr.  Olusola Malomo
          920 Varnum St., NE
          Washington, DC 20017
          202/269-7400

    c.   DC Police and Firefighters' Retirement and Relief Board
          Acting Chairperson, Andrea G. Comentale
          441 4th St., NW Suite 330 South
          Washington, DC 20001

9. Your Complaint

    a.   <u>August 04, 2014</u>- I was ordered to a follow up appointment with Dr. Raquel Gordon.  I inquired as I had before about my return to work, and a medical certification I had provided to the DC Police and Firefighters' Retirement Board documenting my ability to return to work with modification.

    b.   <u>August 25, 2014</u>- I was ordered to a follow-up appointment with Dr. Raquel Gordon.  I again brought up my medical certification to return to work.  Dr. Gordon dismissed my inquires, refusing to act on my doctors orders, stating why don't I wait until after the final administrative trial board; I was the primary witness for three disciplinary Trial Boards against the individuals involved in the assault against me on May 30/31, 2013.

    c.   <u>September 29, 2014</u>- I was ordered to a follow up appointment with Dr. Marc Cottrell and Dr. Raquel Gordon.  My forced interactions with Dr. Gordon were finally terminated; After months of complaining to the DCFEMS administrative personnel at the PFC about the ethics, integrity and professionalism of Dr. Gordon, only after an official written complaint to the DC Fire and EMS (DCFEMS)Fire Chief.  In this transition session I confronted Dr. Gordon about the wanton breach of my privacy that I discovered in her written treatment notes submitted to DC Police and Fire Clinic (DCPFC) and her refusal to accept my first medical certification to return to work. I also insisted to Dr. Cottrell that I would like to receive a written informed consent document that outlines his relationship with me, my rights within that relationship and my written



agreement to interacting with him in any capacity, as he is not treating me and I am unclear, as I asserted to Dr. Gordon on several occasions, of my rights in being forced to report to DCPFC "to be monitored".

d.  **October 07, 2014**- I was ordered to a follow up appointment with Dr. Marc Cottrell.  Dr. Cottrell did not have a written informed consent document written informed consent document that outlines his relationship with me, my rights within that relationship and my written agreement to interacting with him in any capacity.  He stated that one would not be provided. He even went as far to say as he did not know who at the DCPFC I should talk to about my insistence on receiving one. When I inquired about the two written medical certifications that I had provided to him on September 29, 2014, he stated he needed my authorization to speak to my doctors so that he could clarify the accommodations they outlined for my return to work.

e.  **October 09, 2014**- Dr. Marc Cottrell contacted my private psychologist Dr. Carla Rhodes under the pretext of clarifying her medical certification clearing me to return to work with modifications/accommodations.  Instead of addressing the medical certification, as authorized in my signed release, Dr. Cottrell engaged in a heated exchange with my doctor, "in an attempt to incite her to breach the stipulated constraints of the authorization"; to reveal her protocol for my continued treatment; and detail my medical symptoms and her medical notes, because he is the only person that can say when or if I will ever be allowed to come back to work.

f.  **October 14, 2014**- I was ordered to a follow-up appointment with Dr. Cottrell.  When I began to address his exchange with Dr. Rhodes as related to me, Dr. Cottrell then attempted to give me a two page list of questions.  He asserted to me that he was acting with the guidance of his supervisors; that he was not going to accept the medical certifications that my doctors provided to the DCPFC and if I wanted to even be considered for return to work I needed to have my doctors answer his outlined questions in detail, immediately.  I refused to take the list and asserted that he was not only violating the Americans with Disabilities Act concerning medical certifications, but he was also violating my HIPA Patient Privacy rights  by insisting that he would block my return to work until I authorized my doctors to give him access to my private medical files.  I then inquired, again, about the written informed consent document that outlines his relationship with me, my rights within that relationship and my written agreement to interacting with him in any capacity, because he is not my doctor.  He again refused to provide me with a written informed consent form.

g.  **November 06, 2014**- I attended a forced disability hearing as ordered by the DCPFC citing me a "permanently disabled" and the DC Police and Firefighters' Retirement and Relief Board (DCPFRRB), asserting their authority to do so under DC Official Code 5-633, DC Official Code 5-634, DC Official Code 5-709 and DC Official Code 5-710; all in violation of the Americans with Disabilities Act; Title VII of the Civil Rights Act; and Section 504 of the Rehabilitation Act. During

ATTACHMENT I4

the hearing I was interrogated by Chairperson Lois Hochhauser.  Chairperson Lois Hochhauser dismissed my doctors' medical certifications and the need for accommodations, telling me explicitly that I would be retired if I did not return to work in a Full Duty capacity.

h.  **November 14, 2014**- I was ordered to a follow up appointment with Dr. Marc Cottrell.  Dr. Cottrell again refused to provide me with an outlined written informed consent document while insisting that I take his questions to my doctors.  I once again refused asserting my rights within the Americans with Disabilities Act, HIPA Patient Privacy rights and my right to informed written consent documentation.  I left the appointment with Dr. Cottrell without any further interaction.

i.  **November 25, 2014**- I requested a meeting with Dr Olusola Malomo, Dr. Marc Cottrell and Lieutenant Randall Stroman so that I could have positive documentation on who is responsible/authorizing Dr Cottrell's orders to deliberately obstruct my return to work.  Dr. Malomo, Dr. Cottrell, Lieutenant Stroman and Battalion Fire Chief Raymond Gretz were in attendance at the meeting.  In the meeting Dr. Cottrell demanded that I have my doctors answer his questions.  I adamantly refused asserting my rights within the Americans with Disabilities Act, my HIPA Patient Privacy Rights, my rights within the International Association of Firefighters and NFPA 1582, and my rights to an outlined written informed consent document. Dr. Malomo asserted that she was the Medical Director of DCPFC and it is her policies that I have my doctors provide detailed answers to all of Dr. Cottrell's questions.  She even went as far as to say that they don't even have to accommodate me, as my private doctors have requested, "as it is a privilege they can extend if they choose to... I would not be allowed to return to work in a modified capacity until I meet their demands."  Once again, my request for a written informed consent document that outlined my rights in being ordered to continue to report to DCPFC and "be monitored" were ignored.

j.  **December 18, 2014**- I received a written order from the DCPFRRB ordering me to have my private doctors provide the DCPFRRB and the DCPFC with yet another report, ordered to detail my provider's opinions about my diagnosis as well as her treatment plan; violations of the Americans with Disabilities Act and medical certification for return to duty. The DCPFC was to review the report and submit written documentation amending or maintaining its position in light of the report.

k.  **January 22, 2015**- I attended a continuation hearing for my forced disability as ordered by the DCPFRRB. Acting Chairperson Andrea Comentale began her interrogation of me with veiled comments about how many times I have been disciplined/ put on charges/ investigated for insubordination.  Acting Chairperson Andrea Comentale then advised me that the DCPFC had submitted more questions to the DCPFRRB and she was ordering me to have my doctor submit a written report detailing their questions if I wanted to go back to work. I immediately refused citing that the written report that I was ordered to write on December 18, 2014, in violation of

ATTACHMENT I5

my rights, more than addressed the obligations that I had to DCPFC and the DCPFRRB. The written report from my doctors' addressed my ability to perform the essential duties of my job as well as any functional limitations and need for reasonable accommodations. The DCPFC did not submit any documentation amending or maintain its position in light of the report. Instead the DCPFC aided and abetted by the DCPFRRB choose to demand I answer far reaching disability question inconsistent with any determination of the scope of my rights to compensation through Performance of Duty (POD) injury, or the impact of my injury on my ability to perform the essential functions of my job. The questions have a very prejudicial tone that infers that I am a threat or risk of harm/safety to myself and/or others, where there is no objective evidence of such in my files with my private doctors or DCPFC. Acting Chairperson Andrea Comentale in turn became belligerent towards me, berating me, as I vehemently asserted my federal rights.

i.   <u>January 23, 2015</u>- I received a written order from the DCPFRRB, citing DC Official Code 5-721 and DC Official Code 5-722, ordering me to comply with the demands of the DCPFC and the DCPFRRB, immediately have my private doctors answer the questions from DCPFC, in violation of my asserted federal rights.

m.   <u>February 12, 2015</u>- I attended yet another continuation hearing for my forced disability as ordered by the DCPFRRB. Acting Chairperson Andrea Comentale began by asking me why I didn't comply with the DCPFRRB's orders from January 22/23, 2015. I once again asserted that they were a violation of my rights. She disregarded my sentiments and began to interrogate me about my ability to go back to work in a Full Duty capacity, immediately. Once again, to all of her demands, I cited and asserted my rights, specifically those outlined in the Americans with Disabilities Act, stating that the DCPFRRB's treatment and tone towards me joins them to the DCPFC, as they are aiding and abetting disability harassment and discrimination.

n.   <u>March 12, 2015</u> -I submitted written requests to Denise S. Gardner and Lela Jones administrators for the DC Police and Firefighters' Relief and Retirement Board at the DC Office of Human Resources, as well as the DC Police and Firefighters' Relief and Retirement Board inquiring about the status and receipt of the Board's decision, in addition to the copies of the transcripts of the last two hearings and written directives for my appeal to the Board and the DC Court of Appeals. I have not received a response to my requests. I have not received notice regarding the DC Police and Firefighters' Relief and Retirement Board's decision. As of this date March 26, 2015, it has been forty-two (42) days since my last hearing for my forced disability retirement before the DC Police and Firefighters' Relief and Retirement Board.

ATTACHMENT I6

Respectfully,

_Nicole R. McCrea_
Nicole R. McCrea

Subscribed and sworn to before me, in my presence, this
2a day of _march_, 2015 a Notary Public
in and for the _District of Columbia_

_Notary Public_
My commission expires _march 31_, 20 _15_

SHIRLEY S. M. McGALE
Notary Public, District of Columbia
My Commission Expires March 31, 2015

ATTACHMENT I7

Nicole R. McCrea
5205 East Capitol St., SE
Washington, DC 20019
May 01, 2015

DC Office of Human Rights
441 4th Street NW, Suite 570N
Washington DC 20001

Amended List of Respondent(s) relevant to acts of discrimination, retaliation and/or harassment on, Charge of Sexual Harassment Hostile Working Environment, second Continuing Violations complaint, OHR Employment Questionnaire notarized and submitted to the DC Office of Human Rights on March 26, 2015.

**2. Respondent**(s):

Gregory Dean
Fire and EMS Chief
DC Fire and EMS Department
The Frank D. Reeves Center
2000 14th St., NW Suite 500
Washington, DC 20009
(202) 673-3320

Larry B. Jackson
Assistant Fire Chief of Services
DC Fire and EMS Department
The Frank D. Reeves Center
2000 14th St., NW Suite 500
Washington, DC 20009
(202) 673-3320

BFC Raymond Gretz
Medical Services Officer
DC Fire and EMS Department
c/o DC Police and Fire Clinic
920 Varnum St., NE
Washington, DC 20017
(202)269-7400



RECEIVED
Mail Room

JUN 25 2018

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

ATTACHMENT I8

BFC Michael S. Donlon
Medical Services Officer
DC Fire and EMS Department
c/o DC Police and Fire Clinic
920 Varnum St., NE
Washington, DC 20017
(202)269-7400


Dr. Olusola Maloma
Medical Director
DC Police and Fire Clinic
920 Varnum St., NE
Washington, DC 20017
(202)269-7400


Dr. Raquel Gordon
c/o DC Police and Fire Clinic
920 Varnum St., NE
Washington, DC 20017
(202)269-7400


Dr. Marc Cottrell
DC Police and Fire Clinic
920 Varnum St., NE
Washington, DC 20017
(202)269-7400


Dr. Gloria Morote
c/o DC Police and Fire Clinic
920 Varnum St., NE
Washington, DC 20017
(202)269-7400


William B. Sarvis, Jr.
Director of Privacy/ Medical Services
DC Police and Fire Clinic
920 Varnum St., NE
Washington, DC 20017
(202)269-7400

ATTACHMENT I9

Frieda L. Caldwell
Assistant Privacy Officer
DC Police and Fire Clinic
920 Varnum St., NE
Washington, DC 20017
(202)269-7400

Lois Hochhauser
Chairperson
Police & Firefighters' Retirement Relief Board
Benefits and Retirement Administration
D.C. Department of Human Resources
441 4th St., NW Suite 330 South
Washington, D.C. 20001

Andrea G. Comantale
Acting Chairperson
Police & Firefighters' Retirement Relief Board
Benefits and Retirement Administration
D.C. Department of Human Resources
441 4th St., NW Suite 330 South
Washington, D.C. 20001

Lela R. Jones
Human Resources Administrator
Police & Firefighters' Retirement Relief Board
Benefits and Retirement Administration
D.C. Department of Human Resources
441 4th St., NW Suite 340 North
Washington, D.C. 20001
(202) 442-9608

Denise S. Gardner
Human Resources Administrator
Police & Firefighters' Retirement Relief Board
Benefits and Retirement Administration
D.C. Department of Human Resources
441 4th St., NW Suite 340 North
Washington, D.C. 20001

DISTRICT OF COLUMBIA:   SS
SUBSCRIBED AND SWORN TO BEFORE ME
THIS __1__ DAY OF _May_ 2015.

NOTARY PUBLIC
My Commission Expires   2/14/19

Respectfully Submitted,

Nicole R. McCrea

CARL L. EASON JR
NOTARY PUBLIC
Expiration
Fe. 14. 2019
DISTRICT OF COLUMBIA

ATTACHMENT I10





**Office of Human Rights**
DISTRICT OF COLUMBIA

## OHR QUESTIONNAIRE-EMPLOYMENT

*Required Fields

### 1. COMPLAINANT

**\*Today's Date:** JUNE 29, 2015   **\*Name:** NICOLE R. MCCREA

**\*Address:** 5205 East Capitol St, SE   **\*City/State/Zip:** Washington, DC 20019

**E-mail:** NIC_MACK @ Yahoo.Com

**Home Tel #:** 202/491-9656

**What is your language preference?**
☒ English ☐ Spanish ☐ Amharic ☐ Chinese ☐ Vietnamese ☐ Korean
☐ Other (Please list) _____

**Work Tel #:** _____

**IF REPRESENTED BY COUNSEL, PLEASE PROVIDE THE FOLLOWING:**
**Name:** N/A   **Telephone/Fax:** _____
**Address:** _____   **E-mail:** _____
Please note: If you are represented by counsel or retain counsel prior to your scheduled Intake interview, the counsel must either (1) be present with you for the duration of your Intake interview, or (2) withdraw his/her appearance from the interview by submitting a letter to the Office indicating that the interview may take place without his/her representation.

**Do you require a reasonable accommodation?  If so, please explain:** N/A

**Do you require language interpretation?  If so, what language?** N/A

### 2. RESPONDENT

**Name of company or organization:** Please see Attached 8 page Document "Supplement to DC OHR Employment Intake Questionnaire 06/29/2015)"

**Name and Title of principal officer (i.e. President, Owner, Human Resources Manager):**

**Address**
**Tel #:**         **Fax #:**         **City/State/Zip**
                                    **E-mail Address:**

### 3. BASIS OF COMPLAINT

The basis is one of the below listed categories to which you belong and believe that you were treated differently because you belong or are perceived to belong in that category.

**\*Do you feel you were discriminated against because of your: (Check all that apply)**

☒ Race    ☒ Sex    ☐ Age    ☐ Family Responsibilities    ☐ Sexual Orientation

☐ Political Affiliation  ☒ Disability  ☐ Genetic Information  ☐ Gender Identity or Gender expression  ☐ Marital Status

☐ National Origin  ☐ Religion  ☐ Personal Appearance  ☐ Color  ☐ Matriculation

### 4. JURISDICTION
Please check all that apply:

☒ Alleged violation occurred in the District of Columbia

☒ Alleged violation occurred 365 days or less from today's date.

☐ You have not commenced any other action, civil, criminal, or administrative in any other forum based on the same unlawful discriminatory practice described herein.

ATTACHMENT J1

**RECEIVED**
Mail Room
JUN 25 2018
Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

## 5. ISSUES
### What action was taken that made you feel you were treated differently?

- [ ] Family Medical Leave
- [ ] Promotion
- [ ] Transfer
- [ ] Demotion
- [x] Retaliation
- [x] Sexual Harassment
- [x] Hostile Work Environment
- [ ] Failure to Hire
- [x] Discharge
- [ ] Discipline
- [x] Failure to Accommodate (i.e. Religion, Disability)
- [x] Other: CONTINUING VIOLATIONS

## 6. DISTRICT OF COLUMBIA GOVERNMENT EMPLOYEES OR APPLICANTS

Please note: Pursuant to §105 of DCMR Title IV, all District Government employees must first consult an agency EEO counselor within 180 days of the alleged discrimination or prior to filing with the Office of Human Rights, unless the District Government employee is alleging unlawful discrimination based on sexual harassment. The Office of Human Rights cannot process a complaint from a current or former District Government employee unless: (1) the employee has received an exit letter from his/her agency EEO Counselor; (2) twenty-one days have passed since the matter, was referred to the attention of the agency's EEO counselor and no exit letter has been written; or (3) the employee is alleging unlawful discrimination based on sexual harassment.

- [x] You have filed an informal complaint with an agency assigned EEO Officer/ Counselor.

Counselor's Name: WILLIAM BRIAN RAMSEY

Counselor's Agency: Univ. of D.C. (HUMAN RESOURCES)

Counselor's Telephone Number: 202/274-8442

Date Filed: JUNE 01, 2015     Date of Exit Letter: _____

## 7. D.C FAMILY AND MEDICAL LEAVE ACT
### (Only complete section if your complaint deals with FMLA)

"Have you been employed with this company for at least one (1) year and have worked at least one thousand (1,000) hours?
- [ ] YES
- [ ] NO

## 8. WITNESSES
### List whom you feel can corroborate your experience and provide evidence in your support.

Name: Lt. BERNARD Roach
E-mail Address: _____
Telephone: 202/727-0853

Name: Lt. Randall Stroman
E-mail Address: _____
Telephone: 202/269-7509

Name: Ms. Little (DC Police & Fire Clinic)
E-mail Address: _____
Telephone: 202/269-7400

## 9. YOUR COMPLAINT

Describe in detail the incident(s) that led you to file a complaint or discrimination. Please list dates as well as the name(s) of the person(s) who discriminated against you in denying employment, promotion, training, etc. If this is a disability-based complaint, please specify whether an accommodation was requested; the person the request was submitted to and the date Respondent was notified of your disability.

Please see attached 8 page document "Supplement to DC OHR
Employment Intake Questionnaire (06/29/2016)"

THE SUBMISSION OF THE OHR QUESTIONNAIRE CONSTITUTES THE DATE OF FILING FOR STATUTE OF LIMITATIONS PURPOSES.
A COMPLETE AND SUBMITTED OHR QUESTIONNAIRE SATISFIES THE REQUIREMENTS OF 4 DCMR 705.4, 705.5

Please return this form by email to ohr.intake@dc.gov or 441 4th Street NW, Suite 570N, Washington DC, 20001.

The DC Office of Human Rights was established to eradicate discrimination, increase equal opportunity and protect human rights for persons who live, work, or visit the District of Columbia. The receipt of this complaint form by the Office of Human Rights will lead to an intake interview.

Nicole R. McCrea
*Signature of Complainant
(please type full name)

*Date JUNE 2, 2015

**District of Columbia**
The foregoing instrument was acknowledged before me this 2nd day of June, 2015

by Nicole R. McCrea

APRYLL C. GATES, Notary Public
My Commission Expires May 31, 2020

*(Notary seal: APRYLL C. GATES, NOTARY PUBLIC, DISTRICT OF COLUMBIA, Exp. 05/31/20)*

ATTACHMENT J2

**Supplement to DC OHR Employment Intake Questionnaire** (06/29/2015)

**2. Respondent:**

    a.  The District of Columbia
        Attorney General for the District of Columbia
        The Office of the Attorney General of the District of  Columbia
        441 4th St., NW Suite 630 South
        Washington, DC   20001
        (202)727-6295

    b.  Mayor Muriel Bowser
        c/o The Office of the Attorney General of the District of  Columbia
        441 4th St., NW Suite 630 South
        Washington, DC   20001
        (202)727-6295

    c.  Former Mayor Vincent Gray
        c/o The Office of the Attorney General of the District of  Columbia
        441 4th St., NW Suite 630 South
        Washington, DC   20001
        (202)727-6295

    d.  DC Fire and EMS Department
        The Frank D. Reeves Center
        2000 14th St., NW Suite 500
        Washington, DC 20009
        (202) 673-3320

    e.  District of Columbia Police and Firefighters' Retirement and Relief Board
        441 4th Street, NW Suite 330S
        Washington, D.C.   20001
        (202)442-9700

    f.  District of Columbia Police and Fire Clinic
        PFC Associates
        920 Varnum Street, NE
        Washington, D.C.   20017
        (202)269-7400

    g.  Andrea G. Comantale
        Acting Chairperson
        District of Columbia Police and Firefighters' Retirement and Relief Board
        441 4th Street, NW Suite 330S
        Washington, D.C.  20001
        (202)442-9700



ATTACHMENT J3

h.   Lois Hochhauser
     Chairperson
     District of Columbia Police and Firefighters' Retirement and Relief Board
     441 4th Street, NW Suite 330S
     Washington, D.C.   20001
     (202)442-9700

i.   Gregory Dean
     Fire and EMS Chief
     DC Fire and EMS Department
     The Frank D. Reeves Center
     2000 14th St., NW Suite 500
     Washington, DC 20009
     (202) 673-3320

j.   Kenneth B. Ellerbe
     Former Fire and EMS Chief
     DC Fire and EMS Department
     The Frank D. Reeves Center
     2000 14th St., NW Suite 500
     Washington, DC 20009
     (202) 673-3320

k.   The General Counsel for the DC Fire and EMS
     DC Fire and EMS Department
     The Frank D. Reeves Center
     2000 14th St., NW Suite 500
     Washington, DC 20009
     (202) 673-3320

l.   Larry B. Jackson
     Assistant Fire Chief of Services
     DC Fire and EMS Department
     The Frank D. Reeves Center
     2000 14th St., NW Suite 500
     Washington, DC 20009
     (202) 673-3320

m.   BFC Raymond Gretz
     Medical Services Officer
     DC Fire and EMS Department
     c/o DC Police and Fire Clinic
     920 Varnum St., NE
     Washington, DC 20017
     (202)269-7400

ATTACHMENT J4

n.  BFC Michael S. Donlon
    Medical Services Officer
    DC Fire and EMS Department
    c/o DC Police and Fire Clinic
    920 Varnum St., NE
    Washington, DC 20017
    (202)269-7400

o.  Josh Henline, Esq.
    Former EEOC and Diversity Manager
    DC Fire and EMS Department
    The Frank D. Reeves Center
    2000 14th St., NW Suite 500
    Washington, DC 20009
    (202) 673-3320

p.  Gitana Stewart-Ponder
    EEOC and Diversity Manager
    DC Fire and EMS Department
    The Frank D. Reeves Center
    2000 14th St., NW Suite 500
    Washington, DC 20009
    (202) 673-3320

q.  Dr. Olusola Maloma
    Medical Director
    DC Police and Fire Clinic
    920 Varnum St., NE
    Washington, DC 20017
    (202)269-7400

r.  Dr. Raquel Gordon
    c/o DC Police and Fire Clinic
    920 Varnum St., NE
    Washington, DC 20017
    (202)269-7400

s.  Dr. Gloria Morote
    c/o DC Police and Fire Clinic
    920 Varnum St., NE
    Washington, DC 20017
    (202)269-7400

ATTACHMENT J5

t.  William B. Sarvis, Jr.
    Director of Privacy/ Medical Services
    DC Police and Fire Clinic
    920 Varnum St., NE
    Washington, DC 20017
    (202)269-7400

u.  Frieda L. Caldwell
    Assistant Privacy Officer
    DC Police and Fire Clinic
    920 Varnum St., NE
    Washington, DC 20017
    (202)269-7400

v.  Denise S. Gardner
    Human Resources Administrator
    Police & Firefighters' Retirement Relief Board
    Benefits and Retirement Administration
    D.C. Department of Human Resources
    441 4th St., NW Suite 340N
    Washington, D.C. 20001

w.  Lela Jones
    Human Resources Administrator
    Police & Firefighters' Retirement Relief Board
    Benefits and Retirement Administration
    D.C. Department of Human Resources
    441 4th St., NW Suite 340N
    Washington, D.C. 20001

**9. Your Complaint:**

This is an amendment of my continuing violations complaint, filed on March 26, 2015 and formalized with the DC Office of Human Rights and cross-filed with the DC EEOC on May 01, 2015, to include constitutional violations through the execution of The District of Columbia municipal policies and customs, as well as continuing violations, of retaliation, discrimination and harassment, culminating with Constructive Discharge/Termination, in the form of involuntary, forced disability retirement.

a.  **November 06, 2014:** Violation of Title VII of the Civil Rights Act of 1964; Violation of DC Human Rights Act; Violation of 42 U.S. Code 1981; Violation of 42 U.S. Code 1983; Violation of 42 U.S. Code 1985; Violation of 42 U.S. Code 1986; Sexual Harassment Hostile Work Environment; Violation of the Americans with Disabilities Act; Disability Hostile Work Environment; Retaliation ; Retaliation Hostile Work Environment; Disparate Treatment; Intentional and Negligent Infliction of Emotional Distress- I attended a forced disability retirement hearing before the DC

ATTACHMENT J6

Police and Firefighters' Relief and Retirement Board at the DC Office of Human Resources, as ordered, under the execution of The District of Columbia municipal policy and custom with the expressed intent to oppress and/or violate federal and constitutional rights.  The District of Columbia municipal policies and customs asserted and cited being:  DC- Official Code§ 5-633; DC- Official Code§ 5-634; DC- Official Code§ 5-709; and DC- Official Code§ 5-710.  The District of Columbia knew of or should have known of these violations as official notice has been rendered on three separate occasions: Misdemeanor Sexual Abuse in the resultant official police incident report case #13-074-198 on June 1-2, 2013 with subsequent written police reports of investigation of the Misdemeanor Sexual abuse. In addition to the assignment of victim services advocate and Grand Jury investigations, case # 1-1916-13; Notarized written correspondence of Notice to the Mayor of the District of Columbia, hand delivered and stamped by the Office of Risk Management on November 04, 2014; Notarized written correspondence of Notice to the Mayor of the District of Columbia, hand delivered and stamped by the Office of Risk Management on March 26, 2015.

b.  **December 18, 2014**: Violation of Title VII of the Civil Rights Act of 1964; Violation of DC Human Rights Act; Violation of 42 U.S. Code 1981; Violation of 42 U.S. Code 1983; Violation of 42 U.S. Code 1985; Violation of 42 U.S. Code 1986; Violation of District of Columbia Mental Health Act; Sexual Harassment Hostile Work Environment; Violation of the Americans with Disabilities Act; Disability Hostile Work Environment; Retaliation ; Retaliation Hostile Work Environment; Disparate Treatment; Intentional and Negligent Infliction of Emotional Distress- I received written orders at my home from the DC Police and Firefighters' Relief and Retirement Board at the DC Office of Human Resources, ordering me to have my private doctors provide the DC Police and Firefighters' Relief and Retirement Board and the DC Police and Fire Clinic with a detailed report of their medical opinions/ medical notes,  as well as treatment plans, as they relate to my diagnosis of PTSD, under the guise of clarifying the two previous written requests for accommodation. The District of Columbia knew of or should have known of these violations as official notice has been rendered on three separate occasions: Misdemeanor Sexual Abuse in the resultant official police incident report case #13-074-198 on June 1-2, 2013 with subsequent written police reports of investigation of the Misdemeanor Sexual abuse. In addition to the assignment of victim services advocate and Grand Jury investigations, case # 1-1916-13; Notarized written correspondence of Notice to the Mayor of the District of Columbia, hand delivered and stamped by the Office of Risk Management on November 04, 2014; Notarized written correspondence of Notice to the Mayor of the District of Columbia, hand delivered and stamped by the Office of Risk Management on March 26, 2015.

c.  **January 22-23, 2015**: Violation of Title VII of the Civil Rights Act of 1964; Violation of DC Human Rights Act; Violation of 42 U.S. Code 1981; Violation of 42 U.S. Code 1983; Violation of 42 U.S. Code 1985; Violation of 42 U.S. Code 1986; Violation of District of Columbia Mental Health Act; Sexual Harassment Hostile Work Environment; Violation of the Americans with Disabilities Act;

ATTACHMENT J7

Disability Hostile Work Environment; Retaliation ; Retaliation Hostile Work Environment; Disparate Treatment; Intentional and Negligent Infliction of Emotional Distress- I attended a continuation hearing for my forced disability retirement before the DC Police and Firefighters' Relief and Retirement Board at the DC Office of Human Resources, as ordered, under the execution of The District of Columbia municipal policy and custom with the expressed intent to oppress and/or violate federal and constitutional rights. I received written orders asserting The District of Columbia municipal policy and custom with the expressed intent to oppress and/or violate federal and constitutional rights. The District of Columbia municipal policies and customs asserted and cited being:  DC- Official Code§ 5-633; DC- Official Code§ 5-634; DC- Official Code§ 5-709; DC- Official Code§ 5-710; DC- Official Code§5-721; and DC- Official Code§5-722.  The District of Columbia knew of or should have known of these violations as official notice has been rendered on three separate occasions: Misdemeanor Sexual Abuse in the resultant official police incident report case #13-074-198 on June 1-2, 2013 with subsequent written police reports of investigation of the Misdemeanor Sexual abuse. In addition to the assignment of victim services advocate and Grand Jury investigations, case # 1-1916-13; Notarized written correspondence of Notice to the Mayor of the District of Columbia, hand delivered and stamped by the Office of Risk Management on November 04, 2014; Notarized written correspondence of Notice to the Mayor of the District of Columbia, hand delivered and stamped by the Office of Risk Management on March 26, 2015.

d. **February 12, 2015:**Violation of HIPAA Patient Privacy Rights; Violation of Due Process; Malicious Intent to Deter Due Process; Violation of Title VII of the Civil Rights Act of 1964; Violation of DC Human Rights Act; Violation of 42 U.S. Code 1981; Violation of 42 U.S. Code 1983; Violation of 42 U.S. Code 1985; Violation of 42 U.S. Code 1986; Violation of District of Columbia Mental Health Act; Sexual Harassment Hostile Work Environment; Violation of the Americans with Disabilities Act; Disability Hostile Work Environment; Retaliation ; Retaliation Hostile Work Environment; Disparate Treatment; Intentional and Negligent Infliction of Emotional Distress-  I attended a second continuation hearing for my forced disability retirement, before the DC Police and Firefighters' Relief and Retirement Board at the DC Office of Human Resources, as ordered, under the execution of The District of Columbia municipal policy and custom with the expressed intent to oppress and/or violate federal and constitutional rights. The District of Columbia municipal policies and customs asserted and cited being:  DC- Official Code§ 5-633; DC- Official Code§ 5-634; DC- Official Code§ 5-709; DC- Official Code§ 5-710; DC- Official Code§5-721; and DC- Official Code§5-722.  The District of Columbia knew of or should have known of these violations as official notice has been rendered on three separate occasions: Misdemeanor Sexual Abuse in the resultant official police incident report case #13-074-198 on June 1-2, 2013 with subsequent written police reports of investigation of the Misdemeanor Sexual abuse. In addition to the assignment of victim services advocate and Grand Jury investigations, case # 1-1916-13; Notarized written correspondence of Notice to the Mayor of the District of Columbia, hand delivered and stamped by the Office of Risk Management on November 04, 2014; Notarized written correspondence of Notice to the Mayor of the District of Columbia, hand delivered and stamped by the Office of Risk Management on March 26, 2015.



ATTACHMENT J8

e. **March 26, 2015:** <u>Retaliation; Retaliation Hostile Work Environment; Violation of Due Process; Malicious Intent to Deter Due Process; Professional Negligence</u>- I submitted a second written request to Denise S. Gardner and Lela Jones administrators for the DC Police and Firefighters' Relief and Retirement Board at the DC Office of Human Resources, as well as the DC Police and Firefighters' Relief and Retirement Board inquiring about the status and receipt of the Board's final decision, in addition to the copies of the transcripts of the last two hearings and written directives for my appeal to the Board and the DC Court of Appeals. As of this date June 01, 2015, I have not received copies of the transcripts of the last two hearings.

f. **April 08, 2015:** <u>Violation of 42 U.S. Code 1981; Violation of 42 U.S. Code 1983; Violation of 42 U.S. Code 1985; Violation of 42 U.S. Code 1986; Violation of Due Process; Malicious Intent to Deter Due Process; Professional Negligence; Violation of Title VII of the Civil Rights Act of 1964; Violation of DC Human Rights Act; Sexual Harassment Hostile Work Environment; Violation of the Americans with Disabilities Act; Disability Hostile Work Environment; Retaliation ; Retaliation Hostile Work Environment; Disparate Treament; Intentional and Negligent Infliction of Emotional Distress</u>- I received by certified mail to my home, a frivolous and vexatious Motion to Dismiss of my first continuing violations claim, under the Charge of Sexual Harassment Hostile Work Environment, to the DC Office of Human Rights from DC Fire and EMS through its State Actor, Gitana Stewart-Ponder Esq., DC Fire and EMS EEOC & Diversity Manager.

g. **April 13, 2015:** <u>Retaliation; Retaliation Hostile Work Environment; Violation of Due Process; Malicious Intent to Deter Due Process; Professional Negligence</u>-I submitted a third written request to Denise S. Gardner and Lela Jones administrators for the DC Police and Firefighters' Relief and Retirement Board at the DC Office of Human Resources, as well as the DC Police and Firefighters' Relief and Retirement Board inquiring about the status and receipt of the Board's final decision, in addition to the copies of the transcripts of the last two hearings and written directives for my appeal to the Board and the DC Court of Appeals. As of this date June 01, 2015, I have not received copies of the transcripts of the last two hearings.

h. **May 02, 2015:** <u>Constructive Dismissal/Termination; Violation of Title VII of the Civil Rights Act of 1964; Violation of DC Human Rights Act; Violation of 42 U.S. Code 1981; Violation of 42 U.S. Code 1983; Violation of 42 U.S. Code 1985; Violation of 42 U.S. Code 1986; Sexual Harassment Hostile Work Environment; Violation of the Americans with Disabilities Act; Disability Hostile Work Environment; Retaliation ; Retaliation Hostile Work Environment; Disparate Treament; Intentional and Negligent Infliction of Emotional Distress; Defamation of Character; Malignant Misrepresentation of Character; Adverse Treatment/Impact; -</u> I received a written order from the DC Police and Firefighters' Relief and Retirement Board, as presided by Andrea G. Comantale Esq., Acting Chairperson, at the DC Office of Human Resources, outlining its final decision, forcing disability retirement, Effective May 15, 2015, under the execution of The District of Columbia municipal policy and custom with the expressed intent to oppress and/or violate federal and constitutional rights. The District of Columbia municipal policies and customs

ATTACHMENT J9

asserted and cited being:  District of Columbia Omnibus Public Safety Agency Reform Amendment Act of 2004; DC Law 15- 194; DC- Official Code§ 5-701; DC- Official Code§ 5-709; DC- Official Code§ 5-710; and DC- Official Code§5-721(a).

Signature of Complainant: Nicole R. McCrea

District of Columbia

The foregoing instrument was acknowledged before me this 29 day of June , 2015

by Nicole R. Meerea

APRYL C. GATES, Notary Public
My Commission Expires May 31, 2020



ATTACHMENT  J10